# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**SMALL JUSTICE LLC**
> Plaintiff(s)

v.                                   CIVIL ACTION NO.**13-11701-DJC**

**XCENTRIC VENTURES LLC**
> Defendant(s)

### JUDGMENT IN A CIVIL CASE

CASPER, D.J.

☐    **Jury Verdict.** This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

X    **Decision by the Court**.  In accordance with the Memorandum and Order dated March 27, 2015 granting defendants's motion for summary judgment;

**IT IS  ORDERED AND ADJUDGED**

Judgment for defendant Xcentric Ventures LLC

Robert M. Farrell, Clerk

Dated:    March 27, 2015               __/s/ Lisa M. Hourihan_____
                                        ( By )  Deputy Clerk

NOTE:  The post judgment interest rate effective this date is _____%.

(judgciv.frm - 10/96)                                    [jgm.]

Add. 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SMALL JUSTICE LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-11701 |
| | ) | |
| XCENTRIC VENTURES LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                    **March 24, 2014**

## I.    Introduction

Plaintiffs Small Justice LLC ("Small Justice"), Richard A. Goren ("Goren") and
Christian Dupont d/b/a Arabianights-Boston Massachusetts ("Dupont") (collectively, the
"Plaintiffs") bring this action against Xcentric Ventures LLC ("Xcentric" or the "Defendant")
arising from two posts made by Dupont on XCentric's website.  Xcentric has moved to dismiss
Counts III (libel), IV (intentional interference with prospective contractual relations) and V
(violations of Mass. Gen. L. c. 93A) of the First Amended Complaint ("Am. Compl.") pursuant
to Fed. R. Civ. P. 12(b)(6).  Xcentric also seeks dismissal without prejudice of Count I
(declaratory judgment as to ownership of copyright) and Count II (copyright infringement) for
lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  The Plaintiffs have now
moved pursuant to Fed. R. Civ. P. 12(c) for partial Judgment on the Pleadings on two of
Xcentric's affirmative defenses:  copyright ownership and immunity.  For the reasons stated

1

Add. 2

below, (1) the Defendant's motion to dismiss, D. 14, is DENIED as to the copyright claims, but is ALLOWED as to the libel and interference claims and is ALLOWED in part and DENIED in part as to the c. 93A claim; and (4) the Plaintiffs' motion for judgment on the pleadings, D. 20, is DENIED.

## II.    Factual Allegations and Procedural History

Unless otherwise noted, this summary is based upon the factual allegations in the Amended Complaint. Xcentric, an Arizona company, operates a website called the Ripoff Report which invites registered users to post complaints, called "reports," about companies or individuals. Am. Compl. ¶¶ 7, 8. On January 31, 2012, Dupont posted an allegedly defamatory report about Goren's conduct as an attorney and misconduct outside of his professional activities. Id. ¶¶ 11, 12. On February 2, 2012, Dupont posted a second report echoing these allegations. Id. ¶ 16, 17. On March 7, 2012, Xcentric obtained a registration of copyright from the United States Copyright Office entitled "Group Registration for an automated database titled Ripoff Reports from January 1, 2012 to March 7, 2012 . . . ." Gringras Aff. Exh. B, D. 15-2.

In November 2012, Goren sued Dupont for libel and interference with advantageous relations in Suffolk Superior Court. Am. Compl. ¶ 40. On February 28, 2013, the Superior Court entered a default based upon Dupont's failure to appear. Goren Second Aff. Exh. A-2, D. 29-2. On March 20, 2013, the Superior Court entered a judgment permanently enjoining Dupont from publishing or republishing any of the January 2012 Report. Goren Second Aff. Exh. A-3, D. 29-3 at 2. Upon Goren's motion, on May 8, 2013, the Superior Court amended its judgment to transfer ownership of the copyright of the January 2012 Report from Dupont to Goren. Goren Second Aff. Exh. A-4, D. 29-4 at 2. That order also appointed Goren as attorney-in-fact for Dupont, with the power to execute any assignment of the copyright in the January 2012 Report. Id. at 3.

2

Add. 3

On May 14, 2013, Goren served the Superior Court judgment on Xcentric and demanded that Xcentric remove the January 2012 Report from the Ripoff Report website, repeating his demand on June 25, 2013. Am. Compl. ¶¶ 49, 50. On June 27, 2013, Xcentric replied to Goren's demand, asserting immunity to defamation claims as an internet service provider under the Communications Decency Act, 47 U.S.C. § 230. Id. ¶ 51.

The Superior Court, at Goren's subsequent request, amended its judgment again, this time to encompass Dupont's February 2012 Report. Am. Compl. ¶ 53. On August 16, 2013, the Superior Court also ordered that "all rights in and to ownership of the copyright" by Dupont in the Reports "are hereby transferred to . . . Goren, meaning and intending to convey, transfer and assign . . . full and exclusive ownership of copyright in and to each work so as to qualify as a transfer of ownership under . . . 17 U.S.C. §204." Am. Compl. Exh. C, D. 13-3 at 3. Shortly thereafter, Goren served Xcentric with the Superior Court's August 16, 2013 Order and demanded that Xcentric remove the February 2012 Report from its website. Am. Compl. ¶ 54. On the same day, Goren, acting as attorney-in-fact for Dupont, executed a conveyance of the copyrights in the Reports from Dupont to himself. Goren Aff. Exh. 1, D. 20-1. He subsequently assigned his copyright ownership to Small Justice. Id.

On July 16, 2013, Goren and Small Justice initiated this lawsuit, suing Xcentric for copyright infringement. D. 1. Goren and Small Justice then amended their Complaint, adding Dupont as a plaintiff and stating five causes of action: declaratory judgment as to ownership of the copyrights in the Reports (Count I); copyright infringement (Count II); libel (Count III); intentional interference with prospective contractual relations (Count IV); and violations of Mass. Gen. L. c. 93A (Count V). D. 13. Xcentric has now moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P 12(b)(1) and (6), D. 14, and the Plaintiffs have moved for

judgment on the pleadings pursuant Fed. R. Civ. P. 12(c).  D. 20.  After a hearing on both

motions, the Court took the matter under advisement.  D. 34.

## III.    Xcentric's Motion to Dismiss Copyright Claims

### A.    <u>Standard of Review</u>

Xcentric moves to dismiss Counts I and II, pertaining to copyright infringement, for lack

of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  For the Plaintiffs to establish

copyright infringement, they must show "(1) ownership of a valid copyright, and (2) copying of

constituent elements of the work that are original."  <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,</u>

499 U.S. 340, 361 (1991); <u>Motta v. Samuel Weiser, Inc.,</u> 768 F.2d 481, 483 (1st Cir.), cert.

denied, 474 U.S. 1033 (1985).  Pursuant to 17 U.S.C. § 501(b), only "the legal or beneficial

owner of an exclusive right under copyright is entitled . . . to institute an action for any

infringement of that particular right committed while he or she is the owner of it."  Thus, only

the author of a copyrighted work or one who establishes ownership through a valid chain of title

has standing to sue for copyright infringement.  <u>Motta</u>, 768 F.2d at 484.  "Absent this showing, a

plaintiff does not have standing to bring an action under the Copyright Act."  <u>Id.</u>  If the Plaintiffs

lack standing, this Court also lacks subject matter jurisdiction.  <u>See United States v. Union Bank</u>

<u>for Sav. & Inv.,</u> 487 F.3d 8, 22 (1st Cir. 2007).

When considering a 12(b)(1) motion on the "sufficiency" of the "jurisdictionally-

significant facts," the Court "must credit the plaintiff's well-pled factual allegations  (usually

taken from the complaint, but sometimes augmented by an explanatory affidavit or other

repository of uncontested facts), draw[ing] all reasonable inferences from them in [plaintiff's]

favor."  <u>Valentin v. Hosp. Bella Vista</u>, 254 F.3d 358, 363 (1st Cir. 2001).  If the Defendants are

instead are challenging "the accuracy (rather than the sufficiency) of the jurisdictional facts

asserted by the plaintiff," then "plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Id.; see id. at 263 n. 3 (noting that "there is an exception to this praxis for cases in which the jurisdictional facts, though genuinely disputed, are inextricably intertwined with the merits of the case. In that event, the court may defer resolution of the jurisdictional issue until the time of trial").

### B.    Copyright Conveyance from Dupont to Xcentric

The Plaintiffs allege that Small Justice, as the assignee of Goren, owns the copyrights in the Reports and therefore Xcentric's continued display of the Reports constitutes copyright infringement. Am. Compl. ¶¶ 64-70. Goren purportedly acquired the copyrights as a result of the Superior Court orders transferring ownership from Dupont and the assignments made by him, as attorney in fact for Dupont, to himself. Am. Compl. ¶¶ 53, 55; Am. Compl. Exh. C, D. 13-3; Goren Aff. Exh. 1, D. 20-1. Xcentric contends that it holds a valid Certificate of Registration obtained from the United States Copyright Office establishing that it has exclusive rights to the Reports. Def. Mem., D. 14 at 13; Gingras Aff. Exh. B., D. 15-2. Xcentric argues that, because its ownership interest was registered before Goren allegedly acquired his conflicting transfer, Xcentric's interest prevails. Def. Mem., D. 14 at 15. For the reasons stated below, both parties' motions, as they pertain to the copyright claims, are denied.

Before Xcentric posted Dupont's Reports, Dupont had to complete a multi-step process. Am Compl. ¶ 9, 10. On the last screen prior to submission, Dupont was presented with a box with a scroll bar running down its side, entitled "Terms and Conditions." Id. Beneath the "Terms and Conditions" header was a subheading stating "1. Ripoff Report Membership Terms

5

& Conditions." Am. Compl. Exh. A and B, D. 13-1 and 13-2. A portion of the information

contained beneath this subheading was visible on the screen, but no additional terms were visible

to a user unless the user scrolled through them. One of the terms not visible on the screen was

paragraph 6 entitled "Proprietary Rights/Grant of Exclusive Rights." Id. That section read:

> By posting information or content to any public area of www.RipoffReport.com,
> you automatically grant, and you represent and warrant that you have the right to
> grant, to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive
> license to use, copy, perform, display and distribute such information and content
> and to prepare derivative works of, or incorporate into other works, such
> information and content, and to grant and authorize sublicenses of the foregoing.

Am. Compl. Exh. B., D. 13-2 at 2; Gingras Aff. ¶ 6.

Beneath the scrollable Terms and Conditions (the "TAC") was a check box which

Dupont had to check before his Reports were posted. Am. Compl. ¶ 10. The text next to the

check box stated: "By posting this report, I attest this report/rebuttal is valid. I am giving Rip-

off Report irrevocable rights to post it on the website. I acknowledge that once I post my report,

it will not be removed, even at my request. . . ." Id. ¶ 10; Am. Compl. Exh. A, D. 13-1.

XCentric points out that users who do not agree to these terms are prohibited from posting any

content on its website. Gingras Aff. ¶ 6. There was no explicit requirement that users read

Xcentric's TAC nor were users required to electronically check a box indicating that they had

done so. Am. Compl. ¶ 10; Am. Compl. Exh. A and B, D. 13-1 and 13-2. Without that express

assent, Plaintiffs argue, Dupont retained copyrights in the Reports. Pl. Mem., D. 21 at 16.

Whether paragraph 6 of the TAC, along with the language next to the check box, was

sufficient to transfer the copyrights in the Reports from Dupont to Xcentric depends on whether

it was reasonable to expect that Dupont would have understood he was conveying those rights to

Xcentric.[1]  Specht v. Netscape Comm'ns Corp., 306 F.3d 17, 31 (2d Cir. 2002) (opinion by

Sotomayor, J.) (applying test of whether "a reasonably prudent offeree in these circumstances

would have known of the existence of license terms"); see Craigslist Inc. v. 3Taps Inc., 942 F.

Supp. 2d 962, 973 (N.D. Cal. 2013) ("it is reasonable to infer that a Craigslist user would

understand that this 'confirmation' effected a transfer of rights" where users were confronted

with notice that clicking "continue" confirmed Craigslist as the "exclusive licensee of this

content").  Copyright transfer requires only a simple writing signed by the copyright owner.  17

U.S.C. § 204(a).  A transfer of copyright ownership is not valid unless in writing and signed by

the owner of the rights conveyed, but "[n]o magic words must be included in the document"

which "doesn't have to be the Magna Carta; a one-line pro forma statement will do."[2]  3Taps,

942 F. Supp. 2d at 973 (quoting Radio Television Espanola S.A. v. New World Entm't, Ltd., 183

F.3d 922, 927 (9th Cir. 1999)).

    In Specht, the plaintiffs downloaded Netscape's Communicator software from Netscape's

website.  Id. at 21.  Before doing so, scrollable text of the license agreement was displayed to the

plaintiffs, and they could not complete installation until they had clicked on a "yes" button to

indicate their assent to the license terms, including a binding arbitration clause.  Id. at 22.  The

Second Circuit held that the arbitration clause was not enforceable, however, because it was not

---

    [1] The grant of an exclusive license is tantamount to the transfer of copyright ownership.
17 U.S.C. § 101 (defining "transfer of copyright ownership" to include an "exclusive license").

    [2] The E-Sign Act, 15 U.S.C. § 7001, recognizes that the click of a button online can
replace an actual signature.  "Notwithstanding any statute, regulation or other rule of law . . .,
with respect to any transaction in or affecting interstate or foreign commerce -- (1) a signature,
contract or other record relating to such transaction may not be denied legal effect, validity or
enforceability solely because it is in electronic form; and (2) a contract relating to such
transaction may not be denied legal effect, validity or enforceability solely because an electronic
signature or electronic record was used in its formation."  Id. at § 7001(a).

reasonable to hold users to the terms of another computer program the plaintiffs downloaded in connection with, and prior to, Communicator. Id. at 30. That program, called SmartDownload, had no such evident license terms. Id. at 23. SmartDownload's license terms were visible only if the plaintiffs scrolled down past the "Download" button that initiated installation of the SmartDownload software. Id. Additionally, even if a user had scrolled down, he or she would have had to click on an invitation to review the terms, then on another link to the full text of the license agreement. Id. at 23-24.

The Plaintiffs seek to invoke federal jurisdiction, and, in the face of a Rule 12(b)(1) challenge, they bear the burden of establishing standing. Conservation Law Found., Inc. v. United States Envtl. Prot. Agency, No. 10-11455, 2013 WL 2581218, at * 5 (D. Mass. Aug. 29, 2013); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995); Cummings v. Pearson Educ., Inc., No. Civ. A. 03-12183, 2004 WL 2830702, at * 1 (D. Mass. Dec. 6, 2004).

However, whether the Court considers XCentric's Rule 12(b)(1) motion to be challenging the sufficiency or the adequacy of the Plaintiffs' jurisdictional averments, the Court cannot resolve the issue of the ownership of the copyrights on the present record. Although the process by which users posted to the Ripoff Report appears to be similar to the Communicator software context in Specht, the Court cannot say, on this record now before it, what a reasonably prudent offeree in Dupont's position would have concluded about license. See Valentin, 254 F.3d 363 n. 3 (noting that the court may defer resolution of the jurisdictional issue where facts bearing upon that issue are "genuinely disputed, [but] are inextricably intertwined with the merits of the case"). Accordingly, the Court DENIES Defendant's motion to dismiss Claims I and II without

prejudice and DENIES the Plaintiffs' motion for Judgment on the Pleadings as it relates to Xcentric's affirmative defense of copyright ownership.[3]

## IV.  Xcentric's Motion to Dismiss Claims for Libel and Intentional Interference with Prospective Contractual Relations

### A.  <u>Standard of Review</u>

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 1997).[4]  The plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  The Court will dismiss for failure to state a claim if the pleadings lack "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable theory." <u>Berner v. Delahunty</u>, 129 F.3d 20, 25 (1st Cir. 1997), cert. denied, 523 U.S. 1023 (1998) (quoting <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir. 1988)).  The Plaintiffs' complaint must contain sufficient facts that, accepted as true, would allow this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  Aside from the facts set forth in the complaint, exhibits attached to the complaint are properly considered part of the pleading for purpose of  Rule

---

[3] In light of this ruling, the Court need not reach the Plaintiffs' argument that Xcentric's copyright registration of a compilation was insufficient to register the component works as well because the registration omitted the names of the individual authors. D. 28 at 8. For the same reason, the Court also does not need to reach whether the Orders of the Superior Court and the subsequent assignments among the Plaintiffs are valid and enforceable transfers of the copyrights in the Reports. Am. Compl. ¶¶ 53-56.

[4] The Court may also consider documents the authenticity of which is undisputed, documents central to the Plaintiffs' claims and documents referred to in the Amended Complaint. <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).

12(b)(6).  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir.), cert. denied, 555 U.S. 995 (2008).  In addition, "when a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."  Id. (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (internal quotation marks omitted).

### B.      Applicability of the Communications Decency Act, 47 U.S.C. § 230

The Plaintiffs allege that Xcentric's online publication of Dupont's defamatory posts constitutes libel.  Am. Compl. ¶ 72.  Cognizant of Xcentric's contention that it is immune to defamation claims by virtue of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230, the Plaintiffs contend that the such statutory immunity is not available to Xcentric because of Xcentric's asserted ownership of the copyrights in the Reports.  Id.  The Plaintiffs also aver that Xcentric has "intentionally caused these two defamatory *per se* publications to be prominently and frequently featured on Google[] and other search engines . . . ."  Am. Compl. ¶ 73. Specifically, according to the Plaintiffs, Xcentric has caused the Reports "to be indexed by Google and other search engines so as to maximize the number of hits or page views by search engine users" through the use of "generally accepted internet industry-standard protocols, including without limitation its uses of robots meta tag and so-called serving directives."  Id. ¶ 37.  For the reasons stated below, this Court concludes that CDA immunity applies and shields Xcentric from all claims based on the Reports.

### 1.      CDA Immunity and Copyright Ownership

Section 230 of the CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another

information content provider." 47 U.S.C. § 230(c)(1). To avail itself of such immunity, the CDA imposes three requirements: (1) Xcentric must be a provider or user of an interactive computer service (also called an "interactive service provider" or an "ISP"); (2) the Plaintiffs' claim is based on information provided by another information content provider; and (3) the claim would treat Xcentric as the publisher or speaker of that information. <u>Universal Comm'n Sys. v. Lycos</u>, 478 F.3d 413, 418 (1st Cir. 2007).

The First Circuit has interpreted the CDA's immunity broadly in light of the policy concerns Congress sought to address with the statute. <u>Id.</u> at 419 (stating that, like other courts, "we too find that Section 230 immunity should be broadly construed"). Specifically, the CDA implements Congress's "policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." <u>Id.</u> at 418, quoting <u>Zeran v. Am. Online, Inc.</u>, 129 F.3d 327, 330-331 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998) (alterations in original). The First Circuit credited Congress's concerns that intermediary tort liability would have a chilling effect upon online speech, that the burden of separating lawful from unlawful speech was too great, and that the actions of intermediaries who choose to actively screen content should be shielded from liability. <u>Id.</u> at 418-19.

The issue before this Court is whether the second requirement imposed by the CDA – that the information is provided by "another information content provider" – is met. Section 230 defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). For CDA immunity to apply, the postings "that form[] the basis for the state law claim[s] [must have] been provided by '*another*

11

information content provider.'" <u>Lycos</u>, 478 F.3d at 419 (emphasis in original).  Importantly, "an interactive computer service provider remains liable for its own speech." <u>Id.</u>  The Plaintiffs contend that Xcentric's asserted copyright ownership in the Reports transforms it from an intermediary to the provider of the disputed content. Am. Compl., ¶¶ 72-74, 78; Pl. Mem., D. 21 at 3-4, 25-28.  In other words, according to the Plaintiffs, Xcentric adopted the Reports as its own speech, subjecting it to liability, because it holds itself out as the copyright owner. <u>Id.</u>

This Court rejects the argument that an ISP becomes an information content provider when, assuming *arguendo*, it receives an exclusive license to the content posted by a third party. The Plaintiffs cite no authority that has held that an ISP adopts content by virtue of its copyright ownership.  Courts that have addressed the adoption issue have held that an ISP is not a content provider unless it specifically encourages the development of the offensive content.  <u>Fed. Trade Comm'n v. Accusearch Inc.</u>, 570 F.3d 1187, 1201 (10th Cir. 2009) (holding immunity unavailable where defendant paid researchers to acquire confidential content); <u>Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC</u>, 521 F.3d 1157, 1165-66 (9th Cir. 2008) (withholding CDA immunity where website induced users to create illegal housing preferences based on protected characteristics by requiring answers to its own questionnaire); <u>Jones v. Dirty World Ent. Recordings, LLC</u>, 840 F. Supp. 2d 1008, 1011-12 (E.D. Ky. 2012) (deeming website a content provider where it specifically encouraged defamatory content by, *inter alia*, adding its own comments to postings); <u>see</u> <u>Parisi v. Sinclair</u>, 774 F. Supp. 2d 310, 316 (D.C. 2011) (declining to withhold CDA immunity because bookseller merely reposted defamatory promotional statements and stating that "it would be contrary to the purpose of the CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet by establishing immunity for internet publication of third-party content[,] to require a fact-based

analysis of if and when a defendant adopted particular statements and revoke immunity on that

basis") (internal citation and quotation marks omitted).   Here, Xcentric's acquisition of an

exclusive license to the content (if the record ultimately shows that it did acquire such a license)

is an insufficient level of involvement in the development of the content to nullify CDA

immunity.

> 2.    *CDA Immunity and Alleged Re-publication on Search Engines*

The Plaintiffs further attempt to circumvent the CDA by arguing that Xcentric surrenders

its immunity by "instruct[ing] search engines to make copies of the two works under color of

Xcentric's claimed exclusive ownership of the works and also authoriz[ing] Google and the other

search engines to display those cached copies."[5]  D. 28 at 11.  The Plaintiffs acknowledge that

"Xcentric's instructions to the search engines are designed to maximize the number of times each

of the two works is listed on Google's index so as to maximize the number of hits or page views

by search engine users."  Pl. Mem., D. 21 at 8.  The Plaintiffs aver that by instructing Google to

use, or at least by not precluding Google from using, its automated program to acquire cached

copies of the Reports, Xcentric adopts the content of the Reports as its own and causes it to be

republished on Google's website.  D. 21 at 7-9.

As discussed above, the CDA grants immunity to ISPs that passively display content

created by third parties, but ISPs are subject to liability for content created by them.  See Lycos,

478 F.3d at 419.  This Court concludes that the alleged conduct does not rise to the level of the

---

[5] The Plaintiffs cite Field v. Google, Inc., 412 F. Supp. 2d 1106 (D. Nev. 2006), to explain the technology by which Google acquires cached copies of the Reports.  Google uses an automated program to "crawl across the Internet" and to locate, analyze and catalog web pages, thereby making them searchable to a user of the Google search engine.  Id. at 1110.  "As part of this process, Google . . . stores the HTML code from those pages in a temporary repository called a cache.  Once Google indexes and stores a [w]eb page in the cache, it can include that page . . . in the search results it displays to users in response to their queries."  Id. at 1110-11.

"creation or development of information" that would render Xcentric an "information content provider" under the CDA. 47 U.S.C. § 230(f)(3). The Plaintiffs do not allege that Xcentric augments or changes the content of the Reports in any way before they are cached on Google's servers. See Roommates, 521 F.3d at 1174-75 (stating that CDA immunity is lost only where "it is very clear that the website directly participates in developing the alleged illegality" and noting that tacit assent to the conduct of third parties is not sufficient to strip immunity). The Plaintiffs also appear to concede that Xcentric's alleged actions are undertaken with the goal of maximizing the number of times the Ripoff Report appears among Google's search results. However, merely endeavoring to increase the prominence of Xcentric's site among Google's search results does not make Xcentric an information content provider under the CDA. See Asia Econ. Inst. v. Xcentric Ventures LLC, No. CV-10-01369 SVW PJWX, 2011 WL 2469822 at *6 (C.D. Cal. May 4, 2011) (holding that CDA immunity applied where defendant added indexing tags to increase the prominence of its web pages in internet searches because "[i]ncreasing the visibility of a statement is not tantamount to altering its message").

Because immunity under the CDA shields Xcentric from claims based on its publication of the Reports, the Plaintiffs' claims for libel and tortious interference are barred. Therefore Xcentric's motion to dismiss Claims III and IV is ALLOWED and the Plaintiffs' motion for judgment on the pleadings as it relates to Xcentric's assertion of CDA immunity is DENIED.

### V.    XCentric's Motion to Dismiss the Chapter 93A Claim

Mass. Gen. L. c. 93A § 11 provides a private cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice

declared unlawful by section two . . . ."  The referenced section two broadly proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Id. § 2(a).

The Plaintiffs' allegations that Xcentric violated c. 93A boil down to three claims:  (1) that Xcentric's continued display of the Reports, coupled with its asserted copyright ownership in the Reports, constitute unfair and deceptive business practices, Am. Compl. ¶ 85; (2) that Xcentric's assertions of CDA immunity prior to the commencement of this suit, both in its e-mail communications with Goren and in its refusal to comply with the Superior Court injunction, were unfair and deceptive, Am. Compl. ¶¶ 49-51, 86; Gingras Aff. Exh. B., D. 15-7; and (3) that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based Corporate Advisory Program ("CAP") and VIP Arbitration program is oppressive and unethical.  Pl. Mem., D. 21 at 22; Am. Compl. ¶¶ 33-35.  According to the Amended Complaint, Xcentric directs advertisements to injured parties offering to help them achieve positive search engine listings when they pay to become members of the CAP.  Am. Compl. ¶ 34.  The VIP Arbitration program invites victims of defamatory reports to pay to submit the matter to Xcentric's arbitration process.  Id. ¶ 35.  Though Xcentric will not remove the offending reports as a result of such process, redaction of falsehoods appears to be a possible outcome.  Id.  For the reasons stated below, this Court dismisses the first two bases of the Plaintiffs' c. 93A claim, but finds the remaining portion of the c. 93A claim is sufficiently pled.

As to Xcentric's continued display of the Reports, its refusal to strike the Reports from the Ripoff Report website was within its discretion as an ISP under the CDA.  See Lycos, 478 F.3d at 422 (where the "cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service provider's decisions

with respect to that posting, but also for its inherent decisions on how to treat postings generally"). The Plaintiffs cannot attempt an end run around the CDA through the use of c. 93A. See Dulgarian v. Stone, 420 Mass. 843, 852 (1995) (holding that "where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under G.L. c.93A"). The Plaintiffs' suggestion that Xcentric's copyrights in the Reports changes this result is without merit. As discussed above, CDA immunity still protects ISPs who obtain exclusive licenses to the material posted on their sites.

Similarly, this Court holds that the Plaintiffs have failed to plead sufficiently a c. 93A violation predicated on Xcentric's invocation of CDA immunity. The Plaintiffs insist that they "do not assail Xcentric for taking an aggressive litigation position" but that Xcentric violated c. 93A through its "knowingly false and/or deceptive representation that it was not the party responsible for publishing the libel." Pl. Mem., D. 21 at 23. For a c. 93A claim to proceed, litigation tactics must smack of bad faith. See Trenwick Am. Reins. Corp. v. IRC, Inc., 764 F. Supp. 2d, 274, 307 (D. Mass. 2011) ("While there may be debate concerning whether litigation tactics alone can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct"). Xcentric is merely the ISP here, not the information content provider, regardless of whether it holds the copyrights in the Reports. Its meritorious assertion of CDA immunity cannot form the basis for a c. 93A claim.

The Plaintiffs' final portion of the c. 93A claim, premised on Xcentric's CAP and VIP Arbitration services, may proceed. The Plaintiffs argue that it is unfair for Xcentric to refuse to take down the defamatory Reports while simultaneously advertising services by which Goren can pay Xcentric to restore his reputation. Pl. Mem., D. 21 at 22; Am. Compl. ¶¶ 33-35. A trade

practice or act violates c. 93A if "it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to competitors or other business people." Morrison v. Toys "R" Us, Inc., 441 Mass. 441, 457 (2004) (quoting Heller Fin. v. Ins. Co. of N. Am., 410 Mass. 400, 408 (1991)). This definition of prohibited conduct is very broad, and privity is not required by c. 93A "so long as the parties are engaged in more than a minor or insignificant business relationship." Standard Register, Co. v. Bolton-Emerson, Inc., 38 Mass. App. Ct. 545, 551 (1995). The First Circuit has observed that "[w]hat, specifically, constitutes a 'minor or insignificant business relationship' has not been fully fleshed out in the Massachusetts courts, but it has been described as requiring that 'there must be exist some commercial relationship between the parties or the plaintiffs must demonstrate the defendants' actions interfered with trade or commerce.'" In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 193 (1st Cir. 2009) (quoting Spencer v. Doyle, 50 Mass. App. Ct. 6, 12 (2000)). Here, the Plaintiffs have sufficiently alleged that Xcentric's acts are within the "penumbra" of "unfairness," or they are "immoral, unethical, oppressive or unscrupulous," or they interfered with trade or commerce.

Xcentric's motion to dismiss the Plaintiffs' c. 93A claim with respect to (1) Xcentric's continued display of the Reports; and (2) Xcentric's assertion of CDA immunity is ALLOWED and the remainder of Xcentric's motion with respect to the c. 93A claims is DENIED.

## VI.    Conclusion

For the foregoing reasons, Xcentric's Motion to Dismiss, D. 14, is ALLOWED in part and DENIED in part. The Plaintiffs' cross motion for partial Judgment on the Pleadings, D. 20, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT d/b/a ARABIAN NIGHTS-BOSTON, MASSACHUSETTS, <br><br> Plaintiffs, <br><br> v. <br><br> XCENTRIC VENTURES LLC, <br><br> Defendant. | Civil Action No. 13-cv-11701 |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                        **March 27, 2015**

## I.      Introduction

Plaintiffs Small Justice LLC ("Small Justice"), Richard A. Goren ("Goren") and
Christian DuPont d/b/a Arabiannights-Boston, Massachusetts ("DuPont") (collectively, the
"Plaintiffs") have filed this lawsuit against Defendant Xcentric Ventures LLC ("Xcentric")
seeking declaratory judgment as to the ownership of copyright and alleging copyright
infringement. D. 13. The Plaintiffs also allege that Xcentric violated Mass. Gen. L. c. 93A. Id.
Xcentric has moved for summary judgment. D. 55 at 1. For the reasons stated below, the Court
ALLOWS the motion.

## II.      Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material
fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific, admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

This factual recitation is drawn from the undisputed facts submitted by both parties, unless otherwise noted. Goren is a practicing attorney. D. 56 ¶ 1. Xcentric operates a website called the RipoffReport.com ("ROR"). Id. ¶ 4. ROR is an interactive website providing an online consumer advocacy forum allowing users to post free complaints, called "reports," about companies and individuals whom they feel have wronged them in some manner. D. 66 ¶ 5.

To post a report on the ROR website, a user must create a free account by providing his or her name, address, posting pseudonym, e-mail address and telephone number. D. 56 ¶ 6. After the user provides details regarding the company or individual at issue, D. 64-1 & 64-2, and writes his or her report, D. 64-3, the user encounters a screen that says "Submit your Report" and "File a Report," D. 64-5. Below those headings appears a box titled "Terms and Conditions" with a scroll bar running down the right side of the box. D. 64-5, D. 56 ¶ 7, D. 65 ¶¶ 14-16. One

2

of the terms, which is not visible unless a user employs the scroll bar, provides that "[b]y posting information or content to any public area of [the ROR], you automatically grant and you represent and warrant that you have the right to grant to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content . . . ." D. 56 ¶ 8;[1] D. 65 ¶ 33.  A check box appears beneath the box containing the terms and conditions.  D. 65 ¶ 17.  Next to the checkbox is text that provides, in relevant part: "By posting this report/rebuttal, I attest this report is valid.  I am giving Rip-Off Report irrevocable rights to post it on the website.  I acknowledge that once I post my report, it will not be removed, even at my request."  D. 64-5, D. 65 ¶ 17.  To post a report, a user must check the box and click on a "continue" button.  D. 65 ¶ 19.  Finally, at the bottom of the screen are several links, including one called "Terms of Service."  D. 64-5, D. 65 ¶ 17.

In January 2012, DuPont posted a report alleging that Goren engaged in improper conduct in his professional and personal life.  D. 56 ¶ 11, D. 65 ¶¶ 42, 45.  In February 2012, DuPont made a similar report (collectively, the "Reports").  D. 56 ¶ 12, D. 65 ¶ 46.  In November 2012, Goren responded by filing an action against DuPont in Suffolk Superior Court for libel and intentional interference with prospective contractual relations.  D. 56 ¶ 13, D. 66 ¶ 13.  In February 2013, Goren notified DuPont that he intended to waive his claim for damages in favor of an injunction.  D. 56 ¶ 17, D. 66 ¶ 17.  In March 2013, Goren obtained a default judgment against DuPont.  D. 29-3, D. 56 ¶ 16, D. 66 ¶ 16.  Goren also obtained orders appointing himself attorney-in-fact for DuPont and purporting to transfer to him DuPont's copyright to the January 2012 report.  D. 56 ¶¶ 18, 20-21, D. 66 ¶ 20-21.  Thereafter, Goren executed an assignment of DuPont's copyright to himself, which he then assigned to Small

---

[1]Xcentric's quotation of this term omitted the word "perpetual."

Justice.  D. 13 ¶ 55, D. 56 ¶¶ 22.  In July 2013, Goren sought an amended judgment from the Suffolk Superior Court to include the February 2012 report.  D. 56 ¶ 25, D. 66 ¶ 25.  In August 2013, the Suffolk Superior Court amended the default judgment and purported to transfer to Goren "all rights in and to ownership of the copyright by [DuPont]" to both Reports.  D. 13-3. Goren was again appointed attorney-in-fact for DuPont, allowing Goren to execute an assignment of DuPont's copyrights to himself, and then to Small Justice.  D. 13 ¶ 55, D. 13-3, D. 56 ¶¶ 26-27.

Pertinent to the Plaintiff's Chapter 93A claim are two dispute resolution programs offered by Xcentric.  If a party contests the content of a report posted on the ROR, he may avail himself of two, fee-based programs administered by Xcentric -- an arbitration program and the Corporate Advocacy Program (the "CAP").  D. 56 ¶ 10; D. 65 ¶¶ 79-81.  The former program utilizes an arbitration panel to determine if a report contains false statements, which will then be redacted by Xcentric.  D. 56 ¶ 10.  The latter program requires participants to pledge to perform certain customer service activities and calls for Xcentric staff to monitor reports regarding the participant.  Id.  The CAP advertises that members' "search engine listings [will] change from a negative to a positive."  D. 65 ¶ 81.

## IV.    Procedural History

The Plaintiffs instituted this action on July 16, 2013.  D. 1.  They filed their first amended complaint on September 2, 2013.  D. 13.  Xcentric moved to dismiss on September 16, 2013, D. 14, which the Court allowed in part, D. 45.  The Court dismissed Count III (libel), Count IV (intentional interference with prospective contractual relations), and all bases but one for Count V (violation of Chapter 93A).  D. 45.  The parties proceeded with discovery regarding the remaining counts, which include Count I (declaratory judgment as to ownership of copyright),

Count II (copyright infringement), and Count V (violation of Chapter 93A by Xcentric's CAP and arbitration program).  Xcentric now moves for summary judgment.  D. 55.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 87.

## V.   Discussion

### A.   Ownership of the Copyrights to the Reports

The plaintiffs and Xcentric disagree as to whether a ROR user is bound by the terms and conditions contained in the box on the screen where the user submits his report.  D. 55 at 7-12, D. 64 at 10-13.  When the user accesses that screen, the only term visible in the box is an age restriction and some or all of Xcentric's address (the parties dispute how much of the address is visible).  D. 56-7 at 7, D. 64 at 3, D. 64-5.  Further terms are revealed only when the user employs the scroll bar running down the right side of the box.  Among those terms is a transfer of copyright ownership from the user to Xcentric:  "[b]y posting information or content to any public area of [the ROR], you automatically grant . . . to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content."[2]  D. 13-2 at 2.  Below the terms and conditions is a check box that the user must select before his post is accepted by the website.  D. 64 at 3, 6; D. 64-5.  By checking the box, the user agrees that he is "giving Rip-off Report irrevocable rights to post [the report] on the website."  D. 64-5.

Xcentric argues that DuPont agreed to the terms and conditions when he clicked the checkbox, and, therefore, it owns the copyright by virtue of the grant of an exclusive license.  D. 55 at 9.  The Plaintiffs, on the other hand, argue that Xcentric has failed to show that the contract

---

[2]17 U.S.C. § 101 provides that the conveyance of an exclusive license is a transfer of copyright ownership.  "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license."  17 U.S.C. § 101.

Add. 23

terms were "reasonably conspicuous" and that DuPont "unambiguously manifested his assent" to the terms. D. 64 at 12 (quoting <u>Ajemian v. Yahoo!, Inc.</u>, 83 Mass. App. 565, 574-75 (2013) (alterations omitted)).

There are two types of contracts formed online: "clickwrap" and "browsewrap" agreements. <u>Nguyen v. Barnes & Noble Inc.</u>, 763 F.3d 1171, 1175-76 (9th Cir. 2014). In a clickwrap agreement, users must select a check box or radio button to indicate that they agree to the website's terms and conditions. <u>Id.</u> In contrast, browsewrap agreements do "not require the user to manifest assent to the terms and conditions expressly. A party instead gives his assent simply by using the website." <u>Id.</u> at 1176 (quoting <u>Hines v. Overstock.com, Inc.</u>, 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009) (alterations omitted)). Clickwrap agreements are generally upheld because they require affirmative action on the part of the user. <u>Van Tassell v. United Mktg. Grp., LLC</u>, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011). "Because no affirmative action is required by a website user to agree to the terms of a [browsewrap] contract other than his or her use of the website, the determination of the validity of a browsewrap contract depends on whether the user has actual or constructive notice of a website's terms and conditions." <u>Id.</u> If there is no evidence of actual notice, then the website owner must show that it "put[] a reasonably prudent user on inquiry notice of the terms of the contract." <u>Nguyen</u>, 763 F.3d at 1177 (citing <u>Specht v. Netscape Commc'ns Corp.</u>, 306 F.3d 17, 30-31 (2d Cir. 2002)).

Xcentric construes the terms and conditions as a clickwrap agreement, but the user never affirmatively indicates his agreement. The terms accompanying the checkbox do not state that "I agree to the terms and conditions" or other such language indicating express accord. By checking the box, the user agrees only to the terms accompanying the checkbox. This means that

6

the terms and conditions, including the grant of an exclusive license, which is paramount to a copyright transfer, constitute a browsewrap agreement.

The record before the Court is undisputed as to the material facts. Both parties acknowledge that there is no evidence that DuPont took notice of the terms and conditions. <u>See</u> D. 55 at 10-12. In the absence of evidence that DuPont had actual knowledge of the terms and conditions, for Xcentric to obtain the copyrights to his Reports, it must demonstrate that a reasonably prudent user would have had inquiry notice of the conveyance of an exclusive license to Xcentric. <u>Nguyen</u>, 763 F.3d at 1177. The parties' dispute centers on whether the evidence shows that a reasonably prudent user would have had such notice.

To determine whether a user has inquiry notice of a browsewrap agreement, the Court must examine "the design and content of the website and the agreement's webpage." <u>Id.</u> Courts look to the "conspicuousness and placement" of a link to the terms and conditions, "other notices given to users of the terms of use, and the website's general design" to determine whether a reasonably prudent user had inquiry notice of the terms. <u>Id.</u> "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." <u>Id.</u> (citing <u>Specht</u>, 306 F.3d at 23 (terms visible only if user scrolled below button that initiated download of software)); <u>In re Zappos.com, Inc.</u>, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (link to terms buried among other links and website did not direct users to terms); <u>Van Tassell</u>, 795 F. Supp. 2d at 792-93 (term at issue accessible only by clicking on several links)). At the other end of the spectrum, if a website notifies a user that his continued use of a site indicates his assent to the terms, then a browsewrap agreement is more likely to be enforced. <u>Nguyen</u>, 763

F.3d at 1177 (citing <u>Cairo, Inc. v. Crossmedia Servs., Inc.</u>, No. 04-04825, 2005 WL 756610, at *

2, * 4-5 (N.D. Cal. Apr. 1, 2005)).

      Here, the Court concludes that a reasonably prudent user was on inquiry notice of the

terms and conditions associated with the ROR, and, therefore, the transfer of copyright

ownership was valid. The screen where users submitted their reports prominently featured a

portion of the terms in the center of the screen, above the "continue" button that the users clicked

to conclude the posting process. D. 64-5. That screen, along with at least two of the other

screens used in the posting process, also contained blue links to the terms of service at the

bottom of the page which were conspicuously visible without scrolling beyond the "continue"

button used to progress to the subsequent screen. D. 64-1, D. 64-4, D. 64-5. The

conspicuousness of the terms is supported by the contrasting color of the link to them coupled

with the placement of the terms themselves on the final screen prior to submission. <u>See PDC</u>

<u>Labs., Inc. v. Hach Co.</u>, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009)

(granting defendant's motion for partial summary judgment in part as to a contract's

enforceability where link to terms appeared on separate pages of online order process and users

were directed to review terms on final screen); <u>Hubbert v. Dell. Corp.</u>, 835 N.E.2d 113, 983-84

(2005) (concluding that arbitration agreement was part of online contract and deeming terms

valid where links to the terms were visible throughout order process, on marketing web pages,

and final online forms stated that sales were subject to terms and conditions); <u>cf. Nguyen</u>, 763

F.3d at 1178-79 (holding that conspicuous link to terms on every page of website was

insufficient for constructive notice without further notice to users or "affirmative action to

demonstrate assent").

Unlike in <u>Nguyen</u>, in this case, Xcentric provided further notice to users beyond the links at the bottom of the pages of the ROR. The beginning of the list of terms was visible above the "continue" button on the final submission screen. A review of those terms, by means of the scroll bar, would have revealed the term requiring users to transfer an exclusive license to Xcentric. The Plaintiffs dispute that a reasonable user would understand the function of the scroll bar running down the side of the box containing the terms. D. 64 at 3 (observing that there is "no marking or identification of the function as a vertical scroll bar" and that "[t]here is no direction, explicit prompt or even suggestion to use the scroll bar to view any additional disclosures"). A reasonably prudent internet user, however, is conversant in the basic navigation tools required to effectively utilize a website.[3] <u>See</u> <u>Forrest v. Verizon Commc'ns, Inc.</u>, 805 A.2d 1007, 1011 (D.C. Cir. 2002) (in affirming dismissal based upon a forum selection clause, stating that "the use of a 'scroll box' in the electronic version that displays only part of the [a]greement at any one time [is not] inimical to the provision of adequate notice"); <u>see also</u> <u>PDC</u>, 2009 WL 2605270, at *3 (resolving question of whether online terms were sufficiently conspicuous on summary judgment).

In addition, even if a reasonably prudent user could be deemed to be unfamiliar with a scroll bar, the ROR user was also required to check a box below the terms and conditions affirming that he granted an irrevocable right to Xcentric to post his report on the website. D. 64-5. If the user failed to appreciate that scrolling was required to view all of the terms, he was

---

[3] The Plaintiffs make a cursory argument that the any contract between DuPont and Xcentric was illusory because Xcentric reserved the right to change the terms and conditions. D. 64 at 16. They do not allege, however, that Xcentric did change terms and conditions in any way during the relevant time period. Without a change to the terms that affected that Plaintiffs' rights or remedies, the Court is not persuaded that the contract was illusory. <u>Cf.</u> <u>Morrison v. Amway Corp.</u>, 517 F.3d 248, 257 (5th Cir. 2008) (holding arbitration agreement was illusory where Amway unilaterally amended rules of conduct to require arbitration of claims arising prior to implementation of arbitration program).

informed that he was giving an irrevocable right with the further explanation that his post "will not be removed, even at my request."

The notice next to the check box has two consequences. First, a user who has any hesitation regarding the grant of an irrevocable right to display his post is prompted to investigate further, either by reading the terms and conditions placed prominently over the check box, or by clicking on the link to the terms of service at the bottom of the screen. Second, even if the browsewrap agreement were somehow invalid, a user's assent by means of the checkbox granted to Xcentric, at the very least, a non-exclusive license to publish the Reports. A copyright owner who grants a license to his work waives his right to sue the licensee for copyright infringement provided that the licensee's use does not go beyond the scope of the non-exclusive license. John G. Danielson, Inc. v. Winchester-Conant Prop., Inc., 322 F.3d 26, 40 (1st Cir. 2003) (noting that "[u]ses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits"); see Sony Corp. of Am. v. Universal City Studios, Inc. 464 U.S. 417, 433 (1984) (noting that "anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute . . . is not an infringer of the copyright with respect to such use") .

The Court concludes that DuPont transferred copyright ownership to Xcentric by means of an enforceable browsewrap agreement. Xcentric is thus entitled to summary judgment as to Count I (declaratory judgment as to copyright ownership) and Count II (copyright infringement). Moreover, even if the browsewrap agreement were considered invalid and DuPont retained ownership of the copyrights to the Reports, he nonetheless granted a non-exclusive license to Xcentric and, therefore, he waived his right to sue Xcentric for infringement where its use did

Add. 28

not exceed the scope of that license. The latter scenario also requires summary judgment for Xcentric as to Count II.

### B.   Section 201(e) and the Subsequent Transfer of Copyright Ownership

Because Xcentric acquired exclusive ownership of the copyright from DuPont, DuPont ceased to be a holder of copyright and had no remaining rights to assign to Goren pursuant to Goren's Superior Court action. DuPont's purported assignment to Goren (executed by Goren as his attorney-in-fact) of the copyrights to the Reports had no legal effect and Goren acquired nothing supporting a right to sue Xcentric for copyright infringement.

Even if DuPont retained ownership of the copyrights, however, the Superior Court's transfer of rights was barred by 17 U.S.C. § 201(e) which provides:

> When an individual author's ownership of a copyright, or any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under copyright, shall be given effect under this title, except as provided under title 11.

Pursuant to this provision, the purported transfer of copyright ownership by the order pursued by Goren was ineffective. Goren, therefore, did not acquire any rights to transfer to Small Justice. Even so, the Plaintiffs suggest that the transfer was proper to satisfy the default judgment against DuPont. D. 64 at 21. Section 201(e) precludes any involuntary transfer from the author of his copyright. See Veeck v. Southern Bldg. Code Congress Internat'l, Inc., 293 F.3d 791, 803 (5th Cir. 2002) (noting that Section 201(e) "reflects Congress's intention to protect copyrights from involuntary appropriation by government entities"). The transfer here was not rendered voluntary by the fact that DuPont was apprised of the default judgment against him.

The Plaintiffs further argue that Xcentric lacks standing to challenge the ostensible transfer by the Superior Court. D. 64 at 20-21. They base this argument on two grounds. First,

they assert that Xcentric was not assigned an exclusive license to the copyrights.  Id.  As discussed above, that contention is without merit.  Second, they argue that, even if Xcentric acquired ownership of the copyrights, it was not the author and, therefore, cannot take advantage of Section 201(e)'s shield, which, by its express terms, is available only to individual authors, not to assignees of the original author.  Id.; 17 U.S.C. § 201(e).  Xcentric, however, is not the party shielded by Section 201(e) here.  Section 201(e) applies to the attempt by the Superior Court to transfer rights from DuPont, assuming he retained any, to Goren.  DuPont, as an individual author who had not previously transferred his rights, could not be divested of his ownership, if any, by the actions of a governmental body.  See Hendricks & Lewis, PLLC v. Clinton, No. C12-0841-RSL, 2012 WL 5947638, at * 3 (W.D. Wash. Nov. 27, 2012) (observing that Congress sough "to accomplish the goal of precluding all involuntary transfers of copyrights from an individual author unless specifically excluded"), aff'd, 766 F.3d 991 (9th Cir. 2014).  Goren, therefore, acquired no rights to the copyrights, even if DuPont still owned the copyrights at the time of the Superior Court judgment.

In addition to the reasons set forth above, *supra* Section V.A, Section 201(e) eliminates any ownership interest in the copyrights claimed by Goren and Small Justice.  Xcentric is, therefore, entitled to summary judgment on Counts I and II with respect plaintiffs Goren and Small Justice.

### C.    Chapter 93A and the CAP and Arbitration Program

Finally, Xcentric seeks summary judgment on the Plaintiffs' remaining claim under Mass. Gen. L. c. 93A § 11.  The Plaintiffs allege that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based CAP and arbitration program is oppressive and unethical.  D. 13   ¶¶ 33-35.  Xcentric argues that the Plaintiffs' claim is barred by the

12

Communications Decency Act ("CDA"), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). According to Xcentric, because the CDA shields it from claims related to its editorial control over the content of its website, its provision of arbitration services with respect to that content is also shielded. D. 55 at 17-18. Xcentric asserts that to find its services oppressive and unethical is to treat it as the speaker or publisher of information provided by a third party – exactly what is barred by the CDA. Id.

In this case, however, the Plaintiffs' claims arise not from third-party content, but from Xcentric's own solicitations and advertisements. "[A]n interactive computer service provider remains liable for its own speech." Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007). "Put another way, CDA immunity does not apply if the interactive computer service provider is also an 'information content provider,' which is defined in the CDA as an entity that is 'responsible, in whole or in part, for the creation or development of' any allegedly fraudulent 'information.'"[4] Suk Jae Chang v. Wozo LLC, No. 11-10245-DJC, 2012 WL 1067643, at * 14 (D. Mass. Mar. 28, 2012).

While the CDA does not bar the Plaintiffs' allegations, however, the requirements of Chapter 93A itself defeat their claim. Chapter 93A requires the Plaintiffs to have suffered harm: "[a]ny person who engages in the conduct of any trade or commerce and who *suffers any loss of money or property*, real or personal, as a result of the use or employment by another person who

---

[4]The CDA also defeats the Plaintiffs' assertion that public policy prohibits enforcement of the ROR's terms and conditions. D. 64 at 17-20. Congress, through the CDA, chose to confer immunity on interactive computer service providers like Xcentric for libelous content provided by third parties. 47 U.S.C. § 230(c)(1). The Plaintiffs cannot invoke public policy to make an end-run around this statutory determination.

engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action . . . ." Mass. Gen. L. c. 93A § 11 (emphasis added). There must be a "causal link between the . . . wrongful conduct and the loss a plaintiff claims to have suffered." R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 80-81 (2001). The Plaintiffs argue that "[t]here is evidence of continuing injury to Goren's reputation as well as the loss of money [causally] connected to the undisputed solicitations and advertisements." D. 64 at 27.

The CAP and arbitration program, however, are not the source of Goren's reputational injury. The defamatory Reports caused the harm allegedly inflicted on Goren's reputation, and, as the Court previously held, the CDA confers immunity on Xcentric for the content of the Reports. D. 45 at 10-13. Further, Goren has failed to demonstrate how he lost money as a result of the solicitations for the CAP and arbitration program. He does not allege that he incurred the cost of participating in either program, D. 13, or explain how he suffered a financial loss, other than any loss of business related to the shielded Reports. "In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery." Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., 403 Mass. 722, 730 (1989); see Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 823 (2014) (stating that plaintiffs proceeding under c. 93A § 11 must "ultimately . . . prove a distinct injury") (internal quotation marks omitted). Because Goren has not proffered any evidence of a loss caused by the programs of which he complains, the Court allows Xcentric's motion with respect to Claim V.[5]

_____

[5]The Plaintiffs, citing to hearsay, such as excerpts of testimony from a state court proceeding in California and an e-mail to Goren, argue that Xcentric further violated Chapter 93A by engaging in an extortionate scheme to post complaints about companies that were then solicited to pay money to restore their reputations. D. 64 at 28-29. These allegations are not

VI.    **Conclusion**

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 55.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

contained in the Plaintiffs' amended complaint, D. 13, nor is such inadmissible and unsupported evidence sufficient to withstand summary judgment. Fed. R. Civ. P. 56(c).

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SMALL JUSTICE LLC, <br> RICHARD A. GOREN, <br> and, <br> CHRISTIAN DUPONT dba <br> ARABIANIGHTS-BOSTON <br> MASSACHUSETTS <br><br> Plaintiffs, <br><br> v. <br><br> XCENTRIC VENTURES LLC, <br>     Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 1:13-cv-11701-DJC <br> ) <br> ) <br> ) *NOTICE OF APPEAL* <br> ) |

Notice is hereby given that SMALL JUSTICE LLC, RICHARD A. GOREN and CHRISTIAN DUPONT, being all the plaintiffs in the above named case, hereby appeal to the United States Court of Appeals for the First Circuit from the judgment for defendant Xcentric Ventures LLC (Paper 104) entered on March 27, 2015 in accordance with the Memorandum and Order dated March 27, 2015 granting defendant's motion for Summary Judgment.

Respectfully submitted,
SMALL JUSTICE LLC, RICHARD A. GOREN,
and CHRISTIAN DUPONT,
Plaintiffs,

by their attorney,

April 24, 2015

*/s/ Richard A. Goren*
Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
101 Federal Street Suite 1900
Boston MA 02110
617-261-8585
rgoren@richardgorenlaw.com

Add. 34

As of May 1, 2015

Law Office of Richard Goren
1 State Street Suite 1500
Boston MA 02109
617-933-9494
rgoren@richardgorenlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on April 24, 2015.

*/s/ Richard A. Goren*

**May 22, 2015 Paper 115 docket report page**

**From:** ECFnotice@mad.uscourts.gov [mailto:ECFnotice@mad.uscourts.gov]
**Sent:** Friday, May 22, 2015 9:54 AM
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:13-cv-11701-DJC Small Justice LLC,et.al. v. Xcentric Ventures LLC Order

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 5/22/2015 at 9:53 AM EDT and filed on 5/22/2015
**Case Name:**    Small Justice LLC,et.al. v. Xcentric Ventures LLC
**Case Number:**    1:13-cv-11701-DJC
**Filer:**
**WARNING: CASE CLOSED on 03/27/2015**
**Document Number:** 115(No document attached)

**Docket Text:**
**Judge Denise J. Casper: ELECTRONIC ORDER entered. Before the Court rules on the plaintiffs' motion to amend notice of appeal, D. 113, which the defendant opposes, D. 114, the Court wishes to raise an issue regarding the application of 17 U.S.C. § 204. Although judgment entered for Xcentric, D. 104, would not change even if Section 204 applies to Claim I, the Court is inclined to add a footnote (see below) regarding the analysis under Section 204 to the Memorandum and Order issued on 3/27/15, D. 100. The Court invites each party to be heard on this sole issue, if they wish, by filing a memorandum, not to exceed five pages, by 6/5/15. The Court will address the pending motion to amend notice of appeal after the parties have filed their memoranda regarding Section 204.**

**Footnote _[to be added to Memorandum & Order, D. 100]_: Even if 17 U.S.C. § 204, D. 64 at 9, 21 n. 22, applies, the ultimate result here is the same. Section 204 provides that the transfer of a copyright is achieved only with an affirmative action on the part of the transferor, stating that "[a] transfer of copyright**

ownership, other than by operation of law, is not valid unless an instrument of conveyance, or note or memorandum of transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204. Assuming a written and signed conveyance was required here, the browsewrap agreement was insufficient because it did not require the user's affirmative assent, instead relying on the user's use of the ROR as an expression of assent. See Murphy v. Lazarev, 589 Fed. Appx. 757, 765 (6th Cir. 2014) (explaining that "[a] written and signed conveyance is necessary to use copyright material"); cf. Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 888 F. Supp. 2d 691, 696, 708 (D. Md. 2012), aff'd, 722 F.3d 591 (4th Cir. 2013) (enforcing online subscription agreement executed by users containing an exclusive assignment of copyright to uploaded photographs). Evaluated under Section 204, Xcentric did not acquire an exclusive license to the Reports by way of the terms and conditions, and DuPont, as the author of the Reports, retained copyright ownership. Even so, DuPont conveyed a nonexclusive, irrevocable license to Xcentric to display the Reports by means of the check box. Section 204's requirements are inapplicable to a nonexclusive license because it is not a "transfer of copyright ownership" under 17 U.S.C. § 101. See Murphy, 589 Fed. Appx. at 765 (stating that "a nonexclusive license may be granted orally, or may be implied from conduct" because "a nonexclusive license is not a transfer of ownership under 17 U.S.C. § 101 and is not, therefore, subject to the writing requirement of § 204") (internal quotation marks and alterations omitted). Under this scenario, Xcentric is not the owner of the copyright to the Reports, but it may display them in perpetuity. Accordingly, summary judgment still enters in Xcentric's favor. (Hourihan, Lisa)


**1:13-cv-11701-DJC Notice has been electronically mailed to:**

Richard A. Goren    rgoren@richardgorenlaw.com, raglaw@hotmail.com, rsullivan@bodofflaw.com

Daniel G. Booth    dbooth@boothsweet.com

Maria Crimi Speth    mcs@jaburgwilk.com, dag@jaburgwilk.com

**1:13-cv-11701-DJC Notice will not be electronically mailed to:**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT d/b/a ARABIAN NIGHTS-BOSTON, MASSACHUSETTS, <br><br> Plaintiffs, <br><br> v. <br><br> XCENTRIC VENTURES LLC, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 13-cv-11701 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

CASPER, J.                                                    September 30, 2015

### I.    Introduction

A series of post-judgment motions are now pending before the Court.   Following judgment in its favor, Defendant Xcentric moved for an award of costs and attorney's fees. D. 105. The Plaintiffs have moved to amend their original notice of appeal, D. 108. D. 113.   After these two motions were filed, the Court notified the parties that it was inclined to add a footnote to its Memorandum and Order issued on Xcentric's motion for summary judgment, D. 100. D. 115.   The plaintiffs responded with a motion for an indicative ruling pursuant to Fed. R. Civ. P. 62.1 that the Court would allow a motion under Fed. R. Civ. P. 60(b) to vacate the judgment. D. 118. Xcentric then moved to dismiss its counterclaim against Plaintiff Dupont. D. 121. Dupont has moved to amend

1

the Plaintiffs' first amended complaint.  D. 129.  Xcentric has moved for sanctions against Plaintiff Goren pursuant to Fed. R. Civ. P. 11(c)(2).  D. 132.  The Court now denies all the pending motions except Xcentric's motion to dismiss its counterclaim, which the Court ALLOWS.

## II.    Procedural History

This case stems from Plaintiff Dupont's reports ("Reports") posted on Xcentric's website, the Rip-off Report ("ROR"), impugning Plaintiff Goren's professional and personal reputations.  D. 13.  The Plaintiffs originally asserted five claims against Xcentric:  declaratory judgment as to ownership of the copyrights to the Reports posted by Dupont on the ROR website, copyright infringement, libel, intentional interference with prospective contractual relations, and violation of Chapter 93A.  Id.  The Court dismissed the libel claim, the intentional interference claim and all bases but one of the Chapter 93A claim, reasoning that the claims were barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230.  D. 45.  Xcentric moved for summary judgment on the remaining counts, D. 55, which the Court allowed, reasoning that a reasonably prudent ROR user would have understood that he conveyed copyright ownership in his Reports to Xcentric, and, even if he did not, the website was clear that the user granted to Xcentric an irrevocable right to post the Reports.  D. 100.  Moreover, any rights to copyright ownership claimed by Small Justice were improperly acquired in the course of a Superior Court action that, contrary to 17 U.S.C. § 201(e), purported to transfer copyright ownership from Dupont to Goren.  Id.

### III.    Discussion

The Court's proposed footnote, D. 115, recognized that, although not raised by the parties in their summary judgment filings, if the failure to conform to the writing requirement of 17 U.S.C. § 204 applies to Dupont's transfer to Xcentric of an exclusive license to the Reports, Xcentric nonetheless acquired a nonexclusive, irrevocable license to display the reports.   D. 115.   Accordingly, Xcentric is still entitled to summary judgment as to Claim I.

The Plaintiffs argue that if Xcentric acquired only a nonexclusive license, then Dupont retained the copyrights to the Reports.  See D. 117 at 1-2, 4.  The Plaintiffs posit that the Court must declare whether Xcentric "lack[ed] authority to grant sublicenses to Google and other search engines to display *on their servers* copies of DuPont's work." Id. at 2 (emphasis in original).   In addition, Xcentric asserted a counterclaim against Dupont alleging that he violated a provision of the ROR terms and conditions that required him to indemnify Xcentric in the event of a dispute concerning the Reports.  D. 49.  No party moved for summary judgment on the counterclaim.  The Plaintiffs urge the Court to request a remand from the First Circuit pursuant to Fed. R. Civ. P. 62.1 to enable the Court to vacate the judgment under Fed. R. Civ. P. 60(b) and issue a declaratory judgment that Dupont owns the copyrights to the Reports and that the nonexclusive license granted to Xcentric does not permit Xcentric "to authorize Google and other search engines to exercise any rights in his work by displaying cached copies of DuPont's work on their servers."  D. 117 at 4.  The Plaintiffs also seek a judgment for Dupont on Xcentric's counterclaim.  Id.

A.      **Plaintiffs' Rule 62.1 Motion for an Indicative Ruling**

The Plaintiffs' Rule 60(b) motion is without merit, and thus the Court denies their

Rule 62.1 motion for an indicative ruling.  See Ahmed v. Rosenblatt, 118 F.3d 886, 890

(1st Cir. 1997) (indicating that, once appeal taken, remand from First Circuit required to

permit district court to consider Rule 60(b) motion).  Rule 62.1 provides:  "If a timely

motion is made for relief that the court lacks authority to grant because of an appeal that

has been docketed and is pending, the court may:  (1) defer considering the motion; (2)

deny the motion; or (3) state either that it would grant the motion if the court of appeals

remands for that purpose or that the motion raises a substantial issue."  Fed. R. Civ. P.

62.1.  Rule 60(b) confers on the Court the power to "relieve a party . . . from a final

judgment, order, or proceeding" for certain reasons, including "(1) mistake, inadvertence,

surprise, or excusable neglect" and "(6) any other reason that justifies relief."  Fed. R.

Civ. P. 60(b).

"Rule 60(b) relief is 'extraordinary in nature' and, thus, 'motions invoking that

rule should be granted sparingly.'"  Fisher v. Kadant, Inc., 589 F.3d 505, 512 (1st Cir.

2009) (quoting Karak v. Bursaw Oil Corp., 288 F.3d 15, 19 (1st Cir. 2002)).  "A party

seeking relief under Rule 60(b) must demonstrate 'at a bare minimum, that his motion is

timely; that exceptional circumstances exist, favoring extraordinary relief; that if the

judgment is set aside, he has the right stuff to mount a potentially meritorious claim or

defense; and that no unfair prejudice will accrue to the opposing parties should the

motion be granted.'"  Id.  "[A] litigant, as a precondition to relief under Rule 60(b), must

give the trial court reason to believe that vacating the judgment will not be an empty

4

exercise." <u>Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co., Inc.</u>, 953 F.2d 17, 20 (1st Cir. 1992).

The Plaintiffs did not seek a declaration that Dupont owns the copyrights at issue. The prayer for relief as to Count I of the Plaintiffs' first amended complaint sought "a declaration that Small Justice [] is the lawful owner of the copyright ownership of each of the" Reports. D. 13 at 17. The Court ruled in Xcentric's favor based on the relief sought by the Plaintiffs because Small Justice does not own the copyrights to the Reports, and the ruling remains unaltered.

Accordingly, the Court denies the Plaintiffs' motion for an indicative ruling pursuant to Rule 62.1 because the Plaintiffs have not established that the Rule 60(b) motion they wish to assert is "potentially meritorious." <u>Teamsters</u>, 953 F.2d at 21.

**B.      Plaintiffs' Motion to Extend Time to File Notice of Appeal**

Citing Fed. R. App. P. 4(a)(5), the Plaintiffs have moved to extend the time to file a notice of appeal. D. 113 at 1. The Plaintiffs seek the extension so they can amend their April 24, 2015 notice of appeal, D. 108, to include the Court's March 24, 2014 order allowing Xcentric's motion to dismiss certain of the Plaintiffs' claims, D. 45. "By inadvertence the timely filed notice of appeal of the judgment failed to specifically reference the Court's prior March 24, 2014 decision." D. 113 at 2.

Even if this Court retains jurisdiction to consider this motion, <u>see</u> <u>Smith v. Jenkins</u>, 777 F. Supp. 2d 270, 271 (D. Mass. 2011) (citing <u>United States v. Brooks</u>, 145 F.3d 446, 455 (1st Cir. 1998)), Fed. R. App. P. 4(a), invoked by the Plaintiffs, does not provide a mechanism for amending a notice of appeal; it pertains only to extending the deadline for filing a notice of appeal. <u>Smith</u>, 777 F. Supp. 2d at 271. Moreover, even if

5

Rule 4(a)(5) applies, it requires a showing of either good cause or excusable neglect, neither of which has been demonstrated by the Plaintiffs.   Fed. R. App. P. 4(a)(5)(A)(ii). "[W]here there are no forces beyond the control of the would-be appellant that prevent him from taking timely steps to preserve his rights, 'good cause' has no applicability and an extension of the time for appealing can be justified only by a showing of excusable neglect." Mirpuri v. ACT Mfg., Inc., 212 F.3d 624, 630 (1st Cir. 2000).   The Plaintiffs point only to inadvertence as the reason for the oversight; they do not cite any forces beyond their control that prevented them from including the dismissed claims in their notice of appeal.  D. 113.

A determination of whether "excusable neglect" is present should consider the so-called Pioneer factors, including "the danger of prejudice, the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, and whether the movant acted in good faith." Hospital del Maestro v. National Labor Relations Bd., 263 F.3d 173, 174-75 (1st Cir. 2001) (internal quotation marks and alterations omitted); see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993). "The four Pioneer factors do not carry equal weight; the excuse given for the late filing must have the greatest import." Hospital, 263 F.3d at 175 (quoting Lowry v. McDonnell Douglas Corp., 211 F.3d 457, 463 (8th Cir. 2000)).  Here, the only reason offered for the delay is inadvertence, which does not establish excusable neglect. Mirpruri, 212 F.3d at 631 (stating that "mere 'inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect'") (quoting Pioneer, 507 U.S. at 392). The Court denies the Plaintiffs' motion to extend the time to file a notice of appeal.

### C.    Xcentric's Motion to Dismiss Counterclaim

The Plaintiffs, as one of the grounds for the Rule 62.1 motion, and the underlying Rule 60(b) motion, cite the need for the Court to dispose of the outstanding counterclaim asserted by Xcentric against plaintiff Dupont. D. 118 at 1. The counterclaim at issue is for breach of contract. D. 52-1. The ROR terms and conditions required Dupont to indemnify Xcentric if a dispute concerning the Reports arose. Id. at 14.

Pursuant to Fed. R. Civ. P. 41(a)(2) and 41(c), Xcentric now moves to dismiss its own counterclaim. D. 121. Rule 41(a)(2) provides that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court deems proper. . . . Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice." Fed. R. Civ. P. 41(a)(2). Rule 41(c) makes explicit that "[t]his rule applies to a dismissal of any counterclaim . . . ." Fed. R. Civ. P. 41(c).

Rule 41(a)(2) "allows a plaintiff to voluntarily dismiss his own case as long as 'no other party will be prejudiced.'" Colón Cabrera v. Esso Standard Oil Co. (Puerto Rico), Inc., 723 F.3d 82, 87 (1st Cir. 2013) (quoting P.R. Mar. Shipping Auth. v. Leith, 668 F.2d 46, 50 (1st Cir. 1981)). "In deciding whether to grant a Rule 41(a)(2) motion, courts typically look to the 'defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant.'" Doe v. Urohealth Sys., Inc., 216 F.3d 157, 160 (1st Cir. 2000) (quoting Pace v. Southern Express Co., 409 F.2d 331, 334 (7th Cir. 1969)). "Dismissal should in most instances be granted, unless the result would

Add. 44

be to legally harm the defendant." <u>Century Mfg. Co., Inc. v. Central Transp. Int'l, Inc.</u>, 209 F.R.D. 647, 648 (D. Mass. 2002) (internal quotation marks and alterations omitted).

The Plaintiffs do not sufficiently address any prejudice that would be suffered by Dupont if the counterclaim were dismissed. The Plaintiffs' only argument with respect to prejudice is that Dupont "has a legal interest in complying with the Massachusetts judgment." <u>Id.</u> at 10. The Plaintiffs also cite Goren's interest in "effectuating the decree in his favor and also an argument as attorney-in-fact for Dupont to press for implementation of that decree." <u>Id.</u>

The dismissal of the counterclaim does not prejudice Dupont and thus the Court allows Xcentric's motion. The Plaintiffs do not indicate that Dupont or Goren, as his attorney-in-fact, has expended significant resources on the counterclaim, nor had the Plaintiffs moved for summary judgment on the counterclaim. <u>Cf.</u> <u>Urohealth</u>, 216 F.3d at 163. The Plaintiffs were the ones who attempted to use the unresolved counterclaim as a foothold to vacate the judgment entered by the Court, giving Xcentric a reason to pursue its dismissal. In these circumstances, the Court concludes that Dupont will not suffer any legal harm if Xcentric abandons the counterclaim, and, therefore, dismissal is proper.

**D.    Plaintiffs' Motion to Amend First Amended Complaint**

Perhaps recognizing that he did not move for declaratory judgment in his favor, Dupont now moves to amend the Plaintiffs' first amended complaint, D. 13, pursuant to Fed. R. Civ. P. 15(b)(2). D. 129. Rule 15(b)(2) provides a means for "[a] party [to] move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). Dupont seeks a declaration that Dupont granted an unenforceable, as contrary to public policy, non-

exclusive license to Xcentric.  D. 129 at 1; D. 129-1 at 17.  In the alternative, Dupont seeks to amend to obtain a declaration that Dupont owns the copyrights to the Reports. D. 129 at 1-2; D. 129-1 at 17.

"The law in this circuit is clear that a district court may not accept an amended complaint after judgment has entered unless the judgment is set aside or vacated under Rules 59 or 60."  Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 538 (1st Cir. 2011); see United States ex. Rel. Ge, M.D. v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 127 (1st Cir. 2013).  As already discussed, the Court denies the Plaintiffs' motion for an indicative ruling to allow their Rule 60(b) motion to proceed.  Finally, even if the Court were to entertain his motion, Dupont does not provide an adequate reason for the delay in seeking the amendment given that the Plaintiffs were aware of the facts underlying their claim when they filed their first two complaints.  Such a delay would prejudice Xcentric. Feliciano-Hernández, 663 F.3d at 538.  For these reasons, the Court denies Dupont's motion to amend the first amended complaint.

### E.    Xcentric's Motion for Fees and Costs

Xcentric has moved for an award of costs and attorney's fees pursuant to 17 U.S.C. § 505, which provides in relevant part that, in an action for copyright infringement, "the court in its discretion may allow the recovery of full costs by or against any party other than the United States" and that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505. However, as Xcentric has not filed any supporting documentation regarding attorney's fees and costs incurred, the Court denies the motion without prejudice to refiling with supporting documentation.

**F.      Xcentric's Motion for Sanctions Against Plaintiff Goren**

Xcentric seeks sanctions against Goren pursuant to Fed. R. Civ. P. 11(c)(2) for seeking leave to amend the first amended complaint. D. 132. According to Xcentric, the motion was filed "for the improper purpose of harassing and needlessly increasing the cost of litigation." Id. at 1. Xcentric further seeks sanctions under 28 U.S.C. § 1927 "for unreasonably and vexatiously multiplying the proceedings in this matter." Id. The Court denies the motion.

"Rule 11 prohibits filings made with any improper purpose, the offering of frivolous arguments, and the assertion of factual allegations without evidentiary support or the likely prospect of such support." Roger Edwards, LLC v. Fiddes & Son Ltd., 437 F.3d 140, 142 (1st Cir. 2006) (internal quotation marks omitted). Echoing this admonition, 28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

As discussed above, Dupont failed to justify the delay in filing his motion to amend and such a motion was untimely after judgment entered without the indicative ruling now denied by this Court. The Court, however, acknowledges the Plaintiffs' strategic choices in light of the Court's summary judgment ruling and reasoning to seek a remand of the case and an opportunity to broaden the declaratory relief sought. In these circumstances the Court cannot conclude that Dupont's motion was frivolous or vexatious such that it warrants sanctions. The Court, therefore, denies Xcentric's motion for sanctions.

Add. 47

## IV.  Conclusion

For the foregoing reasons, the Court DENIES the Plaintiffs' motion to amend the notice of appeal, D. 113; DENIES the Plaintiffs' motion for an indicative ruling pursuant to Rule 62.1, D. 118; and DENIES Dupont's motion to amend the first amended complaint, D. 129.  The Court ALLOWS Xcentric's motion to dismiss the counterclaim, D. 121.  The Court DENIES Xcentric's motion for Rule 11 sanctions, D. 132.  Finally, the Court DENIES Xcentric's motion for fees and costs without prejudice.[1]

The Court hereby incorporates the footnote set forth at D. 115 into its Memorandum and Order dated March 27, 2015, D. 100, appending it as note 4 to the concluding sentence of Section V.A on page 11.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[1] The Court also ALLOWS *nunc pro tunc* the Plaintiffs' motion to file a surreply, D. 128, and Dupont's motion to file a reply, D. 131.

EXHIBIT B , August 29, 2013 Ripoff Report Terms and Conditions

## 1. Ripoff Report Membership Terms & Conditions

To use this service, you must be at least 14 years old.

www.RipoffReport.com ("ROR") is an online forum created to help keep consumers informed. ROR is operated by Xcentric Ventures, LLC located at:

**Xcentric Ventures, LLC**
Ripoff Report
P.O. Box 310
Tempe, AZ 85280
(602) 359-4357
This is a legal agreement ("Agreement") between you and Xcentric Ventures, LLC ("Xcentric"). Please read the Agreement carefully before registering for ROR. By registering for ROR, you agree to be bound by the terms and conditions of this Agreement (the "Terms"). If you do not agree to the Terms, you are not permitted to use ROR.

The Terms are subject to change by Xcentric, at any time, without notice, effective upon posting of a link to same on our website. Persons who are under 14 years old may not register for ROR. By registering with ROR, you represent and warrant that you are at least 14 years old.

Xcentric reserves the right to immediately suspend or terminate your registration with ROR, without notice, upon any breach of this Agreement by you which is brought to Xcentric's attention.

Your registration with ROR is for your sole, personal use. You may not authorize others to use your user identification and password, and you may not assign or otherwise transfer your account to any other person or entity.

## 2. Online Conduct

**You agree that:**
You are solely responsible for the content or information you publish or display (hereinafter, "post") on ROR.

You will NOT post on ROR any defamatory, inaccurate, abusive, obscene, profane, offensive, threatening, harassing, racially offensive, or illegal material, or any material that infringes or violates another party's rights (including, but not limited to, intellectual property rights, and rights of privacy and publicity). You will use ROR in a manner consistent with any and all applicable laws and regulations. By posting information on ROR, you warrant and represent that the information is truthful and accurate.

You will not post, distribute or reproduce in any way any copyrighted material, trademarks, or other proprietary information without obtaining the prior written consent of the owner of such proprietary rights and except as otherwise permitted by law.

## 3. Indemnity

You will defend, indemnify, and hold harmless Xcentric, its officers, directors, employees, agents and third parties, for any losses, costs, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of your use of ROR, including, but not limited to, any breach by you of the terms of this Agreement

## 4. Online Content

Opinions, advice, statements, offers, or other information or content made available through ROR are those of their respective authors and not of Xcentric, and should not necessarily be relied upon. Such authors are solely responsible for the accuracy of such content. Xcentric does not guarantee the accuracy, completeness, or usefulness of any information on ROR and neither adopts nor endorses nor is responsible for the accuracy or reliability of any opinion, advice or statement made. Under no circumstances will Xcentric be responsible for any loss or damage resulting from anyone's reliance on information or other content posted on ROR.

## 5. Removal of Information

By posting information on ROR, you understand and agree that the material will not be removed even at your request. You shall remain solely responsible for the content of your postings on ROR.

While we do not and cannot review every message posted by users of the Service, and are not responsible for any content of these messages, we reserve the right, but are not obligated, to delete or remove profanity, obscenities, threats of physical violence or damage to property, and private financial information such as social security numbers and credit card information.

## 6. Proprietary Rights/Grant of Exclusive Rights

By posting information or content to any public area of www.RipoffReport.com, you automatically grant, and you represent and warrant that you have the right to grant, to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing.

## 7. Information Supplied by You

Except as provided otherwise in its privacy policy, Xcentric will keep confidential all information supplied by you to Xcentric, and shall use or disclose such information only for the purposes for which such information was collected, or as required by law. Whereas you are legally entitled to publish your comments anonymously, at the discretion of Xcentric, the personally identifying information of any user who is found to have posted numerous complaints about the same company and/or individual using different pseudonyms may lose the confidential protections afforded by this section.

## 8. Disclaimer of Warranty

Xcentric provides ROR on an "as is" basis and grants no warranties of any kind, express, implied, statutory, in connection with ROR or in connection with any communication with Xcentric or its representatives, or otherwise with respect to ROR. Xcentric specifically disclaims any implied warranties of merchantability, fitness for a particular purpose, or non-infringement. Xcentric does not warrant that ROR's connection to the internet will be secure, uninterrupted, always available, or error-free, or will meet your requirements, or that any defects in ROR will be corrected.

## 9. Limitation of Liability

In no event will Xcentric be liable: (i) to you for any incidental, consequential, or indirect damages arising out of the use of or inability to use ROR, even if Xcentric or its agents or representatives know or have been advised of the possibility of such damages or: (ii) to any person other than you. In addition, Xcentric disclaims all liability, regardless of the form of action, for the acts or omissions of other members or users (including, but not limited to, unauthorized users, or "hackers") of ROR.

## 10. State by State Variations

Certain jurisdictions limit the applicability of warranty disclaimers and limitations of liability so the above disclaimers of warranty and limitations of liability may not apply to you.

Add. 50

## 11. General Provisions

You agree that Arizona law (regardless of conflicts of law principles) shall govern this Agreement, that any dispute arising out of or relating to this Agreement shall be subject to the exclusive venue of the federal and state courts in the State of Arizona, and that you submit to the exclusive jurisdiction of the federal and state courts in the State of Arizona in connection with ROR or this Agreement. The failure of Xcentric to exercise or enforce any right or provision of the Terms of Service shall not constitute a waiver of such right or provision. The failure of Xcentric or You to exercise in any respect any right provided for herein shall not be deemed a waiver of any further rights hereunder. This Agreement, accepted upon registering for ROR, contains the entire agreement between you and Xcentric regarding the use of ROR. This Agreement may only be amended upon notice by Xcentric to you, or by a writing signed by you and an authorized official of Xcentric. Unless otherwise explicitly stated, the Terms will survive termination of your registration with ROR. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect.

## 12. Copyright Policy/Termination of User Privileges for Infringement and Contact Information for Suspected Copyright Infringement/DMCA Notices

We will terminate the privileges of any user who uses ROR to unlawfully transmit copyrighted material without a license, express consent, valid defense or fair use exemption to do so. In particular, users who submit user content to ROR, whether articles, images, stories, software or other copyrightable material must ensure that the content they upload does not infringe the copyrights of third parties.

If you believe that your copyright has been infringed through the use of ROR, please contact our Customer Service department at: editor@ripoffreport.com or mail/fax at:

Ripoff Report Legal Department - Copyright Policy
P.O. Box 310
Tempe, AZ 85280
(602) 359-4357

You may also access contact information for ROR's Registered DMCA Agent via the United States Copyright Office's website here: http://www.copyright.gov/onlinesp/agents/xcetven.pdf.

Add. 51

United States Code Annotated
  Title 47. Telegraphs, Telephones, and Radiotelegraphs
    Chapter 5. Wire or Radio Communication (Refs & Annos)
      Subchapter II. Common Carriers (Refs & Annos)
        Part I. Common Carrier Regulation

47 U.S.C.A. § 230

§ 230. Protection for private blocking and screening of offensive material

Effective: October 21, 1998

Currentness

(a) Findings

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by

§ 230. Protection for private blocking and screening of offensive material, 47 USCA § 230

individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) Protection for "good samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of--

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

(e) Effect on other laws

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

Add. 53

**§ 230. Protection for private blocking and screening of offensive material, 47 USCA § 230**

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on Communications Privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**CREDIT(S)**
(June 19, 1934, c. 652, Title II, § 230, as added Feb. 8, 1996, Pub.L. 104-104, Title I, § 509, 110 Stat. 137; Oct. 21, 1998, Pub.L. 105-277, Div. C, Title XIV, § 1404(a), 112 Stat. 2681-739.)

Add. 54

United States Code Annotated
  Title 17. Copyrights (Refs & Annos)
    Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

17 U.S.C.A. § 101

§ 101. Definitions

Effective: December 9, 2010

Currentness

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title, and includes any

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 55

individual serving as an interim Copyright Royalty Judge under such section.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is--

    **(1)** the Universal Copyright Convention;

    **(2)** the Geneva Phonograms Convention;

    **(3)** the Berne Convention;

    **(4)** the WTO Agreement;

    **(5)** the WIPO Copyright Treaty;

Add. 56

(6) the WIPO Performances and Phonograms Treaty; and

(7) any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment, except that no owner or operator of a radio or television station licensed by the Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

Add. 57

To perform or display a work "publicly" means--

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if--

(1) in the case of a published work, the work is first published--

(A) in the United States;

(B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

(C) simultaneously in the United States and a foreign nation that is not a treaty party; or

(D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

(2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is--

(1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

(2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include--

(A)(i) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

(ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

(iii) any portion or part of any item described in clause (i) or (ii);

(B) any work made for hire; or

(C) any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is--

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

Add. 59

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment--

**(A)** shall be considered or otherwise given any legal significance, or

**(B)** shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

**CREDIT(S)**
(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2541; Pub.L. 96-517, § 10(a), Dec. 12, 1980, 94 Stat. 3028; Pub.L. 100-568, § 4(a)(1), Oct. 31, 1988, 102 Stat. 2854; Pub.L. 101-650, Title VI, § 602, Title VII, § 702, Dec. 1, 1990, 104 Stat. 5128, 5133; Pub.L. 102-307, Title I, § 102(b)(2), June 26, 1992, 106 Stat. 266; Pub.L. 102-563, § 3(b), Oct. 28, 1992, 106 Stat. 4248; Pub.L. 104-39, § 5(a), Nov. 1, 1995, 109 Stat. 348; Pub.L. 105-80, § 12(a)(3), Nov. 13, 1997, 111 Stat. 1534; Pub.L. 105-147, § 2(a), Dec. 16, 1997, 111 Stat. 2678; Pub.L. 105-298, Title II, § 205, Oct. 27, 1998, 112 Stat. 2833; Pub.L. 105-304, Title I, § 102(a), Oct. 28, 1998, 112 Stat. 2861; Pub.L. 106-44, § 1(g)(1), Aug. 5, 1999, 113 Stat. 222; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title I, § 1011(d)], Nov. 29, 1999, 113 Stat. 1536, 1501A-544; Pub.L. 106-379, § 2(a), Oct. 27, 2000, 114 Stat. 1444; Pub.L. 107-273, Div. C, Title III, § 13210(5), Nov. 2, 2002, 116 Stat. 1909; Pub.L. 108-419, § 4, Nov. 30, 2004, 118 Stat. 2361; Pub.L. 109-9, Title I, § 102(c), Apr. 27, 2005, 119 Stat. 220; Pub.L. 111-295, § 6(a), Dec. 9, 2010, 124 Stat. 3181.)

Notes of Decisions (398)

17 U.S.C.A. § 101, 17 USCA § 101
Current through P.L. 113-31 (excluding P.L. 113-28) approved 8-9-13

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 60

§ 106. Exclusive rights in copyrighted works, 17 USCA § 106

United States Code Annotated
  Title 17. Copyrights (Refs & Annos)
    Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

17 U.S.C.A. § 106

§ 106. Exclusive rights in copyrighted works

Effective: November 2, 2002

Currentness

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**CREDIT(S)**
(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101-318, § 3(d), July 3, 1990, 104 Stat. 288; Pub.L. 101-650, Title VII, § 704(b)(2), Dec. 1, 1990, 104 Stat. 5134; Pub.L. 104-39, § 2, Nov. 1, 1995, 109 Stat. 336; Pub.L. 106-44, § 1(g)(2), Aug. 5, 1999, 113 Stat. 222; Pub.L. 107-273, Div. C, Title III, § 13210(4)(A), Nov. 2, 2002, 116 Stat. 1909.)

Notes of Decisions (181)

17 U.S.C.A. § 106, 17 USCA § 106
Current through P.L. 113-22 approved 7-25-13

End of Document                                        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 61

§ 201. Ownership of copyright, 17 USCA § 201

United States Code Annotated
   Title 17. Copyrights (Refs & Annos)
     Chapter 2. Copyright Ownership and Transfer (Refs & Annos)

17 U.S.C.A. § 201

§ 201. Ownership of copyright

Currentness

**(a) Initial Ownership.**--Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

**(b) Works Made for Hire.**--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

**(c) Contributions to Collective Works.**--Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

**(d) Transfer of Ownership.--**

   **(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

   **(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

**(e) Involuntary Transfer.**--When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

**CREDIT(S)**
(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2568; Pub.L. 95-598, Title III, § 313, Nov. 6, 1978, 92 Stat. 2676.)

Notes of Decisions (186)

Add. 62

§ 204. Execution of transfers of copyright ownership, 17 USCA § 204

| United States Code Annotated |
| Title 17. Copyrights (Refs & Annos) |
| Chapter 2. Copyright Ownership and Transfer (Refs & Annos) |

17 U.S.C.A. § 204

§ 204. Execution of transfers of copyright ownership

Currentness

**(a)** A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

**(b)** A certificate of acknowledgement is not required for the validity of a transfer, but is prima facie evidence of the execution of the transfer if--

**(1)** in the case of a transfer executed in the United States, the certificate is issued by a person authorized to administer oaths within the United States; or

**(2)** in the case of a transfer executed in a foreign country, the certificate is issued by a diplomatic or consular officer of the United States, or by a person authorized to administer oaths whose authority is proved by a certificate of such an officer.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2570.)

Notes of Decisions (111)

17 U.S.C.A. § 204, 17 USCA § 204
Current through P.L. 114-61 (excluding P.L. 114-52, 114-54, 114-59, and 114-60) approved 10-7-2015

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 63

§ 205. Recordation of transfers and other documents, 17 USCA § 205

United States Code Annotated
Title 17. Copyrights (Refs & Annos)
Chapter 2. Copyright Ownership and Transfer (Refs & Annos)

17 U.S.C.A. § 205

§ 205. Recordation of transfers and other documents

Effective: December 9, 2010

Currentness

(a) **Conditions for Recordation.**--Any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office if the document filed for recordation bears the actual signature of the person who executed it, or if it is accompanied by a sworn or official certification that it is a true copy of the original, signed document. A sworn or official certification may be submitted to the Copyright Office electronically, pursuant to regulations established by the Register of Copyrights.

(b) **Certificate of Recordation.**--The Register of Copyrights shall, upon receipt of a document as provided by subsection (a) and of the fee provided by section 708, record the document and return it with a certificate of recordation.

(c) **Recordation as Constructive Notice.**--Recordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document, but only if--

(1) the document, or material attached to it, specifically identifies the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title or registration number of the work; and

(2) registration has been made for the work.

(d) **Priority Between Conflicting Transfers.**--As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice under subsection (c), within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer. Otherwise the later transfer prevails if recorded first in such manner, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer.

(e) **Priority Between Conflicting Transfer of Ownership and Nonexclusive License.**--A nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if--

§ 205. Recordation of transfers and other documents, 17 USCA § 205

(1) the license was taken before execution of the transfer; or

(2) the license was taken in good faith before recordation of the transfer and without notice of it.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2571; Pub.L. 100-568, § 5, Oct. 31, 1988, 102 Stat. 2857; Pub.L. 111-295, § 3(b), Dec. 9, 2010, 124 Stat. 3180.)

Notes of Decisions (28)

17 U.S.C.A. § 205, 17 USCA § 205
Current through P.L. 114-61 (excluding P.L. 114-52, 114-54, 114-59, and 114-60) approved 10-7-2015

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 65