# United States Court of Appeals
# For the First Circuit

_____

No. 15-1506

SMALL JUSTICE LLC; RICHARD A. GOREN;
CHRISTIAN DUPONT, d/b/a Arabianights-Boston Massachusetts

Plaintiffs and Appellants
v.
XCENTRIC VENTURES LLC
Defendant and Appellee

---

On Appeal from the United States District Court
for the District of Massachusetts
The Honorable Denise J. Casper
Case No. 13-11701-DJC

---

BRIEF OF APPELLANTS SMALL JUSTICE LLC; RICHARD A. GOREN;
CHRISTIAN DUPONT, d/b/a Arabianights-Boston Massachusetts

Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
One State Street Suite 1500
Boston MA 02109
617-933-9494
rgoren@richardgorenlaw.com
Attorney for Appellants

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1, Appellant Small Justice LLC hereby states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

Table of Contents

I.   JURISDICTIONAL STATEMENT ................................... 2

II.  STATEMENT OF THE ISSUES .................................... 2

III. STATEMENT OF CASE ......................................... 4

  A.  Statement of Facts ...................................... 4

  B.  Procedural History ..................................... 13

    1.  The Motion to Dismiss FAC ............................ 14

    2.  Motion for Summary Judgment .......................... 15

    3.  Amendment to March 27, 2015 Memorandum and Order ...... 17

IV.  SUMMARY OF ARGUMENT ....................................... 19

V.   ARGUMENT .................................................. 20

  A.  Standard of Review ..................................... 20

  B.  Immunity Under the CDA ................................. 21

  C.  The District Court's dismissal of tort claims. ......... 26

  D.  DuPont did not transfer exclusive rights to Xcentric. .. 32

    1.  The property rights .................................. 36

    2.  Offer and Acceptance Contract Principles ............. 37

    3.  No inquiry notice justifying enforcement of a browsewrap
    agreement constituting a signed conveyance of DuPont's
    copyrights. ............................................. 39

E.    Involuntary Transfer. ................................. 42

   1.    The separate Order transferring DuPont's copyrights to Goren to effectuate the permanent injunction standing alone is not prohibited by any federal statute and is permitted under both federal and Massachusetts common law. .......... 43

   2.    Only the original individual author DuPont is eligible under specified limitations to claim Section 201 (e) protection against a governmental taking; Xcentric does not have standing to assert Section 201(e) protection which is one of the exclusive rights under the Act . ............... 44

   3.    Small Justice's standing is derived from the written assignment signed by the individual author DuPont's duly appointed attorney in fact and not from a government seizure. 46

F.    The "Contract" with DuPont is Unenforceable. ........... 47

   1.    The "Contract" between DuPont and Xcentric is illusory. 47

   2.    The CDA does not bar or alter application of basic contract principles. ....................................... 48

G.    The District Court erred in dismissing the 93A claim. .. 52

VI.  CONCLUSION ............................................. 62

CERTIFICATE OF COMPLIANCE WITH FED. R APP.  P. 32 (a)(7)(B)... 63

CERTIFICATE OF SERVICE....................................... 63

# TABLE OF AUTHORITIES

## Cases

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11
 (2d Cir. 1997) .......................................... 44

*Ager v. Murray*, 105 U.S. 126 (1881) ........................ 43

*Ajemian v. Yahoo!, Inc.*, 83 Mass. App. 565(2013).. 37, 38, 39, 41

*Arthur D. Little v. Dooyang*, 147 F. 3d 47 (1st Cir. 1998). 53, 61

*Arts Finishers Inc. v. Boston Redevelopment Authority,* 357 Mass.
 40 (1970) .............................................. 47

*Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381 (2004)
 ....................................................... 60

*Baker v. Libbie*, 210 Mass. 599 (1912) ...................... 28

*Barnes v. Yahoo!, Inc.*, 570 F. 3d 1096 (9th Cir. 2009) ....... 24

*Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) ........... 25

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...... 46

*Chaplinsky v. State of New Hampshire*, 315 U.S. 568 (1942) .... 51

*Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v.
 Craigslist, Inc.,* 519 F.3d 666 (7th Cir.2008) ............. 24

*Columbia Chiropractic Group, Inc. v. Trust Ins. Co.,* 430 Mass.
 60 (1999) .............................................. 61

*Craigslist Inc. v. 3Taps Inc.* 942 F. Supp. 2d 962 (N.D. Cal.
 2013) ............................................... 37, 38

*Doe v. McMillan*, 412 U.S.306 (1973)........................... 25

*Durfee v. Duke*, 375 U.S. 106 (1963)........................... 42

*Estate of Hevia v. Portrio Corp.*, 602 F.3d 34 (1st Cir. 2010). 20

*F.T.C v. LeanSpa, LLC,* 920 F. Supp.2d 270 (D. Conn. 2013)..... 27

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,

   521 F. 3d 1157 (9th Cir. 2008)......................... 23, 27

*Fidelity Ins. Co. v. Wilson,* 387 Mass. 841 (1983)............ 60

*Field v. Google*, 412 F. Supp. 2d 1106,(D. Nev. 2006).......... 9

*Folsom v. Marsh*, 2 Story 100, 9 F. Cases 342 (Circuit Court, D.

   Mass. 1841) ........................................... 28, 37

*Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99 (1988).

   ..................................................... 60

*FTC v. Accusearch, Inc.,* 570 F. 3d 1187 (10th Cir. 2009). 23, 27,

   28

*Goren v. Royal Investments Inc.,* 25 Mass. App. Ct. 137 (1987). 37

*Hendricks and Lewis PLLC v. Clinton*, 766 F. 3d 991 (9th Cir.

   2014) ................................................. 43

*Id*..................................................... 40, 42

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,*

   322 F. 3d 26 (1st Cir. 2003) .............................. 36

*Kilbourn v. Thompson*, 103 U.S. 168 (1880).................... 25

*Kraft Power Corp. v. Merrill*, 464 Mass. 145 (2013)........... 58

*Krebiozen Research Foundation v. Beacon Press, Inc.*, 334 Mass.

   86 (1956) ................................................. 51

*Leardi v. Brown*, 394 Mass. 151 (1985)......................... 58

*Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, (1979)

...................................................... 59

*Mass. Employers Ins. Exch. v. Propac-Mass, Inc.,* 420 Mass. 39

(1995) ............................................... 59

*Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*, 685

F. Supp. 2d 217 (D. Mass. 2010) ............................ 49

*Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) ........ 47

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp.

544 (E.D. Va. 2008) ........................................ 27

*New York Times Co., Inc. v. Tasini,* 533 U.S. 483 (2001)....... 8

*Nguyen v. Barnes & Noble, Inc.,* 763 F. 3d 1171 (9th Cir. 2014) 39

*Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.,* 214 F.3d 216 (1st

Cir. 2000) .............................................. 20

*PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593 (1975) 59

*Schnabel v. Trilegiant Corp.,* 697 F. 3d 110, 120 (2d Cir. 2012)

.................................................. 39, 40, 41

*Service Publications v. Goverman*, 396 Mass. 567 (1986)....... 60

*Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281,

952 N.E.2d 1011 (2011) ..................................... 23

*Slaney v. Westwood Auto, Inc.,* 366 Mass. 688 (1975).......... 58

*Specht v. Netscape Communications Corp.,* 306 F. 17 (2d Cir.

2002) ............................................ 38, 40, 41

*Stone v. Essex Cnty. Newspapers, Inc.,* 367 Mass. 849 (1975)... 48

*Universal Comm'n Systems, Inc. v. Lycos*, 478 F. 3d 413 (1st Cir. 2007) ............................................... 21, 50

*Wilson v. Martin-Wilson Automatic Fire-Alarm Co.*, 151 Mass. 515 (1890) ........................................................ 44

*Zeran v. Am. Online, Inc.,* 129 F. 3d 327 (4th Cir. 1997).. 21, 22

Statutes

17 U.S.C § 512............................................... 12

17 U.S.C. § 101.................................. 8, 30, 36, 46

17 U.S.C. § 103................................................. 8

17 U.S.C. § 106.................................... 28, 29, 36

17 U.S.C. § 512...................................... 9, 10, 31

17 U.S.C. §201................................... passim

17 U.S.C. §204.............................. 11, 36, 42, 46

28 U.S.C. § 1291............................................... ix

28 U.S.C. § 1331............................................... ix

28 U.S.C. § 1332......................................... ix, 13

47 U.S.C. § 230.......................... 19, 23, 24, 50

G.L.c. 231, §93............................................ 51

M.G.L. c. 93A, § 11........................................ 58

Rules

Fed. R. Civ. P. 12(b)(1)................................... 14

Fed. R. Civ. P. 12(b)(6)................................... 14

Fed. R. Civ. P. 12(c)...................................... 14

Fed. R. Civ. P. 17................................................ 44

Fed. R. Civ. P. 60(b)........................................... 17

Fed. R. Civ. P. 62.1............................................ 17

Treatises

RESTATEMENT (Second) of CONTRACTS §178(1981)................. 48

RESTATEMENT (Second) of CONTRACTS §179....................... 50

RESTATEMENT (Second) of CONTRACTS §19........................ 38

RESTATEMENT (Second) of CONTRACTS §92........................ 50

Regulations

940 CMR §6.01................................................. 41

## I.   JURISDICTIONAL STATEMENT

This is an appeal from a judgment of the United States District Court for the District of Massachusetts (Casper, J.), entered March 27, 2015 Add.1. The district court had jurisdiction under 28 U.S.C. § 1331 and § 1332.  In their notice of appeal filed on April 24, 2015 (App. 34) plaintiffs-Appellants specified an appeal from the "judgment (Paper 104) entered in accordance with the Memorandum and Order dated March 27, 2015 granting defendant's motion for summary judgment." Add.19.  This Court has jurisdiction under 28 U.S.C. § 1291 over both the March 2014 order dismissing certain claims and March 2015 grant of summary judgment dismissing the balance of plaintiffs' claims.

## II.   STATEMENT OF THE ISSUES

1.   Whether in its March 24, 2014 dismissal of claims, the District Court erred in holding defendant internet service provider (ISP) immune under the Communications Decency Act (CDA) from tort claims arising out a defamatory work first published under color of the ISP's claimed copyright where—according to the ISP—it is impossible for the work, composed by an independent third-party content provider, to be posted on its website without the contributor first granting the ISP all the exclusive rights of copyright ownership.

2

2.    Whether in its March 24, 2014 dismissal of claims, the District Court erred in holding Appellee immune under the CDA from claims arising out of the display or publication of copies of the libelous work on the servers of Google and other search engines where the ISP chose to re-publish the defamatory work on Google and other search engines, with each copy-view prominently featuring "Copyright © 1998-[date of view] Ripoff Report. All rights reserved."

3.    Whether the District Court erred in finding that the ISP's browsewrap agreement effectively transferred all the content-provider's ownership of the exclusive rights of copyright in the defamatory work despite the fact that the terms of such transfer were not necessarily apparent to the content provider prior to submitting his work.

4.    Whether the District Court erred in holding the nonexclusive license to be enforceable in accordance with its terms despite the fact Xcentric's reservation of the right to amend its terms was not expressly limited to prospective modifications.

5.    Whether the District Court erred in ruling that the CDA precluded application of ordinary contract law defenses and hence held the nonexclusive license was enforceable in accordance with its terms when the facts of the case

3

overwhelmingly demonstrate the nonexclusive license to be unenforceable on public policy grounds.

6.    Whether the District Court erred in holding that the transfer of copyright to Goren was barred as an involuntary transfer pursuant to 17 U.S.C. §201(e) despite the fact that the author of the work never challenged such transfer, and the transfer was effected by his attorney-in-fact.

7.    Whether the District Court erred in granting Xcentric summary judgment on Goren's claim pursuant to M.G.L. c. 93A, et seq. reasoning that Goren failed to demonstrate a causal connection between the ISP's conduct and his harm.

### III.    <u>STATEMENT OF CASE</u>

*A. Statement of Facts*

Goren practices law in Boston. The plaintiff Small Justice is a Delaware limited liability company with its principal office in Massachusetts.  The plaintiff DuPont is an individual who had been a defendant in a case prosecuted by Goren on behalf of a plaintiff and against whom in 2011 Goren's client had obtained a judgment.

The defendant Xcentric is an Arizona limited liability company that owns and operates the Ripoff Report, an interactive website.  The Ripoff Report holds itself out as an online consumer advocacy forum that allows users to submit to Xcentric

4

reports about companies or individuals who they feel have wronged them in some manner. App. 70.

"When a user wishes to submit a report to the Ripoff Report…[he is] required to create a free user account before …being] allowed to post anything." Ap. 246, ¶4.  After registering "a user [who] wants to create a report…[is] guided through a five step process." *Id*.  After providing necessary introductory information, including obtaining a "screen name," step 3, captioned "Write your Report" presents a screen in which the user "enters the actual text" of his proposed posting. Ap.249, 260.  Step 5 in the process presents the user with a screen captioned "Submit your Report" beneath which is a sub-caption "Terms and Conditions:" below which is some text alongside which is a box which must be checked in order to submit the report. Ap. 249, 264. The visible words in the box are those set forth on Exhibit A to the FAC. On the step 5 screen on the right hand margin of the box in which the Exhibit A words appeared, is an unidentified scroll bar which if dragged down reveals additional words of the Ripoff Report TOS. The complete TOS, including both the revealed screenshot and the portion only revealed if the viewer found the unidentified scroll down button and then scrolled completely through, is set forth on Exhibit B to the FAC. The material terms which without scrolling are not disclosed include:

> (i) this is a legal agreement between you and
> Xcentric.  Please read the Agreement carefully
> before registering for ROR. By registering for
> ROR, you agree to be bound by the terms and
> conditions of this Agreement… If you do not
> agree to the Terms, you are not permitted to use
> ROR.
>
> (ii) the user agrees prospectively and broadly
> to indemnify Xcentric for costs, liabilities and
> expenses "relating to or arising out of" his
> "use of" the website and/or breach of…[this]
> Agreement;
>
> (iii) that Xcentric reserved the right to change
> the terms of the contract at any time without
> notice by posting a link to the changed terms on
> Xcentric's website; and,
>
> (iv) By posting information or content to any
> public area of www.RipoffReport.com, you
> automatically grant, and you represent and
> warrant that you have the right to grant, to
> Xcentric an irrevocable, perpetual, fully-paid,
> worldwide exclusive license to use, copy,
> perform, display and distribute such information
> and content and to prepare derivative works of,
> or incorporate into other works, such
> information and content, and to grant and
> authorize sublicenses of the foregoing.

Ap. 88-90.  See Add.49-51.

It is undisputed that: "[I]f the user refuses to check this

[step 5] box…[his] report cannot be submitted to the site[.]"

Ap. 249,264. There is no explicit requirement that users read

Xcentric's TOS, nor were users required to check a box

confirming that they had done so. Add. 23.

> Every user-generated submission to the site is
> screened and reviewed by a staff of monitors who
> are authorized to make minor editorial changes
> in order to redact certain types of content

> (primarily offensive language, profanity,
> threats, etc…After a report has been reviewed by
> the staff, it is posted to the site… [Once
> posted, the report] contains some "original"
> content from the author and some generic content
> created by…[Xcentric]

Ap.249. Each and every work published on Xcentric's website

bears a footer proclaiming: "Ripoff Report has an exclusive

license to this report. It may not be copied without the written

permission of Ripoff Report." Ap. 45,¶ 78.

In early 2012 DuPont registered for a free account on the

Ripoff Report website and on the step 3 screen created a writing[1]

alleging that Goren routinely commits crimes in his practice of

law, defrauds both his clients and others, routinely commits

perjury and has a history of violent crimes in his personal

life. Each allegation is completely baseless and false. It is

undisputed on the last step 5 screen DuPont checked the box, and

that Xcentric published the defamatory report on the Ripoff

Report website.

Xcentric contends it owns all the exclusive rights of

copyright to the work that DuPont created pursuant to paragraph

6 of its TOS. According to Xcentric a user cannot post a report

---

[1] On January 31, 2012, and February 2, 2012, DuPont made
essentially identical postings. Because Small Justice possesses
a certification of registration of copyright ownership of the
January content and because it is undisputed DuPont repeated the
same process a few days later, we address the initial
publication.

without affirmatively accepting and agreeing to the TOS. Ap. 106, 116-117. According to Xcentric by the undisputed act of clicking yes to the step 5 box DuPont "signed a written transfer of the exclusive rights of copyright ownership in" his work. Ap.108.

The FAC contends that as a matter of basic offer and acceptance contract principles and Copyright law, the act of clicking the step 5 box cannot not constitute a writing signed by DuPont transferring the exclusive rights of copyright. Ap.73-74, ¶¶28-31. Plaintiffs contend that as a matter of law: the website failed to give a reasonable user sufficient notice of the existence and terms of a contract constituting a transfer of copyright ownership; that a reasonable user is not made aware that by accepting a free offer he is thereby assenting to a transfer of his copyright ownership; that the website failed to give a reasonable user a meaningful opportunity to review paragraphs 2 -12 of the TOS; and, there could be no meeting of the minds as to the material terms of the TOS for a number of reasons, including but not limited to, the offeror retained the right to change the TOS at any time by mere posting on its website where that power is not expressly limited to a prospective modification. Id.

Effective March 7, 2012 Xcentric obtained a registration of copyright at the United States Copyright Office for a "Group

Registration for an automated database titled Ripoff Reports

from January 7, 2012 to March 7, 2012." Ap. 55.

> The Copyright Act recognizes two distinct
> copyrighted works: "Copyright in *each separate*
> *contribution to a collective work* is distinct
> from copyright in *the collective work as a whole*
> ....' § 201(c) …. Copyright in the separate
> contribution "vests initially in the author of
> the contribution"…. Copyright in the collective
> work vests in the collective author … and
> extends only to the creative material
> contributed by that author, not to "the
> preexisting material employed in the work," §
> 103(b). … [C]opyright in "compilation"—a term
> that includes "collective works," 17 U.S.C. §
> 101—is limited to the compiler's original
> "selection, coordination, and arrangement").

*New York Times Co., Inc. v. Tasini,* 533 U.S. 483, 493-94 (2001).

    XCENTRIC holds itself out to Google and other search

engines as the copyright owner of the reports posted on its

Ripoff Report website. Ap.75,¶36.

> Google, like other search engines, uses an
> automated program... to continuously crawl
> across the Internet, to locate and analyze
> available Web pages, and to catalog those Web
> pages into Google's searchable Web index. As
> part of this process, Google makes and analyzes
> a copy of each Web page that it finds, and
> stores the HTML code from those pages in a
> temporary repository called a cache. Once Google
> indexes and stores a Web page in the cache, it
> can include that page, as appropriate, in the
> search results it displays to users in response
> to their queries.

*Field v. Google*, 412 F. Supp. 2d 1106, 1110-1113 (D. Nev. 2006).

    To protect its exclusive right to publish copies of its

copyright works, Xcentric can instruct the search engines that

"it does not want [their] robots to crawl the... [Ripoff Report]
Web site." *Id.*  Xcentric also has the option of precluding or
permitting Google to make cached copies. *Id.*  Xcentric then has
the option of requiring Google to direct a searcher to
Xcentric's Web site rather than permitting Google to allow a
searcher to access the cached copy on Google's servers. *Id.*

   Xcentric notified Google and the other search engines,
among other reasons for purposes of 17 U.S.C. § 512, that it is
owner of the copyright rights to the works at issue, and that
the search engine may make and maintain cached archival copies
of the material that Xcentric so transmits for periods
consistent with the so-called safe harbor provisions of 17
U.S.C. §512.

   It is undisputed as copyright owner Xcentric has authorized
Google and other search engines to store on their servers
"cached" versions of DuPont's content, and instead of solely
providing a link to Ripoff Report website, Google displays on
its servers cached copies of Xcentric's copyrighted work. Ap.
480-484, ¶¶ 73, 77.  It is undisputed that when a searcher stays
on the Google website she is shown the most recent copy of the
work on Google's server; and each such cached copy bears the
copyright notice: "Copyright © 1998-[year of view] Ripoff
Report. All rights reserved." Ap. 484-485, ¶ 77.

In November 2012, Goren filed suit against DuPont in the
Massachusetts Superior Court at law seeking damages for libel
and interference with advantageous relations and in equity to
redress the continuing threat of irreparable harm from the
continued republication of the defamation. Ap. 76, ¶40.  Goren
obtained a preliminary injunction enjoining DuPont and "any
person or entity in active concert or participation" with DuPont
from republishing the defamation. *Id.* ¶42.  After satisfying
itself of actual notice to DuPont that Goren would waive his
claim to damages upon entry of decree in equity, the Superior
Court determined that the continued republication of the
defamation presented a substantial risk of irreparable harm to
Goren that could not be remedied by an award of damages and
entered a permanent injunction.  Ap. 26, 157-160, 191-192.  The
Superior Court's final decree included a number of stand-alone
orders, requiring DuPont to prevent the re-publication of his
calumny.  To effectuate its decree the Superior Court appointed
Goren attorney-in-fact, coupled with an interest to execute an
assignment of DuPont's copyrights and to bring legal action in
DuPont's name seeking retraction or takedown of the defamation.
*Id.*  The Superior Court entered a separate decree that all
rights of ownership of copyright

> is hereby transferred to the plaintiff Richard
> A. Goren, meaning and intending to convey,
> transfer and assign by this Order and Judgment

> the full and exclusive ownership of copyright in
> and to that work so as to qualify as a transfer
> of ownership under 17 U.S.C. §201 (d) and/or
> under 17 U.S.C. §204.

Ap.181.

In May 2013 after being served with the Superior Court decree Xcentric refused Goren's demand to take down the report. Ap. 78, ¶¶49, 50.

As the copyright owner Xcentric publishes on its website the defamatory content and then licenses Google to republish on Google's servers copies of its copyrighted content. At the same time Xcentric advertises to Goren that because it was not the "original author," it did not own the work and had no legal responsibility for injury to his reputation. Xcentric informs the world that under no circumstances will it remove works that have been adjudged defamatory. Ap. 485, ¶ 79. But as the owner of the copyright of the libel, Xcentric advertises that if Goren and any other defamed subject of a Ripoff Report would only pay Xcentric a fee, Xcentric will "make your search engine listings change from a negative to a positive... [and] no matter how you search your name on search engines, it will all look as it should. Positive." Ap.486,¶ 81.

What Goren and other victims are not told is that as the owner of the copyright, Xcentric can preclude Google and the other search engines from listing the Ripoff Report libel on the search engine index. Because search engines will not keep cached

12

copies beyond a few weeks, Xcentric also can cut off all further publication by the search engines of the copies it had authorized the search engines to make.  17 U.S.C § 512.

In his capacity as attorney in fact for DuPont, Goren executed a written assignment transferring to himself and his assigns all right (whether or not now known), title and interest in and to the content he created. Ap.142. Goren then executed an assignment of the copyright to Small Justice. Id. Each written assignment was acknowledged by a Massachusetts notary. Id.  The US Copyright Office issued a certificate of registration that pursuant to a written assignment Small Justice was the owner of DuPont's initial January 31, 2012 work. Ap.200.

In July 2013 having applied for registration of ownership Small Justice and Goren filed suit against Xcentric for copyright infringement. Ap.16. Supported by an affidavit Xcentric moved to dismiss contending that pursuant to its TOS it owned the work and in all events the written assignment to Small Justice was void as a matter of law. Ap.39-67.

*B. Procedural History*

In their September 2013 First Amended Complaint ("FAC") DuPont and his assignees, Goren and Small Justice LLC ("Small Justice") sued Xcentric for copyright infringement seeking declaratory relief and damages. Ap. 68-94. Their essential contention was that the Ripoff Report website's process for

posting a work did not create an enforceable grant of an exclusive license in his work.  Invoking diversity jurisdiction under  28 U.S.C. § 1332, Goren sued Xcentric for libel, unfair and deceptive practices and intentional interference with prospective advantageous relations and sought damages and equitable relief for past and continuing injury to his reputation as a lawyer as a result of Xcentric's repeated publication under color of its claimed ownership of copyright of DuPont's *per se* libel of Goren and separately, regardless of who owned the posting, for violation of Chapter 93A.

1. <u>The Motion to Dismiss FAC</u>

Xcentric filed a Motion to Dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(1) arguing that Goren lacked standing to assert a claim for copyright infringement because it held the exclusive rights to DuPont's defamatory work, not Goren.  It also sought dismissal pursuant to Fed. R. Civ. P. 12(b)(6) of Goren's state law tort claims and M.G.L. c. 93A claims based, in part, on a claim of immunity under the CDA as a "neutral intermediary" vis-à-vis the publication of the defamatory speech. Goren, opposed the motion to dismiss and cross-moved pursuant to Fed. R. Civ. P. 12(c) to strike Xcentric's affirmative defenses of copyright ownership and immunity pursuant to the CDA.

Following oral argument, and a review of multiple affidavits in addition to the FAC and its exhibits, the District

14

Court issued its Memorandum of Decision dated March 24, 2014,
dismissing Goren's state law tort claims, all but one aspect of
his M.G.L. c. 93A claim, and denying dismissal as to the counts
and defenses requiring a determination of the parties'
respective claims to copyright in the DuPont works. Add. 18.  In
its decision on the motion to dismiss, the District Court held
that Xcentric was entitled to immunity under the CDA despite its
claim of copyright in the defamatory content, and despite its
alleged re-publication of that content on search engines like
Google. Add. 14-15. With respect to the G.L. c. 93A claims, the
District Court ruled that excepting only the claim based on
Xcentric's operation of its reputation restoration business and
its solicitation in Massachusetts of victims of defamatory
reports to participate in its fee-based reputation restoration
business, the claims must be dismissed for failure to state a
claim.  Add. 15-16.

2. Motion for Summary Judgment

The claims surviving the Court's March 24, 2014 decision on
the Motion to Dismiss were Goren's claim seeking a declaration
that Small Justice (the assignee of DuPont) owned the exclusive
rights to DuPont's two defamatory postings, and his claim that
Xcentric's practices relative to its reputation repair services
were unfair and deceptive, and therefore in violation of G.L. c.

93A.  Xcentric moved for summary judgment seeking dismissal of these remaining claims.

By its Memorandum and Order dated March 27, 2015, the District Court granted Xcentric's Motion for Summary Judgment terminating all of Goren's claims.  With respect to the Parties' respective claims of copyright to DuPont's defamatory works, the Court held that  "DuPont transferred copyright ownership [of his works] to Xcentric by means of an enforceable browsewrap agreement…[and] even if the browsewrap agreement were considered invalid and DuPont retained ownership of the copyrights to the Reports, he nonetheless granted a non-exclusive license to Xcentric and, therefore, he waived his right to sue Xcentric for infringement where its use did not exceed the scope of that license." Add. 28-29. In its March 27th Memorandum and Order, the District Court further explained that since DuPont had transferred his copyright ownership to Xcentric prior to Goren obtaining his copyright interest in the works through proceedings in the Suffolk Superior Court, Goren held no rights to the defamatory works as Dupont had no rights left to transfer. Add. 29-30.  Further, the District Court held that even if DuPont still held his copyright to the defamatory works after his execution of the browsewrap agreement, the transfer to Goren with the aid of the Suffolk Superior Court was ineffective as an involuntary transfer in violation of 17 U.S.C. §201(e).

16

The District Court likewise dismissed the surviving G.L. c. 93A claim holding that Goren has failed to present any evidence of harm caused to him by way of Xcentric's reputation repair program and its methods of solicitation of customers for such program. Add. 32.

On April 24, 2015, well within the thirty day limitation provided by Fed. R. App. P. 4(a)(1)(A), Appellants filed their Notice of Appeal (Add. 34) of the March 27, 2015 Judgment(Add.1) entered in accordance with the Court's Memorandum and Order granting Xcentric summary judgment.

### 3. Amendment to March 27, 2015 Memorandum and Order

Following a post-judgment motion by Xcentric for an award of costs and attorney's fees, and a motion by plaintiffs to amend their Notice of Appeal to include a reference to the District Court's March 24, 2014 Memorandum and Order granting and part and denying in part Xcentric's Motion to Dismiss, on May 22, 2015, the District Court *sua sponte* issued an order (Add.36-37) that it contemplated adding a footnote to its March 27, 2015 summary judgment decision and invited the parties to file a brief (paper 100). The proposed footnote indicated that

> even [though] the judgment entered for Xcentric,
> D. 104, would not change…[assuming's requirement
> of a written and signed conveyance applies]
> Xcentric did not acquire an exclusive license to
> the Reports…and DuPont, as the author…, retained
> copyright ownership…[But because he did] convey
> [] a nonexclusive license [whereby] Xcentric may

17

display them in perpetuity…summary judgment
still enters in Xcentric's favor.

Both parties filed briefs. In addition pursuant to Fed. R.
Civ. P. 60(b) the plaintiffs moved for an indicative ruling
pursuant to Fed. R. Civ. P. 62.1 requesting that the District
Court indicate whether it would vacate its dismissal of the
Parties' competing claims for declaratory relief in the event
this Court were to remand the case for such purpose ("Motion for
Indicative Ruling"). See ECF #118. Ap.13  In their  Motion for
Indicative Ruling, plaintiffs argued that because the District
Court has found, as expressed in its subsequently added
footnote, that the browsewrap agreement was not a sufficient
writing to satisfy the signed writing requirement, DuPont still
held his copyright at the time the transfer of the same was
effectuated with the aid of the Suffolk Superior Court to Goren
and on to Small Justice.  Plaintiffs urged the District Court to
vacate its dismissal of the declaratory judgment count so that
the Plaintiffs could pursue a declaration that DuPont was the
rightful holder of the copyright, and therefore could preclude
Xcentric from licensing the content to Google and other search
engines.  In addition, and for the same substantive reasons,
Dupont (through Goren) sought leave to amend the FAC in order
request a declaration that he remains the holder of the
copyright to the works. See ECF #129.Ap. 14.

In its Memorandum and Order dated September 30, 2015, the District Court denied Goren's Motion for Indicative Ruling reasoning that the Plaintiffs never sought a declaration in the FAC that "DuPont owns the copyrights at issue, [and] the prayer for relief as to Count I of the Plaintiffs' first amended complaint sought 'a declaration that Small Justice[] is the lawful owner of the copyright ownership of each of the' Reports." Add. 42. In addition, the District Court denied plaintiffs' Motion to Amend Notice of Appeal, DuPont's Motion to Amend Complaint, allowed Xcentric's Motion Dismiss Counterclaim, denied Xcentric's Motion for Sanctions Against Goren and denied Xcentric's Motion for Fees and Costs (without prejudice). Add. 48.

## IV.   SUMMARY OF ARGUMENT

The plaintiff Goren was defamed by a work composed by the plaintiff DuPont and published on the defendant's Ripoff Report website. An interactive computer service provider, or ISP, that adopts content created by a third party as its own is also an information content provider of that content and hence not entitled as a matter of law to immunity pursuant to 47 U.S.C. § 230 for state law causes of action that treat the ISP as the publisher or speaker of that information. Therefore the District Court erred in holding that as a matter of law Xcentric cannot be sued for Goren's state law tort claims both for the

continuing publication on the Ripoff Report and Xcentric's
publication on Google pursuant to its copyright ownership.

An ISP cannot bind a reasonable user of its site to its
Terms of Service (TOS) without providing clear, unavoidable and
inevitable disclosure of its TOS.  Because DuPont did not enter
into an enforceable browsewrap contract, at a very minimum he
retained ownership of his copyrights and Goren, as DuPont's
attorney in fact, has the right to stop Google from continuing
to publish the libel.

The nonexclusive license DuPont granted to Xcentric to post
the defamation is not enforceable both for lack of consideration
and on grounds of public policy.

Finally under the Massachusetts Unfair Practices Act a
plaintiff need only demonstrate a causal connection to the
unfair or deceptive business practices. It is undisputed that as
a result of Xcentric's operation and advertisement in
Massachusetts of its reputation restoration business Goren has
suffered a loss of property and money. Therefore his claims
under G.L. c. 93A should proceed to trial.

### V.  ARGUMENT

A. *Standard of Review*

The March 24, 2014, Order is reviewed by this Court de novo
accepting the factual allegations in the complaint as true and
drawing all reasonable inferences in the plaintiff's favor.

*Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.,* 214 F.3d 216, 220 n.2 (1st Cir. 2000).

The March 27, 2015 summary judgment rulings dismissing plaintiffs' claims are reviewed by this Court de novo accepting the "relevant facts in the light most favorable to the plaintiffs." *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 38 (1st Cir. 2010).

    *B. Immunity Under the CDA*

The District Court erred in dismissing the tort claims because the undisputed relevant facts demonstrate that Xcentric was not merely a neutral intermediary but that a) it was a material information content provider when as the copyright owner it first caused the defamatory statement to be published on its website, and b) it was the sole information content provider when it licensed Google and other search engines to publish on their websites copies of Xcentric's copyrighted content.

A publisher of a libel authored by a third party is generally subject to tort liability. In enacting the CDA, Congress has granted broad immunity to entities… that facilitate the speech of others on the Internet." *Universal Comm'n Systems, Inc. v. Lycos*, 478 F. 3d 413, 415 (1st Cir. 2007).  The broad immunity intended by Congress for "companies that serve as intermediaries for other parties' potentially injurious

21

messages" (*id.* at 418) is predicated on the legislatively specified policy to promote a vibrant free market of ideas on the internet. *Id.* at 418-19 citing *Zeran v. Am. Online, Inc.,* 129 F. 3d 327, 331 (4th Cir. 1997). The CDA has "two parallel goals. The statute is designed at once 'to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material'." *Carafano v Metrosplash.com. Inc.*, 339 F.3d 1119, 1122 (9th Cir 2003).

Understandably ISPs would be reluctant to provide the invaluable First Amendment benefit of a freely accessible, interactive bulletin board if to avoid legal liability they had to conduct a fact based review of each posting before publishing. *Zeran,* supra.

Explaining that an ISP that is itself the "content provider" is not shielded from liability, in *Lycos*, this Court affirmed the district court's allowance of the ISP's motion to dismiss, ruling that:

> Taking...[the plaintiff's] allegations as true,
> Lycos has done nothing in this case that might
> make the misinformation at issue its own, rather
> than that of 'another information content
> provider.'"

*Id*. at 419, 421. The CDA

> establishes that "[n]o provider or user of an
> interactive computer service shall be treated as
> the publisher or speaker of any information

provided by another information content
provider"… and it preempts any state law—
including imposition of tort liability—
inconsistent with its protections… A defendant
is therefore immune from state law liability if
(1) it is a "provider or user of an interactive
computer service"; (2) the complaint seeks to
hold the defendant liable as a "publisher or
speaker"; and (3) the action is based on
"information provided by another information
content provider."

*Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281,

286-87, 952 N.E.2d 1011 (2011) "Creating an open forum for third

parties to post content—including negative commentary—is at the

core of what section 230 protects." *Id.* at 290-91.  An

"information content provider" is "any person or entity that is

responsible, in whole or in part, for the creation or

development of information provided  through the Internet or any

other interactive computer service." 47 U.S.C. § 230 (f) (3).

"Any piece of content can have multiple providers." *Shiamili,*

*supra.*  See *FTC v. Accusearch, Inc.,* 570 F. 3d 1187, 1197-99

(10th Cir. 2009) ("An …[ISP] that is also an information content

provider of certain content is not immune from liability arising

from publication of that content"). The CDA does not explicitly

inform a court how to construe the terms "development" or

"responsible." *Id.*

This Court should broadly construe these undefined terms

and determine an ISP to be ineligible for immunity "if it

contributes materially to the alleged illegality of the

conduct." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F. 3d 1157, 1168 (9th Cir. 2008). For then the ISP is not a mere intermediary for the speech of others but a principal whose alleged wrongdoing is the proximate cause of the injury. See *Accusearch,* 570 F. 3d at 1197-99 ("to be 'responsible' for the development of offensive conduct,…[ISP] must be more than a neutral conduit" and by its actions "actually make available… something previously only potentially available"). See also *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 669 (7th Cir.2008) ("§230(c) as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts..."). The CDA only "protects certain internet-based actors from certain kinds of lawsuits." *Barnes v. Yahoo!, Inc.,* 570 F. 3d 1096, 1099 (9th Cir. 2009). There is no general immunity from liability from publishing libel that is derived from third party content. *Id*. at 1100 ("neither...subsection [§230(c)(1)] nor any other declares a general immunity from liability derived from third-party content").

Because the affirmative defense of immunity under the CDA is to be judicially determined on a case by case basis with an eye toward advancement of the general public policy statements of the CDA, Supreme Court decisions on official immunity are

instructive. The doctrine of immunity attempts to balance two competing, equally vital considerations.

Where the injury is caused by action taken in good faith, for example, by a public official in the exercise of her official duties, the protection of the public interest warrants shielding her from liability. And so, there is no "fixed invariable rule of immunity but …[this court must make] a discerning inquiry into whether the contributions of [the] immunity...[to the public interest it shields] outweigh the... harm to individual citizens..." *Doe v. McMillan*, 412 U.S.306, 320 (1973). Immunity does not automatically lie based on the status or title of the actor. See *Kilbourn v. Thompson*, 103 U.S. 168 (1880). See also *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971).

The immunity doctrine whether for government officials or neutral interactive websites provides no shield unless the volitional publication is sufficiently connected with the proper functioning of the public purpose being served. *Doe v. McMillan*, 412 U.S at 317, 319-20. "The scope of immunity has always been tied to the scope of authority." *Id.* at 320.

There is a fundamental difference between a passive publisher who permits authors to post their works on its interactive website and the same actor publishing its own work on the same website.  The First Amendment benefit lies in

25

passively providing an internet bulletin board freely accessible
to anyone with wireless or hard wired internet access. When as
in this case the ISP requires the creator or author of the
content to transfer ownership to the ISP as condition of the
posting, the ISP is no longer a passive publisher.

The FAC presents two independent theories of recovery
against Xcentric each asserting that Xcentric's tortious conduct
was undertaken outside of the scope of immunity intended by the
CDA. First where in the exercise of ownership of the exclusive
rights of copyright Xcentric—and not DuPont—initially published,
and continues to publish, the defamation on its Ripoff Report
website, there is no immunity under the CDA. Ap. 82,¶72.  Second
even assuming the initial publication to be immune, Xcentric
authorizes and directs Google and other search engines to make
copies of its copyrighted work; and therefore when pursuant to a
license from Xcentric the search engines display copies of the
defamation on their servers to potential clients of Goren,
Xcentric is the information content provider and bereft of
immunity under the CDA. Ap. 82-83, ¶78.

C. *The District Court's dismissal of tort claims.*

The District Court's rejection of both theories and
dismissal of the two alternative claims was error as a matter of
law. Add. 13-15.

26

As to the initial publication by Xcentric on its website, the District Court determined that because DuPont had composed the content, the defamation claim was necessarily predicated on information provided by DuPont. As to the impact of copyright ownership the District Court ruled

> Xcentric's acquisition of an exclusive license to the content (if the record ultimately shows that it did acquire such a license) is an insufficient level in involvement in the development of the content to nullify CDA immunity.

Add. 13-14. On those two legs the District Court held Goren failed to state a claim in tort for publication of the libel on Xcentric's website. That dismissal constitutes error for a number of independent reasons.

First, that DuPont composed the content standing alone is not determinative, as a matter of law, of Xcentric's affirmative defense. *F.T.C v. LeanSpa, LLC.*, 920 F. Supp.2d 270, 275 (D. Conn. 2013); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 550 (E.D. Va. 2008) aff'd, 591 F.3d 250 (4th Cir. 2009).

The initial unlawful conduct targeted by the FAC is not DuPont's composing and then typing the content onto the step 3 screen but Xcentric's initial and continued publication of its copyrighted work on its website. That but for DuPont's step 3 keystrokes no "content" could have been created should not be

27

determinative. *Roommates*, supra; *Accusearch*, supra.  According
to Xcentric it alone could make DuPont's words actually
available to be published for the very first time on its website
and then subsequently licensed to Google; as the owner of the
exclusive rights of copyright Xcentric was "responsible for the
development of the specific content that was the source of the
alleged liability." *Id.*

It is more than plausible that Xcentric is an information
content provider of the libel posted on the Ripoff Report
website.  DuPont composed a series of words and communicated the
expression of his ideas to Xcentric.  Whether or not of any
literary value, DuPont and his representatives "possess the sole
and exclusive copyright therein." *Folsom v. Marsh*, 2 Story 100,
9 F. Cases 342, 346 (Circuit Court, D. Mass. 1841).  The right
of an author to publish or suppress unauthorized publication by
the recipient of his communication is absolute; and, in the
absence "of implications raised by the law from the
circumstances," the author or his court appointed representative
may obtain an injunction preventing the recipient from
publishing or copying his work. *Id.; Baker v. Libbie*, 210 Mass.
599 (1912). These fundamental principles of the author's
presumptive rights are reflected in the Copyright Act. 17 U.S.C.
§ 201(a) ("Initial Ownership").Add. 62. Only the owner of the
copyright has the right to make the first public display of his

28

work. 17 U.S.C. § 106. Add. 61. Therefore Xcentric was an information content provider of the libel it posted on its website under color of its exclusive ownership of copyright.

According to Xcentric while Dupont had composed the content, prior to its posting[2] he ceased to have any ownership of the content before it ever became visible to the public. According to Xcentric no content composed by a third party can be submitted for the website's publication unless and until that individual first agrees to all of Xcentric's TOS including the paragraph six grant of all rights of copyright ownership in and to the content. If Xcentric is correct that all users necessarily agree to its TOS, it acquired the right "to display the copyrighted work publicly" (17 U.S.C. § 106 {Add. 61}) as a condition of DuPont's checking the step 5 box before the posting. According to Xcentric it was the owner of the content prior to its posting. So concurrent with his checking of the step 5 box, DuPont could have no content to provide.

According to Xcentric it was only after DuPont's submission and review by Ripoff Report staff that the speech appeared on

_____

2 It is undisputed on the summary judgment record that the keystrokes entered on the step 3 are never recorded and the content constituting the defamation is reduced to a fixed copy for the first time when it is posted on the Ripoff Report website. Therefore the first publication of the work was upon posting on the Ripoff Report website. 17 U.S.C. §101 ("a work is created when it is fixed in a copy … for the first time");§106.

its website.   The content was initially posted, and continues to
be posted, on Xcentric's website as the copyrighted work of
Xcentric. If checking the step 5 box was the proximate cause of
the posting, that act belongs at least equally to Xcentric as
the owner of the content as to DuPont. Cf. *Roommates*, 521 F. 3d
at 1166-67 ("The projectionist in the theater may push the last
button before a film is displayed on the screen, but surely this
doesn't make him the sole producer of the movie").

Moreover, it is plausible that Xcentric—and not DuPont—is
the creator of the content or work. According to Xcentric there
is no record, no fixed copy of either the step 5 process or the
prior step 3 process where the user's keystrokes on Xcentric's
server compose the words that later become the content. There is
no fixed copy of content until the user checks the step 5 box.
Ap.469-470,¶ 43. Only after DuPont had checked the step 5 box
were the communication of his ideas first reduced to a fixed
copy.   Before then there is no content in the nature of a
copyrightable work. 17 U.S.C. §101 (work is created when it is
"fixed in a copy… for the first time"). Therefore Xcentric was
the owner of the content, when the copyrightable "work" was
first created upon Xcentric's initial public display of its
copyrighted content in a fixed copy.

As to Goren's alternative theory (Ap. 82-83, ¶78),
apparently because Xcentric did not "change[] the content in any

way" the District Court held "the alleged conduct does not rise
to the level of the 'creation or development of information'
that would render Xcentric an 'information content provider'
under the CDA." Add. 14-15. This was error because whether or
not DuPont was the operative "content provider" on the Ripoff
Report website, it is Xcentric that under color of its ownership
of the exclusive rights of copyright is the information content
provider of the content displayed on Google's servers. 17
U.S.C.§512.

The FAC alleges that Xcentric instructed Google's robot
crawler periodically to visit the Ripoff Report website and take
snapshots of the defamation. It is undisputed that under color
of its proclaimed copyright ownership Xcentric instructs Google
to keep those snapshots or copies on Google's servers. Ap. 484-
485.  While Xcentric might have required that a search engine
user be directed to its Ripoff Report website to read the
original work, Xcentric chose to have its licensees publish on
their servers snapshot copies of the defamation that were taken
by Google long after the original Ripoff Report publication.
[*id.*] So even assuming it to be immune from liability for
publication of the libel on its website, Xcentric is the
"information content provider" of copies of the libel that it
directs to be published on the search engine servers.

Therefore, the District Court erred in its finding that Xcentric
was immune pursuant to the CDA.

    *D. DuPont did not transfer exclusive rights to Xcentric.*

      The District Court erred in holding that DuPont had
transferred all exclusive rights of copyright to Xcentric by an
enforceable browsewrap agreement. As a matter of law on the
undisputed material facts a reasonably prudent website user is
not charged with inquiry notice of the TOS paragraph six
transfer of copyright ownership; and, DuPont retained ownership
of the exclusive rights of copyright to the defamatory postings.

      The District Court erred in determining that "a reasonably
prudent user was on inquiry notice of"…[Xcentric's TOS] and
therefore the transfer of copyright ownership was valid." Add.
26. Implicitly ruling that the mere underlining of text is
sufficient to inform a user that such text is a hyperlink, the
District Court determined that the presence on the bottoms of
the step 5 screen and "at least two of the other [posting
process] screens of "blue" underlined text constituted
conspicuously visible links to the TOS. *Id.* Ruling that the
conspicuous presence of the blue underlined text coupled with
the undisputed necessary steps of the five step process
constituted inquiry notice, the District Court held DuPont had
entered into an enforceable contract and had thereby transferred
all his exclusive rights of copyright to the defamatory

postings. Add.28. The Court held Xcentric was entitled to summary judgment on the copyright infringement claims.

After registering for his free account DuPont was guided through the five step process outlined at the outset of this brief. Ap. 343-344, ¶¶ 6-9. In order to proceed from each step to the next, DuPont had to have clicked on a button captioned in bold "Continue." Step five, entitled "Submit your Report" sets forth the offer by Xcentric which was accepted by DuPont when he checked the step 5 box and then clicked the Continue button. All that was visibly offered in the box is the following:

>**Ripoff Report Membership Terms & Conditions**
>
>To use this service, you must be at least 14 years old.
>www.RipoffReport.com ("ROR") is an online forum created to help keep consumers informed. ROR is operated by Xcentric Ventures, LLC located at: [address and phone listed]

To indicate his acceptance of Xcentric's offer DuPont then clicked on a box alongside which in its entirety was the following text:

>By posting this report/rebuttal, I attest this report is valid. I am giving Rip-off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE. Further, I agree that by posting the report/rebuttal that the State of Arizona has exclusive jurisdiction over any disputes between me and the operators of Rip-off Report arising out of this posting.

Ap. 460, ¶ 17.

On the right vertical rectangular margin of this step 5 box
was a square figure, a so-called scroll bar. Ap. 460, ¶¶15-16.
There is no marking or identification of the function as a
vertical scroll bar. Id. There is no direction, explicit prompt
or even suggestion to use the scroll bar to view any additional
disclosures. There is no notice regarding "important terms"
below.  Id. Beneath this step 5 box were two buttons captioned
in bold "**Continue**" and "**Back.**" Ap. *459-60,* ¶14. It is undisputed
DuPont clicked on the step 5 box above and then clicked on the
"**Continue**" button.  Ap. 469-70,¶¶42, 43. Beneath the "**Continue**"
button were a number of underlined terms or phrases:

> (i)Home; (ii) File a Report; (iii) Consumer
> Resources; (iv) Search; (v) Link to Ripoff
> Report; (vi) Privacy Policy; (vii) Terms of
> Service; (viii) FAQ; (ix) About Us; (x) Contact
> Us; and, (xii) Why Ripoff Report will not
> release author information!.

None of these underlined terms or phrases are explicitly labeled
as hyperlinks. Ap. 461, ¶ 18.  The font size of the underlined
terms is not larger than the font size of the words in the box
to be checked. Id.

It is undisputed that only by using the unlabeled scroll
bar and scrolling down is there possible disclosure of a 12
numbered paragraph document bearing a title: "About us: Terms of
Service." Ap. 461, ¶ 24.

Without using the unlabeled scroll bar to find and read the TOS a user is not informed of Xcentric's request to "please" read the "Agreement" and is not informed of the importance of the "Agreement" *i.e.*, "[i]f you do not agree to the Terms, you are not permitted to use ROR," or that Xcentric can unilaterally amend the Terms of Service and that such power is not expressly limited to prospective modifications.  Without scrolling there is no disclosure that a user's act of clicking constitutes his signature to a transfer of all his exclusive rights under copyright of his work.  Ap. 464-65, ¶¶33,34. Without scrolling there is no disclosure that the user accepting the free offer agrees to broadly indemnify Xcentric for any expenses and losses arising out of or relating to the posting.

It is undisputed there is no direction or prompt in the step 5 process to scroll before checking the step 5 box; nor any direction to do so before clicking on the "Continue" button. Ap. 461,¶¶ 19-20. And a user can check the step 5 box and then click on the "Continue" button without scrolling. Ap. 461,¶ 21. Xcentric does not have a record of DuPont's electronic checking of the step 5 box or the "continue" button.  Ap. 469-70,¶ 43. There is no visible notice to a user nor any prompt to take any affirmative action to demonstrate assent to the TOS.  Therefore Xcentric has no direct evidence that DuPont had actual notice of Xcentric's twelve paragraph TOS or that that as part of the

undisputed five step process he affirmatively accepted and
agreed to the TOS. Ap. 470,¶ 44.

1. The property rights

    Under long-established copyright principles, DuPont is the
presumptive owner of his work. 17 U.S.C. § 201(a) "Initial
Ownership" ("Copyright in a work…vests initially in the
author"). The United States has thereby granted to DuPont the
right to control the exploitation of his work. 17 U.S.C. §106
provides that "an owner of copyright under this title has
[specified] exclusive rights." The Act's definition of a
"transfer of copyright ownership" includes a grant of an
"exclusive license" but specifically excludes a nonexclusive
license. 17 U.S.C. §101.

    Any of the "exclusive rights comprised in a copyright…may
be transferred" in whole or in part by an instrument of
conveyance "signed by the owner of the rights conveyed or such
owner's duly authorized agent" or by operation of law. 17 U.S.C.
§§201(d) and 204(a). Only an owner "of any particular exclusive
right is entitled, to the extent of that right, to all of the
protections and remedies accorded the copyright owner by this
title." 17 U.S.C. §201 (d)(2). A grant of a nonexclusive
license does not require a signed writing. See *John G.
Danielson, Inc. v. Winchester-Conant Properties, Inc.,* 322 F. 3d
26, 40 (1st Cir. 2003).

By checking the step 5 box, DuPont accepted the offer
presented to him.  The visible words in the box provide that
Xcentric has the irrevocable right to post the defamation on the
Ripoff Report website.  As a matter of law those words facially
constitute a grant of a nonexclusive license without the
inclusion of any right to exclude others or authorize others to
exercise any rights in the works.  See *Craigslist Inc. v. 3Taps
Inc*. 942 F. Supp. 2d at 973-74.3 See *Folsom v. Marsh*, 2 Story
100, 9 F. Cases at 346.4

2. Offer and Acceptance Contract Principles

There can be no acceptance of an offer the material terms
of which are not disclosed. See *Goren v. Royal Investments Inc.,*
25 Mass. App. Ct. 137, 140-41 (1987).  That the purported
contract was entered into online does not alter "the pertinent
legal principles." *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. 565,
575 n. 12 (2013).  Xcentric has the burden of establishing on
undisputed facts that the provisions of the…[contract it seeks
to enforce including in particular the conveyance of the author
DuPont's ownership in his copyrights] were reasonably

---

3 "The language assigning rights to the content did not use the
phrase 'all rights,' and did not specify that the rights granted
were "exclusive." *Id*. at 974.
4  If this Court determines there was no transfer of exclusive
rights, DuPont by his court appointed attorney will be able to
contest Xcentric's continued licensing of his work to third
parties.

communicated and accepted. *Id.* at 575 citing *Specht v. Netscape Communications Corp.,* 306 F. 17, 35 (2d Cir. 2002); *Craigslist Inc*. v. 3Taps, supra (same). This burden requires proof by clear evidence that (i) Xcentric had provided "[r]easonably conspicuous notice of the existence of [the] contract terms;" and, (ii) the author had "unambiguously manifest[ed his] … assent" to all the material terms of Xcentric's offer including the conveyance of all rights of exploitation of his work. *Ajemian v. Yahoo!,* 83 Mass. App. at 574–75. See RESTATEMENT (Second) of CONTRACTS §19(2)(1981) and Illustration b.

"There are two types of contracts formed online: 'clickwrap' and 'browsewrap' agreements." Add.24. Because Xcentric has no evidence that DuPont checked a box "affirmatively indicat[ing] his agreement to" to all of Xcentric's TOS, the District Court properly rejected Xcentric's contention that DuPont had entered into a click wrap agreement binding himself to all the terms of Xcentric's TOS. Add. 24-25. The District Court found that "by checking the box, the user agrees only to the terms accompanying the checkbox." Add. 24. As set forth above those terms constituted only a nonexclusive license and included none of the exclusive rights of copyright.

3. No inquiry notice justifying enforcement of a browsewrap agreement constituting a signed conveyance of DuPont's copyrights.

To determine the enforceability of a standard form contract proffered online requires a record of what was presented or displayed to the viewer and also of what terms and provisions that were not presented but of which a "reasonably prudent offeree would be on notice." See *Schnabel v. Trilegiant Corp.*, 697 F. 3d 110, 120 (2d Cir. 2012) (question whether receipt of emailed terms can constitute constructive notice). Without such a record there can be no adjudication "that the terms of any agreement were reasonably communicated or that they were accepted." *Ajemian v. Yahoo!,* 83 Mass. App. Ct. at 576.

That Dupont had "the opportunity to review the Terms of Service… prior to submitting" his work "does not establish that the provisions of… [Xcentric's TOS] were reasonably communicated to [him]." *Id.* at 575. That a link to Xcentric's TOS was available at the bottom of the page does not satisfy Xcentric's burden to demonstrate the "reasonableness of communicating the… TOS via a link." *Id.* Even assuming the blue colored underlined term to constitute a conspicuously displayed hyperlink, because Xcentric

> otherwise provides no notice to users nor
> prompts them to take any affirmative action to
> demonstrate assent, even close proximity of the
> hyperlink to relevant buttons users must click
> on—without more—is insufficient to give rise to

> constructive notice. … [C]onsumers cannot be
> expected to ferret out hyperlinks to terms and
> conditions to which they have no reason to
> suspect they will be bound.

*Nguyen v. Barnes & Noble, Inc.,* 763 F. 3d 1171, 1178-79 (9th Cir. 2014).

Because scrolling is necessary to view the material terms and because a user can proceed without scrolling through the TOS, disclosure is not inevitable. There simply is no evidence in the record on which a jury could rely to conclude that any user or DuPont was on "actual notice of circumstances sufficient to put a prudent man upon inquiry [notice of the contracting away of his ownership of all copyright and broadly indemnifying Ripoff Report]." *Schnabel*, 697 F. 3d at 120 (citing *Specht*, 306 F. 3d at 30 n. 14).

As in *Specht*, DuPont was "responding to… [a free] offer that did not carry an immediately visible notice of the existence of [the exclusive] license terms or require unambiguous manifestation of assent to those terms." *Id.* at 31, 32.[5] There was no statement alerting a user to scroll down to see "important terms below." There was no disclosure of any condition to this "free membership" requiring him to contract

---

[5] "When products are "free" and users are invited to download them in the absence of reasonably conspicuous notice that they are about to bind themselves to contract terms, the transactional circumstances cannot be fully analogized to those in the paper world of arm's-length bargaining." *Id.*

40

away his constitutionally impelled property rights.  There was no explicit prompt alerting him to the existence of any of the material provisions of the TOS. It is undisputed DuPont was not required to scroll through the not-immediately visible TOS. The scroll bar was not identified as such. Ap. 344-346, ¶¶ 15-26. The underlined phrase "Terms of Service" at the bottom of the page view standing alone does not convey the importance, nature and relevance of the information to which they led.  Because scrolling was necessary to view the Terms of Service provisions contracting away all of DuPont's copyright interests as well as broadly indemnifying Xcentric, the disclosure should be unavoidable, *i.e.,* DuPont should have been unable to proceed further with the transaction without scrolling through the disclosure. *Schnabel,* supra; *Specht*, supra; *Ajemian*, supra. But it is undisputed DuPont was not required to scroll and the disclosure was not inevitable. Ap. 469-70,¶ 43.

Because there was no conspicuous disclosure of any of the material terms of the TOS and/or that Xcentric could unilaterally change the terms, Xcentric's solicitation and advertisement of a free offer accepted by DuPont as a Massachusetts resident was unfair and deceptive under Chapter 93A.  See 940 CMR §6.01. Add. 83-.].

41

*E. Involuntary Transfer.*

The District Court's ruling that "Section 201(e) eliminates any ownership interest in the copyrights claimed by Goren and Small Justice" (Add.30) is wrong as a matter of law, for two independent reasons.

The Massachusetts Superior Court entered a judgment in equity to redress the continuing irreparable harm to Goren from republication of DuPont's libel. Ap. 477, ¶ 60. That harm includes the continued display on Google's servers of snapshot copies of the original post at Xcentric's direction pursuant to its claimed copyright ownership. Ap. 482-483,484-485, ¶¶71, 77. With Goren having waived his claim for damages the Superior Court entered two separate decrees concerning DuPont's copyrights. One decree declared that the copyrights were thereby transferred to Goren, intending the Order and Judgment to constitute a conveyance of the full and exclusive ownership of copyright under 17 U.S.C. §201(d) and/or under 17 U.S.C. §204. The Superior Court also entered a separate decree appointing Goren as DuPont's "attorney in fact", coupled with an interest, to bring this lawsuit and also to execute a conveyance by DuPont of all rights in and to the copyrights. The judgment of the Superior Court—which is entitled to full faith and credit (*Durfee v. Duke*, 375 U.S. 106, 109 (1963))—decrees that "the

42

acts of said attorney-in-fact shall for all purposes and effects constitute the acts of…DuPont as if done by [Dupont]." *Id.*

1. The separate Order transferring DuPont's copyrights to Goren to effectuate the permanent injunction standing alone is not prohibited by any federal statute and is permitted under both federal and Massachusetts common law.

   "[N]o federal statutory law directly address[es] whether copyrights are subject to execution to satisfy a judgment." *Hendricks and Lewis PLLC v. Clinton*, 766 F. 3d 991, 996 (9th Cir. 2014) (affirming a district court's appointment of receiver to sell a recording artist's copyrights to satisfy a money judgment). The Ninth Circuit held that the defendant recording artist and owner of the copyrights was ineligible to claim the protection of §201 (e) and that like any other intangible property under applicable state law[6] an owner's copyrights are subject to execution to satisfy a judgment. As a matter of federal common law "copyrights like patents are a form of intangible personal property," and if permitted under state law a court appointed trustee may execute an assignment of the copyright to satisfy a money judgment against the patent holder

---

6 While the Copyright Act recognizes the validity of transfers by operation of law without evidence of a writing signed by the owner to indicate a voluntary transfer (17 U.S.C. § 204(a)), it does not define "what constitutes a transfer by operation of law." *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F. 3d 29, 41 (1st Cir. 2012) (the few cases outside of the First Circuit "focus on whether the author of the transfer provided express or implied consent to such change of ownership").

or the copyright owner. *Id.* citing *Ager v. Murray*, 105 U.S. 126, 127-29 (1881).[7]

As a matter of Massachusetts law the Superior Court has power in equity to appoint an agent or attorney in fact to transfer the author's copyright to effectuate a Massachusetts judgment. See *Wilson v. Martin-Wilson Automatic Fire-Alarm Co.*, 151 Mass. 515, 518-520 (1890) (A court in equity having jurisdiction over an owner of a patent may validly authorize a court appointed master to execute an assignment of the patent to satisfy a judgment).

2. Only the original individual author DuPont is eligible under specified limitations to claim Section 201 (e) protection against a governmental taking; Xcentric does not have standing to assert Section 201(e) protection which is one of the exclusive rights under the Act.

The original individual author DuPont is a plaintiff and real party in interest in this action. Fed. R. Civ. P. 17(a). That Goren has been appointed as DuPont's attorney-in-fact does "not enable him to bring suit in his own name." *See, e.g., Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 17-18 (2d Cir. 1997).  Because Xcentric is not an individual, does not even claim to be an entity author of the

---

[7] "[T]he provisions of the patent and copyright acts, securing a sole and exclusive right to the patentee [or author], do not exonerate the right and property...from liability to be subjected by suitable judicial proceedings to the payment of his debts." *Id.* at 996.

individual work and possesses only a nonexclusive license, it has no conceivable eligibility for protection under Section 201(e).

Section 201 of the Act specifies certain rights that are adherent solely to individual authors and prescribes other rights for the benefit of entity authors as well as subsequent owners of any of the exclusive rights of copyright. Subsection (d) "Transfer of Ownership" provides in relevant part:

> (d)The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law,[8]…
>
> (2) Any of the exclusive rights comprised in a copyright…may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

Subsection (e) proscribes certain involuntary transfers by the individual author of a work.

> (e) Involuntary Transfer. When an **individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author**, no action by any governmental

---

[8] Excepting only transfers by operation of law, 17 U.S.C. §204(a) provides a transfer of ownership

> is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

> body or other official or organization
> purporting to seize, expropriate, transfer, or
> exercise rights of ownership with respect to the
> copyright, or any of the exclusive rights under
> a copyright, shall be given effect under this
> title, except as provided under title 11.

17 U.S.C. §201 (e)(emphasis added). By the statute's unambiguous terms Congress granted protection only to "individual authors" and only in the absence of prior voluntary transfers of any of the exclusive rights under copyright.

The legislative history is clear that the stated purpose of Section 201(e) is to protect individual authors principally from foreign governments, and the Soviet Union in particular, appropriating their U.S. copyrights. *Clinton*, 766 F. 3d at 997. Because Xcentric does not claim that DuPont's reports were "works made for hire" under 17 U.S.C. 101, it cannot contend that as an entity author it has standing to raise the Section 201(e) affirmative defense. See generally *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).

3. Small Justice's standing is derived from the written assignment signed by the individual author DuPont's duly appointed attorney in fact and not from a government seizure.

The predicate for subject matter jurisdiction is pursuant to a Certificate of Registration of ownership of the copyright of DuPont's January 31, 2012 posting. (Ap. 478, ¶ 68. That Registration specifies that the author's "Transfer Statement"

46

was by "assignment." *Id.*  DuPont's assignment to Goren and his
assigns was in writing and was signed by Goren as the attorney
in fact for DuPont.  In his individual capacity Goren then
executed a conveyance in writing of the same exclusive rights to
Small Justice LLC. *Id.*¶ 63. Both assignments were acknowledged
by a Massachusetts notary public.17 U.S.C. § 204 (b)(1).

   F. The *"Contract" with DuPont is Unenforceable.*

     The District Court erred when it ruled that assuming DuPont
retained ownership of the copyrights the offer and acceptance of
a nonexclusive license was not an unenforceable illusory
contract and was not unenforceable on public policy grounds.

  1. The "Contract" between DuPont and Xcentric is illusory.

     The visible terms which DuPont accepted provided
unambiguously that once posted the report will not be removed
even at the author's request.  However according to Xcentric
this provision is "subject to change by Xcentric, at any time,
[and] without [individual] notice…" to DuPont. Add. 49. Because
the power is not expressly limited to prospective modifications,
Xcentric promised nothing; it gave no consideration. *Morrison v.
Amway Corp.*, 517 F.3d 248, 254-55 (5th Cir. 2008). Moreover it is
undisputed that Xcentric will remove provably false statements
of fact from posted reports and has removed reports upon the
request of the author. Ap. 488-492, ¶¶ 87, 89; Ap. 592, ¶¶ 87,

89. "[A] promise that binds one to do nothing at all is illusory
and cannot be consideration." *Graphic Arts Finishers Inc. v.
Boston Redevelopment Authority,* 357 Mass. 40, 43 (1970)(dicta).

2. <u>The CDA does not bar or alter application of basic contract
principles.</u>

The CDA does not preclude ordinary contract law defenses to
Xcentric's contract. On the undisputed facts in its de novo
review the Court should hold that the non-exclusive license
agreement is unenforceable on public policy grounds.

To do equity on the facts of this case, whether sitting in
diversity or under federal question jurisdiction, the District
Court should have declared that the provision "once I post my
report, it will not be removed, even at my request" though
initially facially valid is unenforceable as applied on public
policy grounds. "A… term of an agreement is unenforceable on
grounds of public policy if… the interest in its enforcement is
clearly outweighed in the circumstances by a public policy
against the enforcement of such [a] term[]."RESTATEMENT (Second)
of CONTRACTS §178(1)(1981).[9] There is a strong public policy
against *per se* libel. "The State's interest here resides in the
private individual's right to the protection of his own good
name, for this 'reflects no more than our basic concept of the
essential dignity and worth of every human being-a concept at

---

[9] See Add. 68-75.

the root of any decent system of ordered liberty.'" *Stone v.
Essex Cnty. Newspapers, Inc.,* 367 Mass. 849, 858 (1975).
Application of the RESTATEMENT consistent with Massachusetts law
requires examination and weighing of specified factors in favor
of enforcement of the provision against specified factors of
public policy against enforcement. RESTATEMENT (Second) of
CONTRACTS §178(2)and (3)(1981).  See also *Soc'y of the Holy
Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver,
Colorado*, 685 F. Supp. 2d 217, 224 (D. Mass. 2010).

<div align="center">The Factors In Favor of Enforcement</div>

(a) **Xcentric can have no justifiable expectation in
enforcement.**  According to Xcentric's TOS it was a condition of
his posting that DuPont "warrant and represent that the
information is truthful and accurate."  Ap.463-64, ¶ 29. The
Terms of Service prohibited DuPont from "post[ing] on ROR any
defamatory or illegal material." *Id*.  Xcentric specifically
"reserve[s] the right … to delete" harmful information. Ap. 463*,*
¶ 25.  And when provided proof the Ripoff Report will remove or
redact libelous false accusations of the same criminal conduct
of which Goren was falsely accused. Ap. 488-89, ¶¶ 87, 89.  And,
it is undisputed that upon payment of fees to its reputation
restoration business when subjects of defamatory reports
demonstrate falsity, Xcentric will remove or redact the
defamatory post. Ap. 488. Therefore Xcentric can have no morally

<div align="center">49</div>

or legally justifiable expectation to insist on enforcement of its no-removal term.

(b) ***Xcentric suffers no forfeiture if enforcement is denied.*** The posting was free and so there is no posting fee to be returned in whole or in prorated part. Moreover, because as a matter of law Xcentric gave no consideration, there can be no loss.

(c) ***There is no special public interest in enforcement of the term.*** On the contrary Section 230 of the CDA specifically provides ISPs with "Good Samaritan" protections for its actions "taken in good faith" to screen or delete objectionable material "whether or not such material is constitutionally protected." And enforcement of state libel law that is consistent with the ISP's Section 230 rights to screen or delete in its exercise of a publisher's traditional editorial functions is patently in line with the CDA. See *Lycos*, 478 F. 3d at 422 (§ 230 shields ISP's "editorial decision" as to defamatory third-party posting).

<u>The Public Policy factors against enforcement.</u>

**(a) The strength of the public policy against libel is manifested in both legislation and case law.**

> A public policy against enforcement of … terms
> may be derived by the court from (a) legislation
> relevant to such a policy, or (b) the need to
> protect some aspect of the public welfare, as is
> the case for judicial policies against for

50

> example, … (iii) interference with other
> protected interests [including "promises to
> commit [or terms tending] to induce the
> commission of a tort."]

RESTATEMENT (Second) of CONTRACTS §§179 (Add. 76),192, illus. 5

(terms tending to induce libel)(Add. 80-82).

The public interest "in the light of the circumstances of…[this] case…[lies] in the prevention of tortious harms." *Cf. Krebiozen Research Foundation v. Beacon Press, Inc.*, 334 Mass. 86, 99 (1956) (*dicta*). There is no public interest in the re-publication of previously published false accusations of crimes. *See* ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation…"); *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942) ("Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution").

The Commonwealth has enacted legislation promoting retraction of libel. G.L. c. 231, §93.

**(b) Refusal to enforce the term will obviously further the public policy.** Here the defamer seeks to cease republication of his libel on the Ripoff Report website and the Ripoff Report's further publication or display of the libel on Google and other search engines under color of Xcentric's claimed copyright.

51

**(c) *Seriousness of the misconduct and its deliberate nature.***
There has been an adjudication that the publication constitutes libel and that its continued publication causes injury to Goren. While this factor focuses on the defamer, it is noteworthy that Xcentric is deliberately violating its own Terms of Service when it insists on enforcement of this no-removal term.

**(d) *The directness of the connection between the libel and the term*.** While Xcentric presumably was initially unaware of the falsity of the accusations of criminal conduct, it now has proof, a judgment. While Xcentric may be immune under the CDA for its continuing publication, its insistence on enforcement of the no-removal term tends to induce the commission of a tort.

G. *The District Court erred in dismissing the 93A claim.*

Goren's 93A claims focus on Xcentric's unscrupulous use of intellectual property in particular its use of copyright to bait the injury to Goren's reputation in conjunction with the operation of its reputation restoration business. While Xcentric and Goren are not in privity of contract, Xcentric's unfair and deceptive actions were undertaken in the course of its pursuit and/or solicitation of business in the Commonwealth of Massachusetts. While Goren has refused to pay Xcentric to repair his reputation, it is undisputed he has expended money for legal fees and other expenses as a result of Xcentric's practices. Ap. 502, ¶ 105; Ap. 594, ¶ 105.

Rejecting Xcentric's contention that its advertising and offering in Massachusetts of its reputation restoration business constitutes an editorial function that is immune under the CDA, the District Court granted Xcentric summary judgment on the 93A claim for lack of a causal link between: (i) Goren's undisputed injury to his business good will and/or his undisputed expenditure of approximately $5,000; and, (ii) the alleged unfair and deceptive practices. Add. 31-32. The District Court ruled that the "source of Goren's reputational injury…was DuPont's libel]" for which Xcentric is immune under the CDA. Add. 32. The District Court also ruled that because Goren "does not allege that he incurred the cost of participating in…[Xcentric's reputation restoration business] or explain how he suffered a financial loss, other than any loss of business related to the shielded reports," the District Court held the 93A claim had to be dismissed for lack of "any evidence of a loss caused by the programs of which he complains." *Id*.

Dismissing the 93A claim for lack of compensable harm the District Court did not have to address whether Xcentric's false representation of a material fact, namely the visible, and hence operative, words in Xcentric's step 5 box, constituted a bad faith litigation tactic. *Arthur D. Little v. Dooyang*, 147 F. 3d

47, 56 (1st Cir. 1998) (litigation tactics, such as bad faith
claims, may constitute 93A violations provided there is a
commercial context or solicitation of a contractual
relationship). At the February 2014 hearing on its motion to
dismiss, Xcentric informed the District Court that Goren had
misrepresented to the Court the visible, and hence operative,
words of Xcentric's offer. Xcentric informed the Court

> Your Honor, Mr. Goren has said that because it's
> in paragraph 6 and it's down a ways that perhaps
> there was no meeting of the minds. And one of
> the things I think the papers do not do a good
> job of is explaining that the little box that
> the author has to check to submit not only says
> that the author is agreeing to the terms of use,
> but specifically says, I agree to the Ripoff
> Report terms and conditions and that by posting
> this rebuttal, this report or rebuttal, I attest
> this report is valid. I'm giving Ripoff Report
> irrevocable rights to post it on the website and
> granting Ripoff Report's operators an exclusive
> license.

Ap. 210. After the hearing with leave of Court, Xcentric filed
an affidavit averring that the visible terms of its offer to
DuPont included the specific phrases: "I agree to the Ripoff
Report Terms and Conditions," and "I am...granting Ripoff
Reports' operators an exclusive license." Ap. 115-141; Ap. 502-
506; Ap. 594. This was a knowingly false representation of a
material fact; and when the falsity of its representation of the
terms of the operative contract offer was revealed, Xcentric
admitted it had been mistaken. *Id.* But for plaintiffs locating

54

the contradictory affidavits filed in other federal district courts by the affiant and by the same counsel in this case, Xcentric would have committed a fraud on the District Court.

DuPont's Ripoff Reports' accusations of criminal conduct by Goren have been adjudged to be completely false, without basis in fact and to impair his reputation as a lawyer. Ap. 470, ¶45. It is undisputed that Goren's reputation is damaged whenever a person or business conducting an internet search about him reads the defamatory reports; (Ap. 475, ¶ 59) and, that the search engine user interested in Goren need not go the Ripoff Report website. Xcentric holds itself out to search engines as the copyright owner of these reports and pursuant to this claim of right Xcentric has authorized Google and other search engines to take a snapshot and create a "cached" copy that may be displayed and published on Google's servers. Ap. 482-83,¶¶71-73. Whenever an interested party stays on the search engine server and clicks on the cached copy, she reads the most recent snapshot of the defamatory report on the top of which is displayed "Copyright © 1998-2014, Ripoff Report. All rights reserved." Ap. 483, ¶ 77. The Massachusetts judgment enjoined the author DuPont as well as "any person or entity acting as his agent… or any other person or entity in active concert or participation with" the author from "continuing to publish or to republish" the continued

republication of the defamatory reports.

When served with the judgment, Xcentric notified Goren it will not take down or remove the report. Ap. 478, ¶ 61. Instead Xcentric referred Goren to its website's strict non-removal policy. Despite Google's initial efforts to remove from its index the January 31, 2012 defamatory report (Ap. 483-484 at ¶¶ 75,76) Xcentric continues to authorize Google to display on Google's servers the most recent copy of the defamatory report with the notice: "Copyright © 1998-2014, Ripoff Report. All rights reserved." Ap. 482-484, ¶¶ 71, 72, 77.

Xcentric's published policy is that it will not remove a report from its website even if the report is adjudged defamatory or even if the author requests the report to be taken down. Xcentric's policy published in Massachusetts is that any statement posted on its website is a "permanent record." Ap. 485, ¶ 79. However, Xcentric operates a reputation restoration business and offers alternative commercial fee based solutions for the subjects of false and/or defamatory reports posted on its Ripoff Report website. Ap.486, ¶ 80. So Goren visited XCENTRIC's Ripoff Report website and was informed of the opportunity to "join" XCENTRIC's "Corporate Advocacy Program" whereby for some undisclosed fee Xcentric would "restore his reputation." Ap. 486, ¶81. In its July 2013 online

56

advertisement published in Massachusetts Xcentric stated:

> to make your search engine listings change from
> a negative to a positive all you need to know is
> this: by becoming a member of the Corporate
> Advocacy Program, no matter how you search your
> name on search engines, it will all look as it
> should. Positive.

Ap. 486, ¶ 81.

    In March 2014, the District Court held Goren's allegations
of Xcentric's refusal to take down a report that had been
adjudged defamatory "while simultaneously advertising services
by which Goren can pay Xcentric to restore his reputation," were
not barred by the CDA and are to proceed under Chapter 93A.  But
refusing to make automatic disclosure of the operation of its
reputation restoration business (Ap. 492 ¶ 88), Xcentric sought
summary judgment contending that the operation of its reputation
restoration business was an editorial function shielded by
immunity under the CDA. Ap. 335-340.

    Despite Xcentric's refusal to provide discovery there was
evidence that contrary to its website advertisement Xcentric has
deleted or redacted "provably false statements of fact" for
those businesses who paid Xcentric. Ap. 488-493, 501.  It was
also undisputed that Xcentric failed to disclose to Goren that a
person or company who has been falsely accused of criminal
conduct and who presents proof of the falsity of such accusation

can have the false accusations of criminal conduct redacted or removed without joining the CAP program. Ap. 501.  It is open to discovery whether the repair or restoration of one's reputation—by redaction or removal of a defamatory report—under Xcentric's standard form CAP contract would continue for only as long as the monthly payments to Xcentric continued. Ap.501.

To support hearsay allegations that Xcentric has engaged, contracted and/or employed persons to author defamatory posts on the Ripoff Report website (See ECF #70,72,73, 85; Ap. 9-10), Goren served subpoenas on one Darren Meade for documents and to testify at deposition. While Xcentric admitted having made payments to Meade—a prolific poster of reports—and having entered into some undisclosed confidential settlement agreement with him, Xcentric and Meade filed motions to quash the discovery. Ap. 9-10. Concurrent with its dismissal of the 93A claims, the District Court denied the motions to quash as moot. Ap.11.

Massachusetts Gen. Laws Ch. 93A, § 11 prohibits "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." Add.66-67. It "is a statute of broad impact" passed "to aid consumers and others…by making conduct unlawful which was not unlawful under the common law or any prior statute." *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 693 (1975).  A 93A

claim need not be pigeonholed as sounding in contract or tort;
some are contract-based others are tort-based and still others
"neither wholly tortious nor wholly contractual in nature."
*Kraft Power Corp. v. Merrill*, 464 Mass. 145, 156 (2013).
"[T]echnicalities are not to be read into the statute in such a
way as to impede the accomplishment of substantial justice."
*Leardi v. Brown*, 394 Mass. 151, 159 (1985).

An unfair act or practice is not amenable to a bounded
definition because, "[i]t is impossible to frame definitions
which embrace all unfair practices. There is no limit to human
inventiveness in this field." *Levings v. Forbes & Wallace, Inc.*,
8 Mass. App. Ct. 498, 503 (1979) (quoting H. R. Conf. Rep. No.
1142, 63d Cong., 2d Sess. (1914)).  Following federal decisions
under the Federal Trade Commission Act, courts employ the
following factors in evaluating whether conduct is unfair: (i)
whether the practice is within at least the penumbra of some
common-law, statutory, or other established concept of
unfairness; (ii) whether it is immoral, unethical, oppressive or
unscrupulous; and (iii) whether it causes substantial injury to
consumers, competitors or other business people. *PMP Assocs.,
Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (citing
*FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 (1972)). A
court must "focus on the nature of challenged conduct and on the
purpose and effect of that conduct as the crucial factors in

making a G. L. c. 93A fairness determination." *Mass. Employers*

*Ins. Exch. v. Propac-Mass, Inc.,* 420 Mass. 39, 43 (1995). If it

"leaves a rancid flavor of unfairness," it is a violation. *Id.*

> [There is] no static definition of the term
> "deceptive;"…[A] practice is "deceptive,"…"if it
> 'could reasonably be found to have caused a
> person to act differently from the way he [or
> she] otherwise would have acted….[A]dvertising
> need not be totally false in order to be deemed
> deceptive in the context of G.L. c. 93A. … The
> criticized advertising may consist of a
> halftruth, or even may be true as a literal
> matter, but still create an over-all misleading
> impression through failure to disclose material
> information… [regardless of] whether it was
> relied on or resulted in actual deception.

*Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 394-96

(2004).

There need not be a finding of both unfair and deceptive

conduct. An act or practice can be unfair without necessarily

being deceptive. See *Service Publications v. Goverman*, 396

Mass. 567, 578 (1986). Goren need not prove that Xcentric

intended to deceive him or that he relied on the unfair or

deceptive act or practice. *Aspinall*, 442 Mass. at 394.

It is the law of the case that the FAC states a cause of

action under 93A for Goren's undisputed injury to his business

goodwill and his alleged loss of money both as a result of

Xcentric's advertising and operation of its reputation

restoration business.

The District Court erred in dismissing the 93A claim based on a lack of reliance damages. It is sufficient if there is a causal relation between the act or practice and some injury to Goren. *Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99, 104 (1988). See *International Fidelity Ins. Co. v. Wilson,* 387 Mass. 841 (1983). It is undisputed that but for Xcentric's refusal to take down the defamation Goren's injury to his business goodwill would not have continued and that he would not have expended approximately $5,000 in legal fees and other expenses. Ap. 502, ¶ 105. Because the continuing injury to goodwill and the out of pocket expenses "stem from" the unfair practice, they constitute section 11 damages. *Dooyang*, 147 F. 3d at 57. Goren's litigation expenses in this case also constitute "actual damages (a 'loss of money')" if caused by a 93A violation. *Columbia Chiropractric Group, Inc. v. Trust Ins. Co.,* 430 Mass. 60, 63 (1999). And Xcentric's bad faith conduct in litigation coupled with pre-suit unfair or deceptive acts constitutes a violation. *Dooyang*, 147 F. 3d at 56.

The District Court's Order dismissing the 93A claim must be reversed.

## VI.   <u>CONCLUSION</u>

Appellants request the Court grant them relief in accordance with their brief.

                                    Respectfully submitted,

                                    SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT, Plaintiffs-Appellants

                                    by their attorney,

November 16, 2015

                                    <u>*/s/ Richard A. Goren*</u>
Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
One State Street Suite 1500
Boston MA 02110
617-933-9494
rgoren@richardgorenlaw.com

**CERTIFICATE OF COMPLIANCE WITH FED. R APP. P. 32 (a)(7)(B)**

I hereby certify that to the best of my knowledge and belief this brief complies with the Fed. R. App. P. 32 (a) in that as per my word processing system the word count of 13,781.

/s/ Richard A. Goren

**CERTIFICATE OF SERVICE**

I hereby certify that the brief and accompanied Addendum filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 16, 2015.

.

/s/ Richard A. Goren

# United States Court of Appeals
# For the First Circuit

_____

No. 15-1506

SMALL JUSTICE LLC; RICHARD A. GOREN;
CHRISTIAN DUPONT, d/b/a Arabianights-Boston Massachusetts

Plaintiffs and Appellants
v.
XCENTRIC VENTURES LLC
Defendant and Appellee

On Appeal from the United States District Court
for the District of Massachusetts
The Honorable Denise J. Casper
Case No. 13-11701-DJC

ADDENDUM OF APPELLANTS SMALL JUSTICE LLC; RICHARD A. GOREN;
CHRISTIAN DUPONT, d/b/a Arabianights-Boston Massachusetts

Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
One State Street Suite 1500
Boston MA 02109
617-933-9494
rgoren@richardgorenlaw.com
Attorney for Appellants

**ADDENDUM TABLE OF CONTENTS**                                    **Ad. Page**

1.  ECF #104    JUDGMENT March 27, 2015……………………………    1

2.  ECF # 45    March 24, 2014 Memorandum and Order Allowing in part
    and denying in Part Defendant's Motion to Dismiss; and Denying Plaintiffs'
    cross motion for partial judgment on the Pleadings ……………………………    2

3.  ECF #100 March 27, 2015 Memorandum and Order allowing Defendant's
    Motion for Summary Judgment……………………………    19

4.  ECF #108 Notice of Appeal……………………………    34

5.  ECF #115 May 22, 2015 Order text-only entry on docket…………………………    36

6.  ECF #134 September 30, 2015 Memorandum and Order …………………………    38

OPTIONAL as per LR 28.0 (a)(2)

7.  Disputed contractual provisions, Xcentric's Terms of Service (TOS)
    Exhibit B First Amended Complaint ECF #13-2 September 2, 2013
    ………………………………………………………………    49

FEDERAL STATUTES

8.  47 U.S.C.§ 230 Communications Decency Act……………………………    52

9.  17 U.S.C. §101 Copyright Act (definitions) ……………………………    55

10. 17 U.S.C. §106 Copyright Act (exclusive rights) ……………………………    61

11. 17 U.S.C. §201 Copyright Act (ownership of copyright) …………………………    62

12. 17 U.S.C. §204 Copyright Act (execution of transfers of copyright ownership)
    ………………………………………………………………    63

13. 17 U.S.C. §205 Copyright Act (recordation of transfers and
    other documents) ………………………………………………………………    64

MASSACHUSETTS STATUTES

14. G. L. c. 93A, § 11 ………………………………………………………….    66

**ADDENDUM TABLE OF CONTENTS**                                          **Ad. Page**

OTHER AUTHORITIES- OPTIONAL as per LR 28.0 (a)(2)

15.   Restatement (Second) of Contracts  §178 (1981) ……………………….          68

16.   Restatement (Second) of Contracts  §179 (1981) ………………………..         76

17.   Restatement (Second) of Contracts  §192 (1981) ………………………..         80

18.   940 Code of Massachusetts Regulations, section 6.0, 6.01

     Advertising ……………………..………..                                        83

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**SMALL JUSTICE LLC**
        Plaintiff(s)

    v.                          CIVIL ACTION NO.**13-11701-DJC**

**XCENTRIC VENTURES LLC**
        Defendant(s)

**JUDGMENT IN A CIVIL CASE**

CASPER, D.J.

☐    **Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

X    **Decision by the Court**.  In accordance with the Memorandum and Order dated March 27, 2015 granting defendants's motion for summary judgment;

    **IT IS  ORDERED AND ADJUDGED**

    Judgment for defendant Xcentric Ventures LLC

                                             Robert M. Farrell, Clerk

Dated:   March 27, 2015                   /s/ Lisa M. Hourihan
                                       ( By )  Deputy Clerk

NOTE:  The post judgment interest rate effective this date is _____%.

(judgciv.frm - 10/96)                                    [jgm.]

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| SMALL JUSTICE LLC, et al., | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | |
| v. | ) | Civil Action No. 13-cv-11701 |
|  | ) | |
| XCENTRIC VENTURES LLC, | ) | |
|  | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                 **March 24, 2014**

## I.      Introduction

Plaintiffs Small Justice LLC ("Small Justice"), Richard A. Goren ("Goren") and Christian Dupont d/b/a Arabianights-Boston Massachusetts ("Dupont") (collectively, the "Plaintiffs") bring this action against Xcentric Ventures LLC ("Xcentric" or the "Defendant") arising from two posts made by Dupont on XCentric's website. Xcentric has moved to dismiss Counts III (libel), IV (intentional interference with prospective contractual relations) and V (violations of Mass. Gen. L. c. 93A) of the First Amended Complaint ("Am. Compl.") pursuant to Fed. R. Civ. P. 12(b)(6). Xcentric also seeks dismissal without prejudice of Count I (declaratory judgment as to ownership of copyright) and Count II (copyright infringement) for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). The Plaintiffs have now moved pursuant to Fed. R. Civ. P. 12(c) for partial Judgment on the Pleadings on two of Xcentric's affirmative defenses:  copyright ownership and immunity. For the reasons stated

below, (1) the Defendant's motion to dismiss, D. 14,  is DENIED as to the copyright claims, but is ALLOWED as to the libel and interference claims and is ALLOWED in part and DENIED in part as to the c. 93A claim; and (4) the Plaintiffs' motion for judgment on the pleadings, D. 20, is DENIED.

## II.      Factual Allegations and Procedural History

Unless otherwise noted, this summary is based upon the factual allegations in the Amended Complaint.  Xcentric, an Arizona company, operates a website called the Ripoff Report which invites registered users to post complaints, called "reports," about companies or individuals. Am. Compl. ¶¶ 7, 8.  On January 31, 2012, Dupont posted an allegedly defamatory report about Goren's conduct as an attorney and misconduct outside of his professional activities. Id. ¶¶ 11, 12.  On February 2, 2012, Dupont posted a second report echoing these allegations.  Id. ¶ 16, 17.  On March 7, 2012, Xcentric obtained a registration of copyright from the United States Copyright Office entitled "Group Registration for an automated database titled Ripoff Reports from January 1, 2012 to March 7, 2012 . . . ."  Gringras Aff. Exh. B, D. 15-2.

In November 2012, Goren sued Dupont for libel and interference with advantageous relations in Suffolk Superior Court.  Am. Compl. ¶ 40.  On February 28, 2013, the Superior Court entered a default based upon Dupont's failure to appear.  Goren Second Aff. Exh. A-2, D. 29-2.  On March 20, 2013, the Superior Court entered a judgment permanently enjoining Dupont from publishing or republishing any of the January 2012 Report.  Goren Second Aff. Exh. A-3, D. 29-3 at 2.  Upon Goren's motion, on May 8, 2013, the Superior Court amended its judgment to transfer ownership of the copyright of the January 2012 Report from Dupont to Goren.  Goren Second Aff. Exh. A-4, D. 29-4 at 2.  That order also appointed Goren as attorney-in-fact for Dupont, with the power to execute any assignment of the copyright in the January 2012 Report. Id. at 3.

2

On May 14, 2013, Goren served the Superior Court judgment on Xcentric and demanded that Xcentric remove the January 2012 Report from the Ripoff Report website, repeating his demand on June 25, 2013. Am. Compl. ¶¶ 49, 50. On June 27, 2013, Xcentric replied to Goren's demand, asserting immunity to defamation claims as an internet service provider under the Communications Decency Act, 47 U.S.C. § 230. Id. ¶ 51.

The Superior Court, at Goren's subsequent request, amended its judgment again, this time to encompass Dupont's February 2012 Report. Am. Compl. ¶ 53. On August 16, 2013, the Superior Court also ordered that "all rights in and to ownership of the copyright" by Dupont in the Reports "are hereby transferred to . . . Goren, meaning and intending to convey, transfer and assign . . . full and exclusive ownership of copyright in and to each work so as to qualify as a transfer of ownership under . . . 17 U.S.C. §204." Am. Compl. Exh. C, D. 13-3 at 3. Shortly thereafter, Goren served Xcentric with the Superior Court's August 16, 2013 Order and demanded that Xcentric remove the February 2012 Report from its website. Am. Compl. ¶ 54. On the same day, Goren, acting as attorney-in-fact for Dupont, executed a conveyance of the copyrights in the Reports from Dupont to himself. Goren Aff. Exh. 1, D. 20-1. He subsequently assigned his copyright ownership to Small Justice. Id.

On July 16, 2013, Goren and Small Justice initiated this lawsuit, suing Xcentric for copyright infringement. D. 1. Goren and Small Justice then amended their Complaint, adding Dupont as a plaintiff and stating five causes of action: declaratory judgment as to ownership of the copyrights in the Reports (Count I); copyright infringement (Count II); libel (Count III); intentional interference with prospective contractual relations (Count IV); and violations of Mass. Gen. L. c. 93A (Count V). D. 13. Xcentric has now moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P 12(b)(1) and (6), D. 14, and the Plaintiffs have moved for

3

judgment on the pleadings pursuant Fed. R. Civ. P. 12(c). D. 20. After a hearing on both motions, the Court took the matter under advisement. D. 34.

## III.    Xcentric's Motion to Dismiss Copyright Claims

### A.    <u>Standard of Review</u>

Xcentric moves to dismiss Counts I and II, pertaining to copyright infringement, for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). For the Plaintiffs to establish copyright infringement, they must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,</u> 499 U.S. 340, 361 (1991); <u>Motta v. Samuel Weiser, Inc.,</u> 768 F.2d 481, 483 (1st Cir.), cert. denied, 474 U.S. 1033 (1985). Pursuant to 17 U.S.C. § 501(b), only "the legal or beneficial owner of an exclusive right under copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." Thus, only the author of a copyrighted work or one who establishes ownership through a valid chain of title has standing to sue for copyright infringement. <u>Motta</u>, 768 F.2d at 484. "Absent this showing, a plaintiff does not have standing to bring an action under the Copyright Act." <u>Id.</u> If the Plaintiffs lack standing, this Court also lacks subject matter jurisdiction. <u>See</u> <u>United States v. Union Bank for Sav. & Inv.,</u> 487 F.3d 8, 22 (1st Cir. 2007).

When considering a 12(b)(1) motion on the "sufficiency" of the "jurisdictionally-significant facts," the Court "must credit the plaintiff's well-pled factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw[ing] all reasonable inferences from them in [plaintiff's] favor." <u>Valentin v. Hosp. Bella Vista</u>, 254 F.3d 358, 363 (1st Cir. 2001). If the Defendants are instead are challenging "the accuracy (rather than the sufficiency) of the jurisdictional facts

4

asserted by the plaintiff," then "plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Id.; see id. at 263 n. 3 (noting that "there is an exception to this praxis for cases in which the jurisdictional facts, though genuinely disputed, are inextricably intertwined with the merits of the case. In that event, the court may defer resolution of the jurisdictional issue until the time of trial").

### B.   Copyright Conveyance from Dupont to Xcentric

The Plaintiffs allege that Small Justice, as the assignee of Goren, owns the copyrights in the Reports and therefore Xcentric's continued display of the Reports constitutes copyright infringement. Am. Compl. ¶¶ 64-70. Goren purportedly acquired the copyrights as a result of the Superior Court orders transferring ownership from Dupont and the assignments made by him, as attorney in fact for Dupont, to himself. Am. Compl. ¶¶ 53, 55; Am. Compl. Exh. C, D. 13-3; Goren Aff. Exh. 1, D. 20-1. Xcentric contends that it holds a valid Certificate of Registration obtained from the United States Copyright Office establishing that it has exclusive rights to the Reports. Def. Mem., D. 14 at 13; Gingras Aff. Exh. B., D. 15-2. Xcentric argues that, because its ownership interest was registered before Goren allegedly acquired his conflicting transfer, Xcentric's interest prevails. Def. Mem., D. 14 at 15. For the reasons stated below, both parties' motions, as they pertain to the copyright claims, are denied.

Before Xcentric posted Dupont's Reports, Dupont had to complete a multi-step process. Am Compl. ¶ 9, 10. On the last screen prior to submission, Dupont was presented with a box with a scroll bar running down its side, entitled "Terms and Conditions." Id. Beneath the "Terms and Conditions" header was a subheading stating "1. Ripoff Report Membership Terms

& Conditions."  Am. Compl. Exh. A and B, D. 13-1 and 13-2.  A portion of the information

contained beneath this subheading was visible on the screen, but no additional terms were visible

to a user unless the user scrolled through them.  One of the terms not visible on the screen was

paragraph 6 entitled "Proprietary Rights/Grant of Exclusive Rights."  Id.  That section read:

> By posting information or content to any public area of www.RipoffReport.com,
> you automatically grant, and you represent and warrant that you have the right to
> grant, to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive
> license to use, copy, perform, display and distribute such information and content
> and to prepare derivative works of, or incorporate into other works, such
> information and content, and to grant and authorize sublicenses of the foregoing.

Am. Compl. Exh. B., D. 13-2 at 2; Gingras Aff. ¶ 6.

Beneath the scrollable Terms and Conditions (the "TAC") was a check box which

Dupont had to check before his Reports were posted.  Am. Compl. ¶ 10.  The text next to the

check box stated:  "By posting this report, I attest this report/rebuttal is valid.  I am giving Rip-

off Report irrevocable rights to post it on the website.  I acknowledge that once I post my report,

it will not be removed, even at my request. . . ."  Id. ¶ 10; Am. Compl. Exh. A, D. 13-1.

XCentric points out that users who do not agree to these terms are prohibited from posting any

content on its website.  Gingras Aff. ¶ 6.  There was no explicit requirement that users read

Xcentric's TAC nor were users required to electronically check a box indicating that they had

done so.  Am. Compl. ¶ 10; Am. Compl. Exh. A and B, D. 13-1 and 13-2.  Without that express

assent, Plaintiffs argue, Dupont retained copyrights in the Reports.  Pl. Mem., D. 21 at 16.

Whether paragraph 6 of the TAC, along with the language next to the check box, was

sufficient to transfer the copyrights in the Reports from Dupont to Xcentric depends on whether

it was reasonable to expect that Dupont would have understood he was conveying those rights to

Xcentric.[1]   Specht v. Netscape Comm'ns Corp., 306 F.3d 17, 31 (2d Cir. 2002) (opinion by

Sotomayor, J.) (applying test of whether "a reasonably prudent offeree in these circumstances

would have known of the existence of license terms"); see Craigslist Inc. v. 3Taps Inc., 942 F.

Supp. 2d 962, 973 (N.D. Cal. 2013) ("it is reasonable to infer that a Craigslist user would

understand that this 'confirmation' effected a transfer of rights" where users were confronted

with notice that clicking "continue" confirmed Craigslist as the "exclusive licensee of this

content").  Copyright transfer requires only a simple writing signed by the copyright owner.  17

U.S.C. § 204(a).  A transfer of copyright ownership is not valid unless in writing and signed by

the owner of the rights conveyed, but "[n]o magic words must be included in the document"

which "doesn't have to be the Magna Carta; a one-line pro forma statement will do."[2]   3Taps,

942 F. Supp. 2d at 973 (quoting Radio Television Espanola S.A. v. New World Entm't, Ltd., 183

F.3d 922, 927 (9th Cir. 1999)).

In Specht, the plaintiffs downloaded Netscape's Communicator software from Netscape's

website.  Id. at 21.  Before doing so, scrollable text of the license agreement was displayed to the

plaintiffs, and they could not complete installation until they had clicked on a "yes" button to

indicate their assent to the license terms, including a binding arbitration clause.  Id. at 22.  The

Second Circuit held that the arbitration clause was not enforceable, however, because it was not

---

[1] The grant of an exclusive license is tantamount to the transfer of copyright ownership. 17 U.S.C. § 101 (defining "transfer of copyright ownership" to include an "exclusive license").

[2] The E-Sign Act, 15 U.S.C. § 7001, recognizes that the click of a button online can replace an actual signature.  "Notwithstanding any statute, regulation or other rule of law . . ., with respect to any transaction in or affecting interstate or foreign commerce -- (1) a signature, contract or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form; and (2) a contract relating to such transaction may not be denied legal effect, validity or enforceability solely because an electronic signature or electronic record was used in its formation."  Id. at § 7001(a).

7

Add. 8

reasonable to hold users to the terms of another computer program the plaintiffs downloaded in connection with, and prior to, Communicator. Id. at 30. That program, called SmartDownload, had no such evident license terms. Id. at 23. SmartDownload's license terms were visible only if the plaintiffs scrolled down past the "Download" button that initiated installation of the SmartDownload software. Id. Additionally, even if a user had scrolled down, he or she would have had to click on an invitation to review the terms, then on another link to the full text of the license agreement. Id. at 23-24.

The Plaintiffs seek to invoke federal jurisdiction, and, in the face of a Rule 12(b)(1) challenge, they bear the burden of establishing standing. Conservation Law Found., Inc. v. United States Envtl. Prot. Agency, No. 10-11455, 2013 WL 2581218, at * 5 (D. Mass. Aug. 29, 2013); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995); Cummings v. Pearson Educ., Inc., No. Civ. A. 03-12183, 2004 WL 2830702, at * 1 (D. Mass. Dec. 6, 2004).

However, whether the Court considers XCentric's Rule 12(b)(1) motion to be challenging the sufficiency or the adequacy of the Plaintiffs' jurisdictional averments, the Court cannot resolve the issue of the ownership of the copyrights on the present record. Although the process by which users posted to the Ripoff Report appears to be similar to the Communicator software context in Specht, the Court cannot say, on this record now before it, what a reasonably prudent offeree in Dupont's position would have concluded about license. See Valentin, 254 F.3d 363 n. 3 (noting that the court may defer resolution of the jurisdictional issue where facts bearing upon that issue are "genuinely disputed, [but] are inextricably intertwined with the merits of the case"). Accordingly, the Court DENIES Defendant's motion to dismiss Claims I and II without

prejudice and DENIES the Plaintiffs' motion for Judgment on the Pleadings as it relates to Xcentric's affirmative defense of copyright ownership.[3]

## IV.    Xcentric's Motion to Dismiss Claims for Libel and Intentional Interference with Prospective Contractual Relations

### A.    <u>Standard of Review</u>

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 1997).[4]    The plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).    The Court will dismiss for failure to state a claim if the pleadings lack "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable theory." <u>Berner v. Delahunty</u>, 129 F.3d 20, 25 (1st Cir. 1997), cert. denied, 523 U.S. 1023 (1998) (quoting <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir. 1988)).    The Plaintiffs' complaint must contain sufficient facts that, accepted as true, would allow this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).    Aside from the facts set forth in the complaint, exhibits attached to the complaint are properly considered part of the pleading for purpose of  Rule

---

[3] In light of this ruling, the Court need not reach the Plaintiffs' argument that Xcentric's copyright registration of a compilation was insufficient to register the component works as well because the registration omitted the names of the individual authors. D. 28 at 8. For the same reason, the Court also does not need to reach whether the Orders of the Superior Court and the subsequent assignments among the Plaintiffs are valid and enforceable transfers of the copyrights in the Reports. Am. Compl. ¶¶ 53-56.

[4] The Court may also consider documents the authenticity of which is undisputed, documents central to the Plaintiffs' claims and documents referred to in the Amended Complaint. <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).

12(b)(6).  <u>Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 321 (1st Cir.), cert.

denied, 555 U.S. 995 (2008).  In addition, "when a complaint's factual allegations are expressly

linked to – and admittedly dependent upon – a document (the authenticity of which is not

challenged), that document effectively merges into the pleadings and the trial court can review it

in deciding a motion to dismiss under Rule 12(b)(6)."  <u>Id.</u> (quoting <u>Beddall v. State St. Bank &</u>

<u>Trust Co.</u>, 137 F.3d 12, 16-17 (1st Cir. 1998) (internal quotation marks omitted).

**B.**     **Applicability of the Communications Decency Act, 47 U.S.C. § 230**

The Plaintiffs allege that Xcentric's online publication of Dupont's defamatory posts

constitutes libel.  Am. Compl. ¶ 72.  Cognizant of Xcentric's contention that it is immune to

defamation claims by virtue of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230,

the Plaintiffs contend that the such statutory immunity is not available to Xcentric because of

Xcentric's asserted ownership of the copyrights in the Reports.  <u>Id.</u>  The Plaintiffs also aver that

Xcentric has "intentionally caused these two defamatory *per se* publications to be prominently

and frequently featured on Google[] and other search engines . . . ."  Am. Compl. ¶ 73.

Specifically, according to the Plaintiffs, Xcentric has caused the Reports "to be indexed by

Google and other search engines so as to maximize the number of hits or page views by search

engine users" through the use of "generally accepted internet industry-standard protocols,

including without limitation its uses of robots meta tag and so-called serving directives."  <u>Id.</u> ¶

37.  For the reasons stated below, this Court concludes that CDA immunity applies and shields

Xcentric from all claims based on the Reports.

*1.*     *CDA Immunity and Copyright Ownership*

Section 230 of the CDA provides that "[n]o provider or user of an interactive computer

service shall be treated as the publisher or speaker of any information provided by another

information content provider." 47 U.S.C. § 230(c)(1). To avail itself of such immunity, the CDA imposes three requirements: (1) Xcentric must be a provider or user of an interactive computer service (also called an "interactive service provider" or an "ISP"); (2) the Plaintiffs' claim is based on information provided by another information content provider; and (3) the claim would treat Xcentric as the publisher or speaker of that information. Universal Comm'n Sys. v. Lycos, 478 F.3d 413, 418 (1st Cir. 2007).

The First Circuit has interpreted the CDA's immunity broadly in light of the policy concerns Congress sought to address with the statute. Id. at 419 (stating that, like other courts, "we too find that Section 230 immunity should be broadly construed"). Specifically, the CDA implements Congress's "policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." Id. at 418, quoting Zeran v. Am. Online, Inc., 129 F.3d 327, 330-331 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998) (alterations in original). The First Circuit credited Congress's concerns that intermediary tort liability would have a chilling effect upon online speech, that the burden of separating lawful from unlawful speech was too great, and that the actions of intermediaries who choose to actively screen content should be shielded from liability. Id. at 418-19.

The issue before this Court is whether the second requirement imposed by the CDA – that the information is provided by "another information content provider" – is met. Section 230 defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). For CDA immunity to apply, the postings "that form[] the basis for the state law claim[s] [must have] been provided by '*another*

11

information content provider.'" <u>Lycos</u>, 478 F.3d at 419 (emphasis in original). Importantly, "an interactive computer service provider remains liable for its own speech." <u>Id.</u> The Plaintiffs contend that Xcentric's asserted copyright ownership in the Reports transforms it from an intermediary to the provider of the disputed content. Am. Compl., ¶¶ 72-74, 78; Pl. Mem., D. 21 at 3-4, 25-28. In other words, according to the Plaintiffs, Xcentric adopted the Reports as its own speech, subjecting it to liability, because it holds itself out as the copyright owner. <u>Id.</u>

This Court rejects the argument that an ISP becomes an information content provider when, assuming <i>arguendo</i>, it receives an exclusive license to the content posted by a third party. The Plaintiffs cite no authority that has held that an ISP adopts content by virtue of its copyright ownership. Courts that have addressed the adoption issue have held that an ISP is not a content provider unless it specifically encourages the development of the offensive content. <u>Fed. Trade Comm'n v. Accusearch Inc.</u>, 570 F.3d 1187, 1201 (10th Cir. 2009) (holding immunity unavailable where defendant paid researchers to acquire confidential content); <u>Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC</u>, 521 F.3d 1157, 1165-66 (9th Cir. 2008) (withholding CDA immunity where website induced users to create illegal housing preferences based on protected characteristics by requiring answers to its own questionnaire); <u>Jones v. Dirty World Ent. Recordings, LLC</u>, 840 F. Supp. 2d 1008, 1011-12 (E.D. Ky. 2012) (deeming website a content provider where it specifically encouraged defamatory content by, <i>inter alia</i>, adding its own comments to postings); <u>see</u> <u>Parisi v. Sinclair</u>, 774 F. Supp. 2d 310, 316 (D.C. 2011) (declining to withhold CDA immunity because bookseller merely reposted defamatory promotional statements and stating that "it would be contrary to the purpose of the CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet by establishing immunity for internet publication of third-party content[,] to require a fact-based

analysis of if and when a defendant adopted particular statements and revoke immunity on that basis") (internal citation and quotation marks omitted). Here, Xcentric's acquisition of an exclusive license to the content (if the record ultimately shows that it did acquire such a license) is an insufficient level of involvement in the development of the content to nullify CDA immunity.

### 2. CDA Immunity and Alleged Re-publication on Search Engines

The Plaintiffs further attempt to circumvent the CDA by arguing that Xcentric surrenders its immunity by "instruct[ing] search engines to make copies of the two works under color of Xcentric's claimed exclusive ownership of the works and also authoriz[ing] Google and the other search engines to display those cached copies."[5] D. 28 at 11. The Plaintiffs acknowledge that "Xcentric's instructions to the search engines are designed to maximize the number of times each of the two works is listed on Google's index so as to maximize the number of hits or page views by search engine users." Pl. Mem., D. 21 at 8. The Plaintiffs aver that by instructing Google to use, or at least by not precluding Google from using, its automated program to acquire cached copies of the Reports, Xcentric adopts the content of the Reports as its own and causes it to be republished on Google's website. D. 21 at 7-9.

As discussed above, the CDA grants immunity to ISPs that passively display content created by third parties, but ISPs are subject to liability for content created by them. See Lycos, 478 F.3d at 419. This Court concludes that the alleged conduct does not rise to the level of the

---

[5] The Plaintiffs cite Field v. Google, Inc., 412 F. Supp. 2d 1106 (D. Nev. 2006), to explain the technology by which Google acquires cached copies of the Reports. Google uses an automated program to "crawl across the Internet" and to locate, analyze and catalog web pages, thereby making them searchable to a user of the Google search engine. Id. at 1110. "As part of this process, Google . . . stores the HTML code from those pages in a temporary repository called a cache. Once Google indexes and stores a [w]eb page in the cache, it can include that page . . . in the search results it displays to users in response to their queries." Id. at 1110-11.

"creation or development of information" that would render Xcentric an "information content provider" under the CDA.  47 U.S.C. § 230(f)(3).  The Plaintiffs do not allege that Xcentric augments or changes the content of the Reports in any way before they are cached on Google's servers.  See Roommates, 521 F.3d at 1174-75 (stating that CDA immunity is lost only where "it is very clear that the website directly participates in developing the alleged illegality" and noting that tacit assent to the conduct of third parties is not sufficient to strip immunity).  The Plaintiffs also appear to concede that Xcentric's alleged actions are undertaken with the goal of maximizing the number of times the Ripoff Report appears among Google's search results.  However, merely endeavoring to increase the prominence of Xcentric's site among Google's search results does not make Xcentric an information content provider under the CDA.  See Asia Econ. Inst. v. Xcentric Ventures LLC, No. CV-10-01369 SVW PJWX, 2011 WL 2469822 at *6 (C.D. Cal. May 4, 2011) (holding that CDA immunity applied where defendant added indexing tags to increase the prominence of its web pages in internet searches because "[i]ncreasing the visibility of a statement is not tantamount to altering its message").

Because immunity under the CDA shields Xcentric from claims based on its publication of the Reports, the Plaintiffs' claims for libel and tortious interference are barred.  Therefore Xcentric's motion to dismiss Claims III and IV is ALLOWED and the Plaintiffs' motion for judgment on the pleadings as it relates to Xcentric's assertion of CDA immunity is DENIED.

**V.     XCentric's Motion to Dismiss the Chapter 93A Claim**

Mass. Gen. L. c. 93A § 11 provides a private cause of action to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice

14

declared unlawful by section two . . . ." The referenced section two broadly proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Id. § 2(a).

The Plaintiffs' allegations that Xcentric violated c. 93A boil down to three claims: (1) that Xcentric's continued display of the Reports, coupled with its asserted copyright ownership in the Reports, constitute unfair and deceptive business practices, Am. Compl. ¶ 85; (2) that Xcentric's assertions of CDA immunity prior to the commencement of this suit, both in its e-mail communications with Goren and in its refusal to comply with the Superior Court injunction, were unfair and deceptive, Am. Compl. ¶¶ 49-51, 86; Gingras Aff. Exh. B., D. 15-7; and (3) that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based Corporate Advisory Program ("CAP") and VIP Arbitration program is oppressive and unethical. Pl. Mem., D. 21 at 22; Am. Compl. ¶¶ 33-35. According to the Amended Complaint, Xcentric directs advertisements to injured parties offering to help them achieve positive search engine listings when they pay to become members of the CAP. Am. Compl. ¶ 34. The VIP Arbitration program invites victims of defamatory reports to pay to submit the matter to Xcentric's arbitration process. Id. ¶ 35. Though Xcentric will not remove the offending reports as a result of such process, redaction of falsehoods appears to be a possible outcome. Id. For the reasons stated below, this Court dismisses the first two bases of the Plaintiffs' c. 93A claim, but finds the remaining portion of the c. 93A claim is sufficiently pled.

As to Xcentric's continued display of the Reports, its refusal to strike the Reports from the Ripoff Report website was within its discretion as an ISP under the CDA. See Lycos, 478 F.3d at 422 (where the "cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service provider's decisions

15

Case: 15-1506 Document: 00116920594 Page: 95 Date Filed: 02/16/2016 Entry ID: 5954004

with respect to that posting, but also for its inherent decisions on how to treat postings generally"). The Plaintiffs cannot attempt an end run around the CDA through the use of c. 93A. See Dulgarian v. Stone, 420 Mass. 843, 852 (1995) (holding that "where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under G.L. c.93A"). The Plaintiffs' suggestion that Xcentric's copyrights in the Reports changes this result is without merit. As discussed above, CDA immunity still protects ISPs who obtain exclusive licenses to the material posted on their sites.

Similarly, this Court holds that the Plaintiffs have failed to plead sufficiently a c. 93A violation predicated on Xcentric's invocation of CDA immunity. The Plaintiffs insist that they "do not assail Xcentric for taking an aggressive litigation position" but that Xcentric violated c. 93A through its "knowingly false and/or deceptive representation that it was not the party responsible for publishing the libel." Pl. Mem., D. 21 at 23. For a c. 93A claim to proceed, litigation tactics must smack of bad faith. See Trenwick Am. Reins. Corp. v. IRC, Inc., 764 F. Supp. 2d, 274, 307 (D. Mass. 2011) ("While there may be debate concerning whether litigation tactics alone can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct"). Xcentric is merely the ISP here, not the information content provider, regardless of whether it holds the copyrights in the Reports. Its meritorious assertion of CDA immunity cannot form the basis for a c. 93A claim.

The Plaintiffs' final portion of the c. 93A claim, premised on Xcentric's CAP and VIP Arbitration services, may proceed. The Plaintiffs argue that it is unfair for Xcentric to refuse to take down the defamatory Reports while simultaneously advertising services by which Goren can pay Xcentric to restore his reputation. Pl. Mem., D. 21 at 22; Am. Compl. ¶¶ 33-35. A trade

16

practice or act violates c. 93A if "it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to competitors or other business people." <u>Morrison v. Toys "R" Us, Inc.</u>, 441 Mass. 441, 457 (2004) (quoting <u>Heller Fin. v. Ins. Co. of N. Am.</u>, 410 Mass. 400, 408 (1991)). This definition of prohibited conduct is very broad, and privity is not required by c. 93A "so long as the parties are engaged in more than a minor or insignificant business relationship." <u>Standard Register, Co. v. Bolton-Emerson, Inc.</u>, 38 Mass. App. Ct. 545, 551 (1995). The First Circuit has observed that "[w]hat, specifically, constitutes a 'minor or insignificant business relationship' has not been fully fleshed out in the Massachusetts courts, but it has been described as requiring that 'there must be exist some commercial relationship between the parties or the plaintiffs must demonstrate the defendants' actions interfered with trade or commerce.'" <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 582 F.3d 156, 193 (1st Cir. 2009) (quoting <u>Spencer v. Doyle</u>, 50 Mass. App. Ct. 6, 12 (2000)). Here, the Plaintiffs have sufficiently alleged that Xcentric's acts are within the "penumbra" of "unfairness," or they are "immoral, unethical, oppressive or unscrupulous," or they interfered with trade or commerce.

Xcentric's motion to dismiss the Plaintiffs' c. 93A claim with respect to (1) Xcentric's continued display of the Reports; and (2) Xcentric's assertion of CDA immunity is ALLOWED and the remainder of Xcentric's motion with respect to the c. 93A claims is DENIED.

## VI.    Conclusion

For the foregoing reasons, Xcentric's Motion to Dismiss, D. 14, is ALLOWED in part and DENIED in part. The Plaintiffs' cross motion for partial Judgment on the Pleadings, D. 20, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SMALL JUSTICE LLC, RICHARD A. GOREN, and CHRISTIAN DUPONT d/b/a ARABIAN NIGHTS-BOSTON, MASSACHUSETTS, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No. 13-cv-11701 |
| XCENTRIC VENTURES LLC, | ) ) ) |  |
| Defendant. | ) ) ) ) |  |

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **March 27, 2015**

### I.    Introduction

Plaintiffs Small Justice LLC ("Small Justice"), Richard A. Goren ("Goren") and Christian DuPont d/b/a Arabiannights-Boston, Massachusetts ("DuPont") (collectively, the "Plaintiffs") have filed this lawsuit against Defendant Xcentric Ventures LLC ("Xcentric") seeking declaratory judgment as to the ownership of copyright and alleging copyright infringement. D. 13. The Plaintiffs also allege that Xcentric violated Mass. Gen. L. c. 93A. Id. Xcentric has moved for summary judgment. D. 55 at 1. For the reasons stated below, the Court ALLOWS the motion.

### II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a

1

matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific, admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III. Factual Background

This factual recitation is drawn from the undisputed facts submitted by both parties, unless otherwise noted. Goren is a practicing attorney. D. 56 ¶ 1. Xcentric operates a website called the RipoffReport.com ("ROR"). Id. ¶ 4. ROR is an interactive website providing an online consumer advocacy forum allowing users to post free complaints, called "reports," about companies and individuals whom they feel have wronged them in some manner. D. 66 ¶ 5.

To post a report on the ROR website, a user must create a free account by providing his or her name, address, posting pseudonym, e-mail address and telephone number. D. 56 ¶ 6. After the user provides details regarding the company or individual at issue, D. 64-1 & 64-2, and writes his or her report, D. 64-3, the user encounters a screen that says "Submit your Report" and "File a Report," D. 64-5. Below those headings appears a box titled "Terms and Conditions" with a scroll bar running down the right side of the box. D. 64-5, D. 56 ¶ 7, D. 65 ¶¶ 14-16. One

2

of the terms, which is not visible unless a user employs the scroll bar, provides that "[b]y posting information or content to any public area of [the ROR], you automatically grant and you represent and warrant that you have the right to grant to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content . . . ." D. 56 ¶ 8;[1] D. 65 ¶ 33. A check box appears beneath the box containing the terms and conditions. D. 65 ¶ 17. Next to the checkbox is text that provides, in relevant part: "By posting this report/rebuttal, I attest this report is valid. I am giving Rip-Off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request." D. 64-5, D. 65 ¶ 17. To post a report, a user must check the box and click on a "continue" button. D. 65 ¶ 19. Finally, at the bottom of the screen are several links, including one called "Terms of Service." D. 64-5, D. 65 ¶ 17.

In January 2012, DuPont posted a report alleging that Goren engaged in improper conduct in his professional and personal life. D. 56 ¶ 11, D. 65 ¶¶ 42, 45. In February 2012, DuPont made a similar report (collectively, the "Reports"). D. 56 ¶ 12, D. 65 ¶ 46. In November 2012, Goren responded by filing an action against DuPont in Suffolk Superior Court for libel and intentional interference with prospective contractual relations. D. 56 ¶ 13, D. 66 ¶ 13. In February 2013, Goren notified DuPont that he intended to waive his claim for damages in favor of an injunction. D. 56 ¶ 17, D. 66 ¶ 17. In March 2013, Goren obtained a default judgment against DuPont. D. 29-3, D. 56 ¶ 16, D. 66 ¶ 16. Goren also obtained orders appointing himself attorney-in-fact for DuPont and purporting to transfer to him DuPont's copyright to the January 2012 report. D. 56 ¶¶ 18, 20-21, D. 66 ¶ 20-21. Thereafter, Goren executed an assignment of DuPont's copyright to himself, which he then assigned to Small

---

[1]Xcentric's quotation of this term omitted the word "perpetual."

Justice. D. 13 ¶ 55, D. 56 ¶¶ 22. In July 2013, Goren sought an amended judgment from the
Suffolk Superior Court to include the February 2012 report. D. 56 ¶ 25, D. 66 ¶ 25. In August
2013, the Suffolk Superior Court amended the default judgment and purported to transfer to
Goren "all rights in and to ownership of the copyright by [DuPont]" to both Reports. D. 13-3.
Goren was again appointed attorney-in-fact for DuPont, allowing Goren to execute an
assignment of DuPont's copyrights to himself, and then to Small Justice. D. 13 ¶ 55, D. 13-3, D.
56 ¶¶ 26-27.

Pertinent to the Plaintiff's Chapter 93A claim are two dispute resolution programs offered
by Xcentric. If a party contests the content of a report posted on the ROR, he may avail himself
of two, fee-based programs administered by Xcentric -- an arbitration program and the Corporate
Advocacy Program (the "CAP"). D. 56 ¶ 10; D. 65 ¶¶ 79-81. The former program utilizes an
arbitration panel to determine if a report contains false statements, which will then be redacted
by Xcentric. D. 56 ¶ 10. The latter program requires participants to pledge to perform certain
customer service activities and calls for Xcentric staff to monitor reports regarding the
participant. Id. The CAP advertises that members' "search engine listings [will] change from a
negative to a positive." D. 65 ¶ 81.

## IV. Procedural History

The Plaintiffs instituted this action on July 16, 2013. D. 1. They filed their first amended
complaint on September 2, 2013. D. 13. Xcentric moved to dismiss on September 16, 2013, D.
14, which the Court allowed in part, D. 45. The Court dismissed Count III (libel), Count IV
(intentional interference with prospective contractual relations), and all bases but one for Count
V (violation of Chapter 93A). D. 45. The parties proceeded with discovery regarding the
remaining counts, which include Count I (declaratory judgment as to ownership of copyright),

Count II (copyright infringement), and Count V (violation of Chapter 93A by Xcentric's CAP and arbitration program).  Xcentric now moves for summary judgment.  D. 55.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 87.

## V.      Discussion

### A.      Ownership of the Copyrights to the Reports

The plaintiffs and Xcentric disagree as to whether a ROR user is bound by the terms and conditions contained in the box on the screen where the user submits his report.  D. 55 at 7-12, D. 64 at 10-13.  When the user accesses that screen, the only term visible in the box is an age restriction and some or all of Xcentric's address (the parties dispute how much of the address is visible).  D. 56-7 at 7, D. 64 at 3, D. 64-5.  Further terms are revealed only when the user employs the scroll bar running down the right side of the box.  Among those terms is a transfer of copyright ownership from the user to Xcentric:  "[b]y posting information or content to any public area of [the ROR], you automatically grant . . . to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content."[2]  D. 13-2 at 2.  Below the terms and conditions is a check box that the user must select before his post is accepted by the website.  D. 64 at 3, 6; D. 64-5.  By checking the box, the user agrees that he is "giving Rip-off Report irrevocable rights to post [the report] on the website."  D. 64-5.

Xcentric argues that DuPont agreed to the terms and conditions when he clicked the checkbox, and, therefore, it owns the copyright by virtue of the grant of an exclusive license.  D. 55 at 9.  The Plaintiffs, on the other hand, argue that Xcentric has failed to show that the contract

---

[2]17 U.S.C. § 101 provides that the conveyance of an exclusive license is a transfer of copyright ownership.  "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license."  17 U.S.C. § 101.

Case: 15-1546 Document: 00116938954 Page: 6 Date Filed: 10/16/2015 Entry ID: 5953704

terms were "reasonably conspicuous" and that DuPont "unambiguously manifested his assent" to the terms. D. 64 at 12 (quoting Ajemian v. Yahoo!, Inc., 83 Mass. App. 565, 574-75 (2013) (alterations omitted)).

There are two types of contracts formed online: "clickwrap" and "browsewrap" agreements. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014). In a clickwrap agreement, users must select a check box or radio button to indicate that they agree to the website's terms and conditions. Id. In contrast, browsewrap agreements do "not require the user to manifest assent to the terms and conditions expressly. A party instead gives his assent simply by using the website." Id. at 1176 (quoting Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009) (alterations omitted)). Clickwrap agreements are generally upheld because they require affirmative action on the part of the user. Van Tassell v. United Mktg. Grp., LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011). "Because no affirmative action is required by a website user to agree to the terms of a [browsewrap] contract other than his or her use of the website, the determination of the validity of a browsewrap contract depends on whether the user has actual or constructive notice of a website's terms and conditions." Id. If there is no evidence of actual notice, then the website owner must show that it "put[] a reasonably prudent user on inquiry notice of the terms of the contract." Nguyen, 763 F.3d at 1177 (citing Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 30-31 (2d Cir. 2002)).

Xcentric construes the terms and conditions as a clickwrap agreement, but the user never affirmatively indicates his agreement. The terms accompanying the checkbox do not state that "I agree to the terms and conditions" or other such language indicating express accord. By checking the box, the user agrees only to the terms accompanying the checkbox. This means that

6

the terms and conditions, including the grant of an exclusive license, which is paramount to a copyright transfer, constitute a browsewrap agreement.

The record before the Court is undisputed as to the material facts. Both parties acknowledge that there is no evidence that DuPont took notice of the terms and conditions. <u>See</u> D. 55 at 10-12. In the absence of evidence that DuPont had actual knowledge of the terms and conditions, for Xcentric to obtain the copyrights to his Reports, it must demonstrate that a reasonably prudent user would have had inquiry notice of the conveyance of an exclusive license to Xcentric. <u>Nguyen</u>, 763 F.3d at 1177. The parties' dispute centers on whether the evidence shows that a reasonably prudent user would have had such notice.

To determine whether a user has inquiry notice of a browsewrap agreement, the Court must examine "the design and content of the website and the agreement's webpage." <u>Id</u>. Courts look to the "conspicuousness and placement" of a link to the terms and conditions, "other notices given to users of the terms of use, and the website's general design" to determine whether a reasonably prudent user had inquiry notice of the terms. <u>Id</u>. "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." <u>Id</u>. (citing <u>Specht</u>, 306 F.3d at 23 (terms visible only if user scrolled below button that initiated download of software)); <u>In re Zappos.com, Inc.</u>, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (link to terms buried among other links and website did not direct users to terms); <u>Van Tassell</u>, 795 F. Supp. 2d at 792-93 (term at issue accessible only by clicking on several links)). At the other end of the spectrum, if a website notifies a user that his continued use of a site indicates his assent to the terms, then a browsewrap agreement is more likely to be enforced. <u>Nguyen</u>, 763

F.3d at 1177 (citing <u>Cairo, Inc. v. Crossmedia Servs., Inc.</u>, No. 04-04825, 2005 WL 756610, at *

2, * 4-5 (N.D. Cal. Apr. 1, 2005)).

Here, the Court concludes that a reasonably prudent user was on inquiry notice of the

terms and conditions associated with the ROR, and, therefore, the transfer of copyright

ownership was valid.  The screen where users submitted their reports prominently featured a

portion of the terms in the center of the screen, above the "continue" button that the users clicked

to conclude the posting process.  D. 64-5.  That screen, along with at least two of the other

screens used in the posting process, also contained blue links to the terms of service at the

bottom of the page which were conspicuously visible without scrolling beyond  the "continue"

button used to progress to the subsequent screen.   D. 64-1, D. 64-4, D. 64-5.   The

conspicuousness of the terms is supported by the contrasting color of the link to them coupled

with the placement of the terms themselves on the final screen prior to submission.  <u>See PDC

Labs., Inc. v. Hach Co.</u>, No. 09-1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009)

(granting defendant's motion for partial summary judgment in part as to a contract's

enforceability where link to terms appeared on separate pages of online order process and users

were directed to review terms on final screen); <u>Hubbert v. Dell Corp.</u>, 835 N.E.2d 113, 983-84

(2005) (concluding that arbitration agreement was part of online contract and deeming terms

valid where links to the terms were visible throughout order process, on marketing web pages,

and final online forms stated that sales were subject to terms and conditions); <u>cf. Nguyen</u>, 763

F.3d at 1178-79 (holding that conspicuous link to terms on every page of website was

insufficient for constructive notice without further notice to users or "affirmative action to

demonstrate assent").

Unlike in <u>Nguyen</u>, in this case, Xcentric provided further notice to users beyond the links at the bottom of the pages of the ROR. The beginning of the list of terms was visible above the "continue" button on the final submission screen. A review of those terms, by means of the scroll bar, would have revealed the term requiring users to transfer an exclusive license to Xcentric. The Plaintiffs dispute that a reasonable user would understand the function of the scroll bar running down the side of the box containing the terms. D. 64 at 3 (observing that there is "no marking or identification of the function as a vertical scroll bar" and that "[t]here is no direction, explicit prompt or even suggestion to use the scroll bar to view any additional disclosures"). A reasonably prudent internet user, however, is conversant in the basic navigation tools required to effectively utilize a website.[3] <u>See</u> <u>Forrest v. Verizon Commc'ns, Inc.</u>, 805 A.2d 1007, 1011 (D.C. Cir. 2002) (in affirming dismissal based upon a forum selection clause, stating that "the use of a 'scroll box' in the electronic version that displays only part of the [a]greement at any one time [is not] inimical to the provision of adequate notice"); <u>see also</u> <u>PDC</u>, 2009 WL 2605270, at *3 (resolving question of whether online terms were sufficiently conspicuous on summary judgment).

In addition, even if a reasonably prudent user could be deemed to be unfamiliar with a scroll bar, the ROR user was also required to check a box below the terms and conditions affirming that he granted an irrevocable right to Xcentric to post his report on the website. D. 64-5. If the user failed to appreciate that scrolling was required to view all of the terms, he was

---

[3]The Plaintiffs make a cursory argument that the any contract between DuPont and Xcentric was illusory because Xcentric reserved the right to change the terms and conditions. D. 64 at 16. They do not allege, however, that Xcentric did change terms and conditions in any way during the relevant time period. Without a change to the terms that affected that Plaintiffs' rights or remedies, the Court is not persuaded that the contract was illusory. <u>Cf.</u> <u>Morrison v. Amway Corp.</u>, 517 F.3d 248, 257 (5th Cir. 2008) (holding arbitration agreement was illusory where Amway unilaterally amended rules of conduct to require arbitration of claims arising prior to implementation of arbitration program).

9

informed that he was giving an irrevocable right with the further explanation that his post "will not be removed, even at my request."

The notice next to the check box has two consequences. First, a user who has any hesitation regarding the grant of an irrevocable right to display his post is prompted to investigate further, either by reading the terms and conditions placed prominently over the check box, or by clicking on the link to the terms of service at the bottom of the screen. Second, even if the browsewrap agreement were somehow invalid, a user's assent by means of the checkbox granted to Xcentric, at the very least, a non-exclusive license to publish the Reports. A copyright owner who grants a license to his work waives his right to sue the licensee for copyright infringement provided that the licensee's use does not go beyond the scope of the non-exclusive license. John G. Danielson, Inc. v. Winchester-Conant Prop., Inc., 322 F.3d 26, 40 (1st Cir. 2003) (noting that "[u]ses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits"); see Sony Corp. of Am. v. Universal City Studios, Inc. 464 U.S. 417, 433 (1984) (noting that "anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute . . . is not an infringer of the copyright with respect to such use") .

The Court concludes that DuPont transferred copyright ownership to Xcentric by means of an enforceable browsewrap agreement. Xcentric is thus entitled to summary judgment as to Count I (declaratory judgment as to copyright ownership) and Count II (copyright infringement). Moreover, even if the browsewrap agreement were considered invalid and DuPont retained ownership of the copyrights to the Reports, he nonetheless granted a non-exclusive license to Xcentric and, therefore, he waived his right to sue Xcentric for infringement where its use did

not exceed the scope of that license. The latter scenario also requires summary judgment for Xcentric as to Count II.

### B. Section 201(e) and the Subsequent Transfer of Copyright Ownership

Because Xcentric acquired exclusive ownership of the copyright from DuPont, DuPont ceased to be a holder of copyright and had no remaining rights to assign to Goren pursuant to Goren's Superior Court action. DuPont's purported assignment to Goren (executed by Goren as his attorney-in-fact) of the copyrights to the Reports had no legal effect and Goren acquired nothing supporting a right to sue Xcentric for copyright infringement.

Even if DuPont retained ownership of the copyrights, however, the Superior Court's transfer of rights was barred by 17 U.S.C. § 201(e) which provides:

> When an individual author's ownership of a copyright, or any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under copyright, shall be given effect under this title, except as provided under title 11.

Pursuant to this provision, the purported transfer of copyright ownership by the order pursued by Goren was ineffective. Goren, therefore, did not acquire any rights to transfer to Small Justice. Even so, the Plaintiffs suggest that the transfer was proper to satisfy the default judgment against DuPont. D. 64 at 21. Section 201(e) precludes any involuntary transfer from the author of his copyright. See Veeck v. Southern Bldg. Code Congress Internat'l, Inc., 293 F.3d 791, 803 (5th Cir. 2002) (noting that Section 201(e) "reflects Congress's intention to protect copyrights from involuntary appropriation by government entities"). The transfer here was not rendered voluntary by the fact that DuPont was apprised of the default judgment against him.

The Plaintiffs further argue that Xcentric lacks standing to challenge the ostensible transfer by the Superior Court. D. 64 at 20-21. They base this argument on two grounds. First,

they assert that Xcentric was not assigned an exclusive license to the copyrights. Id. As discussed above, that contention is without merit. Second, they argue that, even if Xcentric acquired ownership of the copyrights, it was not the author and, therefore, cannot take advantage of Section 201(e)'s shield, which, by its express terms, is available only to individual authors, not to assignees of the original author. Id.; 17 U.S.C. § 201(e). Xcentric, however, is not the party shielded by Section 201(e) here. Section 201(e) applies to the attempt by the Superior Court to transfer rights from DuPont, assuming he retained any, to Goren. DuPont, as an individual author who had not previously transferred his rights, could not be divested of his ownership, if any, by the actions of a governmental body. See Hendricks & Lewis, PLLC v. Clinton, No. C12-0841-RSL, 2012 WL 5947638, at * 3 (W.D. Wash. Nov. 27, 2012) (observing that Congress sough "to accomplish the goal of precluding all involuntary transfers of copyrights from an individual author unless specifically excluded"), aff'd, 766 F.3d 991 (9th Cir. 2014). Goren, therefore, acquired no rights to the copyrights, even if DuPont still owned the copyrights at the time of the Superior Court judgment.

In addition to the reasons set forth above, *supra* Section V.A, Section 201(e) eliminates any ownership interest in the copyrights claimed by Goren and Small Justice. Xcentric is, therefore, entitled to summary judgment on Counts I and II with respect plaintiffs Goren and Small Justice.

### C. Chapter 93A and the CAP and Arbitration Program

Finally, Xcentric seeks summary judgment on the Plaintiffs' remaining claim under Mass. Gen. L. c. 93A § 11. The Plaintiffs allege that Xcentric's solicitation of victims of defamatory reports to participate in its fee-based CAP and arbitration program is oppressive and unethical. D. 13 ¶¶ 33-35. Xcentric argues that the Plaintiffs' claim is barred by the

Communications Decency Act ("CDA"), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). According to Xcentric, because the CDA shields it from claims related to its editorial control over the content of its website, its provision of arbitration services with respect to that content is also shielded. D. 55 at 17-18. Xcentric asserts that to find its services oppressive and unethical is to treat it as the speaker or publisher of information provided by a third party – exactly what is barred by the CDA. Id.

In this case, however, the Plaintiffs' claims arise not from third-party content, but from Xcentric's own solicitations and advertisements. "[A]n interactive computer service provider remains liable for its own speech." Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007). "Put another way, CDA immunity does not apply if the interactive computer service provider is also an 'information content provider,' which is defined in the CDA as an entity that is 'responsible, in whole or in part, for the creation or development of' any allegedly fraudulent 'information.'"[4] Suk Jae Chang v. Wozo LLC, No. 11-10245-DJC, 2012 WL 1067643, at * 14 (D. Mass. Mar. 28, 2012).

While the CDA does not bar the Plaintiffs' allegations, however, the requirements of Chapter 93A itself defeat their claim. Chapter 93A requires the Plaintiffs to have suffered harm: "[a]ny person who engages in the conduct of any trade or commerce and who *suffers any loss of money or property*, real or personal, as a result of the use or employment by another person who

---

[4] The CDA also defeats the Plaintiffs' assertion that public policy prohibits enforcement of the ROR's terms and conditions. D. 64 at 17-20. Congress, through the CDA, chose to confer immunity on interactive computer service providers like Xcentric for libelous content provided by third parties. 47 U.S.C. § 230(c)(1). The Plaintiffs cannot invoke public policy to make an end-run around this statutory determination.

engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action . . . ." Mass. Gen. L. c. 93A § 11 (emphasis added). There must be a "causal link between the . . . wrongful conduct and the loss a plaintiff claims to have suffered." R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 80-81 (2001). The Plaintiffs argue that "[t]here is evidence of continuing injury to Goren's reputation as well as the loss of money [causally] connected to the undisputed solicitations and advertisements." D. 64 at 27.

The CAP and arbitration program, however, are not the source of Goren's reputational injury. The defamatory Reports caused the harm allegedly inflicted on Goren's reputation, and, as the Court previously held, the CDA confers immunity on Xcentric for the content of the Reports. D. 45 at 10-13. Further, Goren has failed to demonstrate how he lost money as a result of the solicitations for the CAP and arbitration program. He does not allege that he incurred the cost of participating in either program, D. 13, or explain how he suffered a financial loss, other than any loss of business related to the shielded Reports. "In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery." Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., 403 Mass. 722, 730 (1989); see Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 823 (2014) (stating that plaintiffs proceeding under c. 93A § 11 must "ultimately . . . prove a distinct injury") (internal quotation marks omitted). Because Goren has not proffered any evidence of a loss caused by the programs of which he complains, the Court allows Xcentric's motion with respect to Claim V.[5]

_____

[5]The Plaintiffs, citing to hearsay, such as excerpts of testimony from a state court proceeding in California and an e-mail to Goren, argue that Xcentric further violated Chapter 93A by engaging in an extortionate scheme to post complaints about companies that were then solicited to pay money to restore their reputations. D. 64 at 28-29. These allegations are not

14

VI.    **Conclusion**

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 55.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

contained in the Plaintiffs' amended complaint, D. 13, nor is such inadmissible and unsupported evidence sufficient to withstand summary judgment.  Fed. R. Civ. P. 56(c).

15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
SMALL JUSTICE LLC,                  )
RICHARD A. GOREN,                   )
and,                                )
CHRISTIAN DUPONT dba                )
ARABIANIGHTS-BOSTON                 )
MASSACHUSETTS                       )
                                    )
Plaintiffs,                         )
                                    ) CIVIL ACTION NO. 1:13-cv-11701-DJC
v.                                  )
                                    )
XCENTRIC VENTURES LLC,              )      NOTICE OF APPEAL
            Defendant.              )
                                    )
```

Notice is hereby given that SMALL JUSTICE LLC, RICHARD A. GOREN and

CHRISTIAN DUPONT, being all the plaintiffs in the above named case, hereby appeal to the

United States Court of Appeals for the First Circuit from the judgment for defendant Xcentric

Ventures LLC (Paper 104) entered on March 27, 2015 in accordance with the Memorandum and

Order dated March 27, 2015 granting defendant's motion for Summary Judgment.

<div style="margin-left: 40%;">

Respectfully submitted,
SMALL JUSTICE LLC, RICHARD A. GOREN,
and CHRISTIAN DUPONT,
Plaintiffs,

by their attorney,

*/s/ Richard A. Goren*
Richard A. Goren, Esq. BBO #203700
Law Office of Richard Goren
101 Federal Street Suite 1900
Boston MA 02110
617-261-8585
rgoren@richardgorenlaw.com

</div>

April 24, 2015

Add. 34

As of May 1, 2015

Law Office of Richard Goren
1 State Street Suite 1500
Boston MA 02109
617-933-9494
rgoren@richardgorenlaw.com

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those non-registered participants (if any) on April 24, 2015.

                             */s/ Richard A. Goren*

Add. 35

**May 22, 2015 Paper 115 docket report page**

**From:** ECFnotice@mad.uscourts.gov [mailto:ECFnotice@mad.uscourts.gov]
**Sent:** Friday, May 22, 2015 9:54 AM
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:13-cv-11701-DJC Small Justice LLC,et.al. v. Xcentric Ventures LLC Order

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 5/22/2015 at 9:53 AM EDT and filed on 5/22/2015
**Case Name:**         Small Justice LLC,et.al. v. Xcentric Ventures LLC
**Case Number:**      1:13-cv-11701-DJC
**Filer:**
**WARNING: CASE CLOSED on 03/27/2015**
**Document Number:** 115(No document attached)

**Docket Text:**
**Judge Denise J. Casper: ELECTRONIC ORDER entered. Before the Court rules on the plaintiffs' motion to amend notice of appeal, D. 113, which the defendant opposes, D. 114, the Court wishes to raise an issue regarding the application of 17 U.S.C. § 204. Although judgment entered for Xcentric, D. 104, would not change even if Section 204 applies to Claim I, the Court is inclined to add a footnote (see below) regarding the analysis under Section 204 to the Memorandum and Order issued on 3/27/15, D. 100. The Court invites each party to be heard on this sole issue, if they wish, by filing a memorandum, not to exceed five pages, by 6/5/15. The Court will address the pending motion to amend notice of appeal after the parties have filed their memoranda regarding Section 204.**

**Footnote [to be added to Memorandum & Order, D. 100]: Even if 17 U.S.C. § 204, D. 64 at 9, 21 n. 22, applies, the ultimate result here is the same. Section 204 provides that the transfer of a copyright is achieved only with an affirmative action on the part of the transferor, stating that "[a] transfer of copyright**

Add. 36

ownership, other than by operation of law, is not valid unless an instrument of conveyance, or note or memorandum of transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204. Assuming a written and signed conveyance was required here, the browsewrap agreement was insufficient because it did not require the user's affirmative assent, instead relying on the user's use of the ROR as an expression of assent. <u>See</u> <u>Murphy v. Lazarev</u>, 589 Fed. Appx. 757, 765 (6th Cir. 2014) (explaining that "[a] written and signed conveyance is necessary to use copyright material"); <u>cf.</u> <u>Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.</u>, 888 F. Supp. 2d 691, 696, 708 (D. Md. 2012), <u>aff'd</u>, 722 F.3d 591 (4th Cir. 2013) (enforcing online subscription agreement executed by users containing an exclusive assignment of copyright to uploaded photographs). Evaluated under Section 204, Xcentric did not acquire an exclusive license to the Reports by way of the terms and conditions, and DuPont, as the author of the Reports, retained copyright ownership. Even so, DuPont conveyed a nonexclusive, irrevocable license to Xcentric to display the Reports by means of the check box. Section 204's requirements are inapplicable to a nonexclusive license because it is not a "transfer of copyright ownership" under 17 U.S.C. § 101. <u>See</u> <u>Murphy</u>, 589 Fed. Appx. at 765 (stating that "a nonexclusive license may be granted orally, or may be implied from conduct" because "a nonexclusive license is not a transfer of ownership under 17 U.S.C. § 101 and is not, therefore, subject to the writing requirement of § 204") (internal quotation marks and alterations omitted). Under this scenario, Xcentric is not the owner of the copyright to the Reports, but it may display them in perpetuity. Accordingly, summary judgment still enters in Xcentric's favor. (Hourihan, Lisa)


**1:13-cv-11701-DJC Notice has been electronically mailed to:**

Richard A. Goren    rgoren@richardgorenlaw.com, raglaw@hotmail.com, rsullivan@bodofflaw.com

Daniel G. Booth    dbooth@boothsweet.com

Maria Crimi Speth    mcs@jaburgwilk.com, dag@jaburgwilk.com

**1:13-cv-11701-DJC Notice will not be electronically mailed to:**

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **SMALL JUSTICE LLC, RICHARD A.** | ) | |
| **GOREN, and CHRISTIAN DUPONT d/b/a** | ) | |
| **ARABIAN NIGHTS-BOSTON,** | ) | |
| **MASSACHUSETTS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 13-cv-11701** |
| | ) | |
| | ) | |
| **XCENTRIC VENTURES LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |

<div align="center">

**MEMORANDUM AND ORDER**

</div>

**CASPER, J.**                                                      **September 30, 2015**

**I.      Introduction**

A series of post-judgment motions are now pending before the Court.   Following

judgment in its favor, Defendant Xcentric moved for an award of costs and attorney's

fees.  D. 105. The Plaintiffs have moved to amend their original notice of appeal, D. 108.

D. 113.   After these two motions were filed, the Court notified the parties that it was

inclined to add a footnote to its Memorandum and Order issued on Xcentric's motion for

summary judgment, D. 100.  D. 115.   The plaintiffs responded with a motion for an

indicative ruling pursuant to Fed. R. Civ. P. 62.1 that the Court would allow a motion

under Fed. R. Civ. P. 60(b) to vacate the judgment.  D. 118.  Xcentric then moved to

dismiss its counterclaim against Plaintiff Dupont.  D. 121.  Dupont has moved to amend

<div align="center">

1

</div>

the Plaintiffs' first amended complaint. D. 129. Xcentric has moved for sanctions against Plaintiff Goren pursuant to Fed. R. Civ. P. 11(c)(2). D. 132. The Court now denies all the pending motions except Xcentric's motion to dismiss its counterclaim, which the Court ALLOWS.

## II.    Procedural History

This case stems from Plaintiff Dupont's reports ("Reports") posted on Xcentric's website, the Rip-off Report ("ROR"), impugning Plaintiff Goren's professional and personal reputations. D. 13. The Plaintiffs originally asserted five claims against Xcentric: declaratory judgment as to ownership of the copyrights to the Reports posted by Dupont on the ROR website, copyright infringement, libel, intentional interference with prospective contractual relations, and violation of Chapter 93A. Id. The Court dismissed the libel claim, the intentional interference claim and all bases but one of the Chapter 93A claim, reasoning that the claims were barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230. D. 45. Xcentric moved for summary judgment on the remaining counts, D. 55, which the Court allowed, reasoning that a reasonably prudent ROR user would have understood that he conveyed copyright ownership in his Reports to Xcentric, and, even if he did not, the website was clear that the user granted to Xcentric an irrevocable right to post the Reports. D. 100. Moreover, any rights to copyright ownership claimed by Small Justice were improperly acquired in the course of a Superior Court action that, contrary to 17 U.S.C. § 201(e), purported to transfer copyright ownership from Dupont to Goren. Id.

2

## III.    Discussion

The Court's proposed footnote, D. 115, recognized that, although not raised by the parties in their summary judgment filings, if the failure to conform to the writing requirement of 17 U.S.C. § 204 applies to Dupont's transfer to Xcentric of an exclusive license to the Reports, Xcentric nonetheless acquired a nonexclusive, irrevocable license to display the reports.   D. 115.   Accordingly, Xcentric is still entitled to summary judgment as to Claim I.

The Plaintiffs argue that if Xcentric acquired only a nonexclusive license, then Dupont retained the copyrights to the Reports.   See D. 117 at 1-2, 4.   The Plaintiffs posit that the Court must declare whether Xcentric "lack[ed] authority to grant sublicenses to Google and other search engines to display *on their servers* copies of DuPont's work." Id. at 2 (emphasis in original).   In addition, Xcentric asserted a counterclaim against Dupont alleging that he violated a provision of the ROR terms and conditions that required him to indemnify Xcentric in the event of a dispute concerning the Reports.   D. 49.   No party moved for summary judgment on the counterclaim.   The Plaintiffs urge the Court to request a remand from the First Circuit pursuant to Fed. R. Civ. P. 62.1 to enable the Court to vacate the judgment under Fed. R. Civ. P. 60(b) and issue a declaratory judgment that Dupont owns the copyrights to the Reports and that the nonexclusive license granted to Xcentric does not permit Xcentric "to authorize Google and other search engines to exercise any rights in his work by displaying cached copies of DuPont's work on their servers."   D. 117 at 4.   The Plaintiffs also seek a judgment for Dupont on Xcentric's counterclaim.   Id.

A.      **Plaintiffs' Rule 62.1 Motion for an Indicative Ruling**

The Plaintiffs' Rule 60(b) motion is without merit, and thus the Court denies their Rule 62.1 motion for an indicative ruling.  See <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997) (indicating that, once appeal taken, remand from First Circuit required to permit district court to consider Rule 60(b) motion).  Rule 62.1 provides:  "If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:  (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Civ. P. 62.1.  Rule 60(b) confers on the Court the power to "relieve a party . . . from a final judgment, order, or proceeding" for certain reasons, including "(1) mistake, inadvertence, surprise, or excusable neglect" and "(6) any other reason that justifies relief."  Fed. R. Civ. P. 60(b).

"Rule 60(b) relief is 'extraordinary in nature' and, thus, 'motions invoking that rule should be granted sparingly.'"  <u>Fisher v. Kadant, Inc.</u>, 589 F.3d 505, 512 (1st Cir. 2009) (quoting <u>Karak v. Bursaw Oil Corp.</u>, 288 F.3d 15, 19 (1st Cir. 2002)).  "A party seeking relief under Rule 60(b) must demonstrate 'at a bare minimum, that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted.'"  <u>Id.</u>  "[A] litigant, as a precondition to relief under Rule 60(b), must give the trial court reason to believe that vacating the judgment will not be an empty

4

exercise." <u>Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co., Inc.</u>, 953 F.2d 17, 20 (1st Cir. 1992).

The Plaintiffs did not seek a declaration that Dupont owns the copyrights at issue. The prayer for relief as to Count I of the Plaintiffs' first amended complaint sought "a declaration that Small Justice [] is the lawful owner of the copyright ownership of each of the" Reports. D. 13 at 17. The Court ruled in Xcentric's favor based on the relief sought by the Plaintiffs because Small Justice does not own the copyrights to the Reports, and the ruling remains unaltered.

Accordingly, the Court denies the Plaintiffs' motion for an indicative ruling pursuant to Rule 62.1 because the Plaintiffs have not established that the Rule 60(b) motion they wish to assert is "potentially meritorious." <u>Teamsters</u>, 953 F.2d at 21.

**B. Plaintiffs' Motion to Extend Time to File Notice of Appeal**

Citing Fed. R. App. P. 4(a)(5), the Plaintiffs have moved to extend the time to file a notice of appeal. D. 113 at 1. The Plaintiffs seek the extension so they can amend their April 24, 2015 notice of appeal, D. 108, to include the Court's March 24, 2014 order allowing Xcentric's motion to dismiss certain of the Plaintiffs' claims, D. 45. "By inadvertence the timely filed notice of appeal of the judgment failed to specifically reference the Court's prior March 24, 2014 decision." D. 113 at 2.

Even if this Court retains jurisdiction to consider this motion, <u>see</u> <u>Smith v. Jenkins</u>, 777 F. Supp. 2d 270, 271 (D. Mass. 2011) (citing <u>United States v. Brooks</u>, 145 F.3d 446, 455 (1st Cir. 1998)), Fed. R. App. P. 4(a), invoked by the Plaintiffs, does not provide a mechanism for amending a notice of appeal; it pertains only to extending the deadline for filing a notice of appeal. <u>Smith</u>, 777 F. Supp. 2d at 271. Moreover, even if

Rule 4(a)(5) applies, it requires a showing of either good cause or excusable neglect, neither of which has been demonstrated by the Plaintiffs. Fed. R. App. P. 4(a)(5)(A)(ii). "[W]here there are no forces beyond the control of the would-be appellant that prevent him from taking timely steps to preserve his rights, 'good cause' has no applicability and an extension of the time for appealing can be justified only by a showing of excusable neglect." Mirpuri v. ACT Mfg., Inc., 212 F.3d 624, 630 (1st Cir. 2000). The Plaintiffs point only to inadvertence as the reason for the oversight; they do not cite any forces beyond their control that prevented them from including the dismissed claims in their notice of appeal. D. 113.

A determination of whether "excusable neglect" is present should consider the so-called Pioneer factors, including "the danger of prejudice, the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, and whether the movant acted in good faith." Hospital del Maestro v. National Labor Relations Bd., 263 F.3d 173, 174-75 (1st Cir. 2001) (internal quotation marks and alterations omitted); see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993). "The four Pioneer factors do not carry equal weight; the excuse given for the late filing must have the greatest import." Hospital, 263 F.3d at 175 (quoting Lowry v. McDonnell Douglas Corp., 211 F.3d 457, 463 (8th Cir. 2000)). Here, the only reason offered for the delay is inadvertence, which does not establish excusable neglect. Mirpruri, 212 F.3d at 631 (stating that "mere 'inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect'") (quoting Pioneer, 507 U.S. at 392). The Court denies the Plaintiffs' motion to extend the time to file a notice of appeal.

### C. Xcentric's Motion to Dismiss Counterclaim

The Plaintiffs, as one of the grounds for the Rule 62.1 motion, and the underlying Rule 60(b) motion, cite the need for the Court to dispose of the outstanding counterclaim asserted by Xcentric against plaintiff Dupont. D. 118 at 1. The counterclaim at issue is for breach of contract. D. 52-1. The ROR terms and conditions required Dupont to indemnify Xcentric if a dispute concerning the Reports arose. Id. at 14.

Pursuant to Fed. R. Civ. P. 41(a)(2) and 41(c), Xcentric now moves to dismiss its own counterclaim. D. 121. Rule 41(a)(2) provides that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court deems proper. . . . Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice." Fed. R. Civ. P. 41(a)(2). Rule 41(c) makes explicit that "[t]his rule applies to a dismissal of any counterclaim . . . ." Fed. R. Civ. P. 41(c).

Rule 41(a)(2) "allows a plaintiff to voluntarily dismiss his own case as long as 'no other party will be prejudiced.'" Colón Cabrera v. Esso Standard Oil Co. (Puerto Rico), Inc., 723 F.3d 82, 87 (1st Cir. 2013) (quoting P.R. Mar. Shipping Auth. v. Leith, 668 F.2d 46, 50 (1st Cir. 1981)). "In deciding whether to grant a Rule 41(a)(2) motion, courts typically look to the 'defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant.'" Doe v. Urohealth Sys., Inc., 216 F.3d 157, 160 (1st Cir. 2000) (quoting Pace v. Southern Express Co., 409 F.2d 331, 334 (7th Cir. 1969)). "Dismissal should in most instances be granted, unless the result would

Add. 44

be to legally harm the defendant." <u>Century Mfg. Co., Inc. v. Central Transp. Int'l, Inc.</u>, 209 F.R.D. 647, 648 (D. Mass. 2002) (internal quotation marks and alterations omitted).

The Plaintiffs do not sufficiently address any prejudice that would be suffered by Dupont if the counterclaim were dismissed. The Plaintiffs' only argument with respect to prejudice is that Dupont "has a legal interest in complying with the Massachusetts judgment." <u>Id.</u> at 10. The Plaintiffs also cite Goren's interest in "effectuating the decree in his favor and also an argument as attorney-in-fact for Dupont to press for implementation of that decree." <u>Id.</u>

The dismissal of the counterclaim does not prejudice Dupont and thus the Court allows Xcentric's motion. The Plaintiffs do not indicate that Dupont or Goren, as his attorney-in-fact, has expended significant resources on the counterclaim, nor had the Plaintiffs moved for summary judgment on the counterclaim. <u>Cf.</u> <u>Urohealth</u>, 216 F.3d at 163. The Plaintiffs were the ones who attempted to use the unresolved counterclaim as a foothold to vacate the judgment entered by the Court, giving Xcentric a reason to pursue its dismissal. In these circumstances, the Court concludes that Dupont will not suffer any legal harm if Xcentric abandons the counterclaim, and, therefore, dismissal is proper.

**D.     Plaintiffs' Motion to Amend First Amended Complaint**

Perhaps recognizing that he did not move for declaratory judgment in his favor, Dupont now moves to amend the Plaintiffs' first amended complaint, D. 13, pursuant to Fed. R. Civ. P. 15(b)(2). D. 129. Rule 15(b)(2) provides a means for "[a] party [to] move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). Dupont seeks a declaration that Dupont granted an unenforceable, as contrary to public policy, non-

Add. 45

exclusive license to Xcentric.  D. 129 at 1; D. 129-1 at 17.  In the alternative, Dupont seeks to amend to obtain a declaration that Dupont owns the copyrights to the Reports. D. 129 at 1-2; D. 129-1 at 17.

"The law in this circuit is clear that a district court may not accept an amended complaint after judgment has entered unless the judgment is set aside or vacated under Rules 59 or 60."  Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 538 (1st Cir. 2011); see United States ex. Rel. Ge, M.D. v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 127 (1st Cir. 2013).  As already discussed, the Court denies the Plaintiffs' motion for an indicative ruling to allow their Rule 60(b) motion to proceed.  Finally, even if the Court were to entertain his motion, Dupont does not provide an adequate reason for the delay in seeking the amendment given that the Plaintiffs were aware of the facts underlying their claim when they filed their first two complaints.  Such a delay would prejudice Xcentric. Feliciano-Hernández, 663 F.3d at 538.  For these reasons, the Court denies Dupont's motion to amend the first amended complaint.

### E.   Xcentric's Motion for Fees and Costs

Xcentric has moved for an award of costs and attorney's fees pursuant to 17 U.S.C.  §  505,  which  provides  in  relevant  part  that,  in  an  action  for  copyright infringement, "the court in its discretion may allow the recovery of full costs by or against any party other than the United States" and that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  17 U.S.C. § 505. However, as Xcentric has not filed any supporting documentation regarding attorney's fees and costs incurred, the Court denies the motion without prejudice to refiling with supporting documentation.

**F.** **Xcentric's Motion for Sanctions Against Plaintiff Goren**

Xcentric seeks sanctions against Goren pursuant to Fed. R. Civ. P. 11(c)(2) for seeking leave to amend the first amended complaint. D. 132. According to Xcentric, the motion was filed "for the improper purpose of harassing and needlessly increasing the cost of litigation." Id. at 1. Xcentric further seeks sanctions under 28 U.S.C. § 1927 "for unreasonably and vexatiously multiplying the proceedings in this matter." Id. The Court denies the motion.

"Rule 11 prohibits filings made with any improper purpose, the offering of frivolous arguments, and the assertion of factual allegations without evidentiary support or the likely prospect of such support." Roger Edwards, LLC v. Fiddes & Son Ltd., 437 F.3d 140, 142 (1st Cir. 2006) (internal quotation marks omitted). Echoing this admonition, 28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

As discussed above, Dupont failed to justify the delay in filing his motion to amend and such a motion was untimely after judgment entered without the indicative ruling now denied by this Court. The Court, however, acknowledges the Plaintiffs' strategic choices in light of the Court's summary judgment ruling and reasoning to seek a remand of the case and an opportunity to broaden the declaratory relief sought. In these circumstances the Court cannot conclude that Dupont's motion was frivolous or vexatious such that it warrants sanctions. The Court, therefore, denies Xcentric's motion for sanctions.

Add. 47

## IV.    Conclusion

For the foregoing reasons, the Court DENIES the Plaintiffs' motion to amend the notice of appeal, D. 113; DENIES the Plaintiffs' motion for an indicative ruling pursuant to Rule 62.1, D. 118; and DENIES Dupont's motion to amend the first amended complaint, D. 129. The Court ALLOWS Xcentric's motion to dismiss the counterclaim, D. 121. The Court DENIES Xcentric's motion for Rule 11 sanctions, D. 132. Finally, the Court DENIES Xcentric's motion for fees and costs without prejudice.[1]

The Court hereby incorporates the footnote set forth at D. 115 into its Memorandum and Order dated March 27, 2015, D. 100, appending it as note 4 to the concluding sentence of Section V.A on page 11.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[1] The Court also ALLOWS *nunc pro tunc* the Plaintiffs' motion to file a surreply, D. 128, and Dupont's motion to file a reply, D. 131.

Add. 48

EXHIBIT B , August 29, 2013 Ripoff Report Terms and Conditions

## 1. Ripoff Report Membership Terms & Conditions

To use this service, you must be at least 14 years old.

www.RipoffReport.com ("ROR") is an online forum created to help keep consumers informed. ROR is operated by Xcentric Ventures, LLC located at:

**Xcentric Ventures, LLC**
Ripoff Report
P.O. Box 310
Tempe, AZ 85280
(602) 359-4357

This is a legal agreement ("Agreement") between you and Xcentric Ventures, LLC ("Xcentric"). Please read the Agreement carefully before registering for ROR. By registering for ROR, you agree to be bound by the terms and conditions of this Agreement (the "Terms"). If you do not agree to the Terms, you are not permitted to use ROR.

The Terms are subject to change by Xcentric, at any time, without notice, effective upon posting of a link to same on our website. Persons who are under 14 years old may not register for ROR. By registering with ROR, you represent and warrant that you are at least 14 years old.

Xcentric reserves the right to immediately suspend or terminate your registration with ROR, without notice, upon any breach of this Agreement by you which is brought to Xcentric's attention.

Your registration with ROR is for your sole, personal use. You may not authorize others to use your user identification and password, and you may not assign or otherwise transfer your account to any other person or entity.

## 2. Online Conduct

**You agree that:**
You are solely responsible for the content or information you publish or display (hereinafter, "post") on ROR.

You will NOT post on ROR any defamatory, inaccurate, abusive, obscene, profane, offensive, threatening, harassing, racially offensive, or illegal material, or any material that infringes or violates another party's rights (including, but not limited to, intellectual property rights, and rights of privacy and publicity). You will use ROR in a manner consistent with any and all applicable laws and regulations. By posting information on ROR, you warrant and represent that the information is truthful and accurate.

You will not post, distribute or reproduce in any way any copyrighted material, trademarks, or other proprietary information without obtaining the prior written consent of the owner of such proprietary rights and except as otherwise permitted by law.

## 3. Indemnity

You will defend, indemnify, and hold harmless Xcentric, its officers, directors, employees, agents and third parties, for any losses, costs, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of your use of ROR, including, but not limited to, any breach by you of the terms of this Agreement

## 4. Online Content

Opinions, advice, statements, offers, or other information or content made available through ROR are those of their respective authors and not of Xcentric, and should not necessarily be relied upon. Such authors are solely responsible for the accuracy of such content. Xcentric does not guarantee the accuracy, completeness, or usefulness of any information on ROR and neither adopts nor endorses nor is responsible for the accuracy or reliability of any opinion, advice or statement made. Under no circumstances will Xcentric be responsible for any loss or damage resulting from anyone's reliance on information or other content posted on ROR.

## 5. Removal of Information

By posting information on ROR, you understand and agree that the material will not be removed even at your request. You shall remain solely responsible for the content of your postings on ROR.

While we do not and cannot review every message posted by users of the Service, and are not responsible for any content of these messages, we reserve the right, but are not obligated, to delete or remove profanity, obscenities, threats of physical violence or damage to property, and private financial information such as social security numbers and credit card information.

## 6. Proprietary Rights/Grant of Exclusive Rights

By posting information or content to any public area of www.RipoffReport.com, you automatically grant, and you represent and warrant that you have the right to grant, to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content and to prepare derivative works of, or incorporate into other works, such information and content, and to grant and authorize sublicenses of the foregoing.

## 7. Information Supplied by You

Except as provided otherwise in its privacy policy, Xcentric will keep confidential all information supplied by you to Xcentric, and shall use or disclose such information only for the purposes for which such information was collected, or as required by law. Whereas you are legally entitled to publish your comments anonymously, at the discretion of Xcentric, the personally identifying information of any user who is found to have posted numerous complaints about the same company and/or individual using different pseudonyms may lose the confidential protections afforded by this section.

## 8. Disclaimer of Warranty

Xcentric provides ROR on an "as is" basis and grants no warranties of any kind, express, implied, statutory, in connection with ROR or in connection with any communication with Xcentric or its representatives, or otherwise with respect to ROR. Xcentric specifically disclaims any implied warranties of merchantability, fitness for a particular purpose, or non-infringement. Xcentric does not warrant that ROR's connection to the internet will be secure, uninterrupted, always available, or error-free, or will meet your requirements, or that any defects in ROR will be corrected.

## 9. Limitation of Liability

In no event will Xcentric be liable: (i) to you for any incidental, consequential, or indirect damages arising out of the use of or inability to use ROR, even if Xcentric or its agents or representatives know or have been advised of the possibility of such damages or; (ii) to any person other than you. In addition, Xcentric disclaims all liability, regardless of the form of action, for the acts or omissions of other members or users (including, but not limited to, unauthorized users, or "hackers") of ROR.

## 10. State by State Variations

Certain jurisdictions limit the applicability of warranty disclaimers and limitations of liability so the above disclaimers of warranty and limitations of liability may not apply to you.

2

## 11. General Provisions

You agree that Arizona law (regardless of conflicts of law principles) shall govern this Agreement, that any dispute arising out of or relating to this Agreement shall be subject to the exclusive venue of the federal and state courts in the State of Arizona, and that you submit to the exclusive jurisdiction of the federal and state courts in the State of Arizona in connection with ROR or this Agreement. The failure of Xcentric to exercise or enforce any right or provision of the Terms of Service shall not constitute a waiver of such right or provision. The failure of Xcentric or You to exercise in any respect any right provided for herein shall not be deemed a waiver of any further rights hereunder. This Agreement, accepted upon registering for ROR, contains the entire agreement between you and Xcentric regarding the use of ROR. This Agreement may only be amended upon notice by Xcentric to you, or by a writing signed by you and an authorized official of Xcentric. Unless otherwise explicitly stated, the Terms will survive termination of your registration with ROR. If any provision of this Agreement is held invalid, the remainder of this Agreement shall continue in full force and effect.

## 12. Copyright Policy/Termination of User Privileges for Infringement and Contact Information for Suspected Copyright Infringement/DMCA Notices

We will terminate the privileges of any user who uses ROR to unlawfully transmit copyrighted material without a license, express consent, valid defense or fair use exemption to do so. In particular, users who submit user content to ROR, whether articles, images, stories, software or other copyrightable material must ensure that the content they upload does not infringe the copyrights of third parties.

If you believe that your copyright has been infringed through the use of ROR, please contact our Customer Service department at: editor@ripoffreport.com or mail/fax at:

Ripoff Report Legal Department - Copyright Policy
P.O. Box 310
Tempe, AZ 85280
(602) 359-4357

You may also access contact information for ROR's Registered DMCA Agent via the United States Copyright Office's website here: http://www.copyright.gov/onlinesp/agents/xcetven.pdf.

Add. 51

§ 230. Protection for private blocking and screening of offensive material, 47 USCA § 230

United States Code Annotated
   Title 47. Telegraphs, Telephones, and Radiotelegraphs
      Chapter 5. Wire or Radio Communication (Refs & Annos)
         Subchapter II. Common Carriers (Refs & Annos)
            Part I. Common Carrier Regulation

47 U.S.C.A. § 230

§ 230. Protection for private blocking and screening of offensive material

Effective: October 21, 1998

Currentness

(a) Findings

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by

Add. 52

§ 230. Protection for private blocking and screening of offensive material, 47 USCA § 230

individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) Protection for "good samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of--

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

(e) Effect on other laws

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

Add. 53

§ 230. Protection for private blocking and screening of offensive material, 47 USCA § 230

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on Communications Privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

  (A) filter, screen, allow, or disallow content;

  (B) pick, choose, analyze, or digest content; or

  (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**CREDIT(S)**
(June 19, 1934, c. 652, Title II, § 230, as added Feb. 8, 1996, Pub.L. 104-104, Title I, § 509, 110 Stat. 137; Oct. 21, 1998, Pub.L. 105-277, Div. C, Title XIV, § 1404(a), 112 Stat. 2681-739.)

Add. 54

United States Code Annotated
   Title 17. Copyrights (Refs & Annos)
     Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

<div align="center">

17 U.S.C.A. § 101

§ 101. Definitions

Effective: December 9, 2010

Currentness

</div>

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

"Audiovisual works" are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied.

The "Berne Convention" is the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto.

The "best edition" of a work is the edition, published in the United States at any time before the date of deposit, that the Library of Congress determines to be most suitable for its purposes.

A person's "children" are that person's immediate offspring, whether legitimate or not, and any children legally adopted by that person.

A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

"Copyright owner", with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right.

A "Copyright Royalty Judge" is a Copyright Royalty Judge appointed under section 802 of this title, and includes any

individual serving as an interim Copyright Royalty Judge under such section.

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

A "device", "machine", or "process" is one now known or later developed.

A "digital transmission" is a transmission in whole or in part in a digital or other non-analog format.

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

An "establishment" is a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The term "financial gain" includes receipt, or expectation of receipt, of anything of value, including the receipt of other copyrighted works.

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

A "food service or drinking establishment" is a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is nonresidential is used for that purpose, and in which nondramatic musical works are performed publicly.

The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland, on October 29, 1971.

The "gross square feet of space" of an establishment means the entire interior space of that establishment, and any adjoining outdoor space used to serve patrons, whether on a seasonal basis or otherwise.

The terms "including" and "such as" are illustrative and not limitative.

An "international agreement" is--

    **(1)** the Universal Copyright Convention;

    **(2)** the Geneva Phonograms Convention;

    **(3)** the Berne Convention;

    **(4)** the WTO Agreement;

    **(5)** the WIPO Copyright Treaty;

(6) the WIPO Performances and Phonograms Treaty; and

(7) any other copyright treaty to which the United States is a party.

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

"Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

The term "motion picture exhibition facility" means a movie theater, screening room, or other venue that is being used primarily for the exhibition of a copyrighted motion picture, if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances.

"Motion pictures" are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

A "performing rights society" is an association, corporation, or other entity that licenses the public performance of nondramatic musical works on behalf of copyright owners of such works, such as the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and SESAC, Inc.

"Phonorecords" are material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "phonorecords" includes the material object in which the sounds are first fixed.

"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

For purposes of section 513, a "proprietor" is an individual, corporation, partnership, or other entity, as the case may be, that owns an establishment or a food service or drinking establishment, except that no owner or operator of a radio or television station licensed by the Federal Communications Commission, cable system or satellite carrier, cable or satellite carrier service or programmer, provider of online services or network access or the operator of facilities therefor, telecommunications company, or any other such audio or audiovisual service or programmer now known or as may be developed in the future, commercial subscription music service, or owner or operator of any other transmission service, shall under any circumstances be deemed to be a proprietor.

A "pseudonymous work" is a work on the copies or phonorecords of which the author is identified under a fictitious name.

"Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

To perform or display a work "publicly" means--

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

"Registration", for purposes of sections 205(c)(2), 405, 406, 410(d), 411, 412, and 506(e), means a registration of a claim in the original or the renewed and extended term of copyright.

"Sound recordings" are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied.

"State" includes the District of Columbia and the Commonwealth of Puerto Rico, and any territories to which this title is made applicable by an Act of Congress.

A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

A "transmission program" is a body of material that, as an aggregate, has been produced for the sole purpose of transmission to the public in sequence and as a unit.

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.

The "United States", when used in a geographical sense, comprises the several States, the District of Columbia and the Commonwealth of Puerto Rico, and the organized territories under the jurisdiction of the United States Government.

For purposes of section 411, a work is a "United States work" only if--

(1) in the case of a published work, the work is first published--

(A) in the United States;

(B) simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

(C) simultaneously in the United States and a foreign nation that is not a treaty party; or

(D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

(2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

Add. 58

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later remarried.

The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.

The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland, on December 20, 1996.

A "work of visual art" is--

(1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

(2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

A work of visual art does not include--

(A)(i) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

(ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

(iii) any portion or part of any item described in clause (i) or (ii);

(B) any work made for hire; or

(C) any work not subject to copyright protection under this title.

A "work of the United States Government" is a work prepared by an officer or employee of the United States Government as part of that person's official duties.

A "work made for hire" is--

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

Add. 59

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment--

(A) shall be considered or otherwise given any legal significance, or

(B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made For Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.

**CREDIT(S)**
(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2541; Pub.L. 96-517, § 10(a), Dec. 12, 1980, 94 Stat. 3028; Pub.L. 100-568, § 4(a)(1), Oct. 31, 1988, 102 Stat. 2854; Pub.L. 101-650, Title VI, § 602, Title VII, § 702, Dec. 1, 1990, 104 Stat. 5128, 5133; Pub.L. 102-307, Title I, § 102(b)(2), June 26, 1992, 106 Stat. 266; Pub.L. 102-563, § 3(b), Oct. 28, 1992, 106 Stat. 4248; Pub.L. 104-39, § 5(a), Nov. 1, 1995, 109 Stat. 348; Pub.L. 105-80, § 12(a)(3), Nov. 13, 1997, 111 Stat. 1534; Pub.L. 105-147, § 2(a), Dec. 16, 1997, 111 Stat. 2678; Pub.L. 105-298, Title II, § 205, Oct. 27, 1998, 112 Stat. 2833; Pub.L. 105-304, Title I, § 102(a), Oct. 28, 1998, 112 Stat. 2861; Pub.L. 106-44, § 1(g)(1), Aug. 5, 1999, 113 Stat. 222; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title I, § 1011(d)], Nov. 29, 1999, 113 Stat. 1536, 1501A-544; Pub.L. 106-379, § 2(a), Oct. 27, 2000, 114 Stat. 1444; Pub.L. 107-273, Div. C, Title III, § 13210(5), Nov. 2, 2002, 116 Stat. 1909; Pub.L. 108-419, § 4, Nov. 30, 2004, 118 Stat. 2361; Pub.L. 109-9, Title I, § 102(c), Apr. 27, 2005, 119 Stat. 220; Pub.L. 111-295, § 6(a), Dec. 9, 2010, 124 Stat. 3181.)

Notes of Decisions (398)

17 U.S.C.A. § 101, 17 USCA § 101
Current through P.L. 113-31 (excluding P.L. 113-28) approved 8-9-13

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Add. 60

United States Code Annotated
  Title 17. Copyrights (Refs & Annos)
    Chapter 1. Subject Matter and Scope of Copyright (Refs & Annos)

17 U.S.C.A. § 106

§ 106. Exclusive rights in copyrighted works

Effective: November 2, 2002

Currentness

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

**CREDIT(S)**
(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101-318, § 3(d), July 3, 1990, 104 Stat. 288; Pub.L. 101-650, Title VII, § 704(b)(2), Dec. 1, 1990, 104 Stat. 5134; Pub.L. 104-39, § 2, Nov. 1, 1995, 109 Stat. 336; Pub.L. 106-44, § 1(g)(2), Aug. 5, 1999, 113 Stat. 222; Pub.L. 107-273, Div. C, Title III, § 13210(4)(A), Nov. 2, 2002, 116 Stat. 1909.)

Notes of Decisions (181)

17 U.S.C.A. § 106, 17 USCA § 106
Current through P.L. 113-22 approved 7-25-13

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.          1

Add. 61

United States Code Annotated
   Title 17. Copyrights (Refs & Annos)
     Chapter 2. Copyright Ownership and Transfer (Refs & Annos)

17 U.S.C.A. § 201

§ 201. Ownership of copyright

Currentness

**(a) Initial Ownership.**--Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

**(b) Works Made for Hire.**--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

**(c) Contributions to Collective Works.**--Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

**(d) Transfer of Ownership.**--

   **(1)** The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

   **(2)** Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

**(e) Involuntary Transfer.**--When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

**CREDIT(S)**
(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2568; Pub.L. 95-598, Title III, § 313, Nov. 6, 1978, 92 Stat. 2676.)

Notes of Decisions (186)

| United States Code Annotated |
| Title 17. Copyrights (Refs & Annos) |
| Chapter 2. Copyright Ownership and Transfer (Refs & Annos) |

17 U.S.C.A. § 204

§ 204. Execution of transfers of copyright ownership

Currentness

**(a)** A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

**(b)** A certificate of acknowledgement is not required for the validity of a transfer, but is prima facie evidence of the execution of the transfer if--

**(1)** in the case of a transfer executed in the United States, the certificate is issued by a person authorized to administer oaths within the United States; or

**(2)** in the case of a transfer executed in a foreign country, the certificate is issued by a diplomatic or consular officer of the United States, or by a person authorized to administer oaths whose authority is proved by a certificate of such an officer.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2570.)

Notes of Decisions (111)

17 U.S.C.A. § 204, 17 USCA § 204
Current through P.L. 114-61 (excluding P.L. 114-52, 114-54, 114-59, and 114-60) approved 10-7-2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 63

| United States Code Annotated |
| Title 17. Copyrights (Refs & Annos) |
| Chapter 2. Copyright Ownership and Transfer (Refs & Annos) |

17 U.S.C.A. § 205

§ 205. Recordation of transfers and other documents

Effective: December 9, 2010

Currentness

**(a) Conditions for Recordation.**--Any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office if the document filed for recordation bears the actual signature of the person who executed it, or if it is accompanied by a sworn or official certification that it is a true copy of the original, signed document. A sworn or official certification may be submitted to the Copyright Office electronically, pursuant to regulations established by the Register of Copyrights.

**(b) Certificate of Recordation.**--The Register of Copyrights shall, upon receipt of a document as provided by subsection (a) and of the fee provided by section 708, record the document and return it with a certificate of recordation.

**(c) Recordation as Constructive Notice.**--Recordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document, but only if--

(1) the document, or material attached to it, specifically identifies the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title or registration number of the work; and

(2) registration has been made for the work.

**(d) Priority Between Conflicting Transfers.**--As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice under subsection (c), within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer. Otherwise the later transfer prevails if recorded first in such manner, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer.

**(e) Priority Between Conflicting Transfer of Ownership and Nonexclusive License.**--A nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if--

**(1)** the license was taken before execution of the transfer; or

**(2)** the license was taken in good faith before recordation of the transfer and without notice of it.

**CREDIT(S)**

(Pub.L. 94-553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2571; Pub.L. 100-568, § 5, Oct. 31, 1988, 102 Stat. 2857; Pub.L. 111-295, § 3(b), Dec. 9, 2010, 124 Stat. 3180.)

Notes of Decisions (28)

17 U.S.C.A. § 205, 17 USCA § 205
Current through P.L. 114-61 (excluding P.L. 114-52, 114-54, 114-59, and 114-60) approved 10-7-2015

**End of Document**                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 65

Massachusetts General Laws chapter 93A, § 11

§ 11. Persons engaged in business; actions for unfair trade practices; class actions; damages; injunction; costs

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

Such person, if he has not suffered any loss of money or property, may obtain such an injunction if it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property.

Any persons entitled to bring such action may, if the use or employment of the unfair method of competition or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective, practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such a manner as the court directs.

A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as hereinafter provided, with provision for tendering by the person against whom the claim is asserted of a written offer of settlement for single damages, also as hereinafter provided. No rights to equitable relief shall be created under this paragraph, nor shall a person asserting such claim be able to assert any claim on behalf of other similarly injured and situated persons as provided in the preceding paragraph. The provisions of sections ninety-five to one hundred and ten, inclusive, of chapter two hundred and thirty-one, where applicable, shall apply to a claim under this section, except that the provisions for remand, removal and transfer shall be controlled by the amount of single damages claimed hereunder.

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The respondent may tender with his answer in any such action a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

In any action brought under this section, in addition to the provisions of paragraph (b) of section two, the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act.

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

may decide that, although enforcement of a promise is not precluded on grounds of public policy, the promisee is not entitled to equitable relief such as specific performance. See § 365. Or it may avoid the problem of unenforceability by so interpreting the promise that no contravention of public policy is involved. See §§ 203(a), 207. That a promise that is unenforceable on grounds of public policy may nevertheless be consideration for a return promise, see § 78 and Comment *d* to § 75.

## REPORTER'S NOTE

This Topic combines former Topic 1, Definition of Illegal Bargains, with former Topic 9, Bargains Prohibited by Statute, and with those parts of former Topic 12, Effects of Illegality, that are not included in Topic 5, Restitution. This reorganization was made to unite in an introductory topic all of the general rules that deal with the unenforceability of promises on grounds of public policy. The next three topics deal with specific rules for particular subjects. The rules in this Topic reject the use of the term

"void" for the reasons given in Comment *a* to § 7. They reject the use of the term "voidable" because the parties are not subject to requirements, such as restitution, that are generally imposed for avoidance on such grounds as mistake, misrepresentation or duress. See § 384. On unenforceability generally, see 6A Corbin, Contracts §§ 1373–78, 1510–15, 1518–29, 1532–41 (1961 & Supp. 1980); 14 Williston, Contracts §§ 1628–32B (3d ed. 1972); 15 id. §§ 1748–73, 1779–83, 1786A–92.

## § 178.   When a Term Is Unenforceable on Grounds of Public Policy

**(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.**

**(2) In weighing the interest in the enforcement of a term, account is taken of**

**(a) the parties' justified expectations,**

**(b) any forfeiture that would result if enforcement were denied, and**

**(c) any special public interest in the enforcement of the particular term.**

**(3) In weighing a public policy against enforcement of a term, account is taken of**

    **(a) the strength of that policy as manifested by legislation or judicial decisions,**

    **(b) the likelihood that a refusal to enforce the term will further that policy,**

    **(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and**

    **(d) the directness of the connection between that misconduct and the term.**

**Comment:**

    *a. Legislation providing for unenforceability.* Occasionally, on grounds of public policy, legislation provides that specified kinds of promises or other terms are unenforceable. Whether such legislation is valid and applicable to the particular term in dispute is beyond the scope of this Restatement. Assuming that it is, the court is bound to carry out the legislative mandate with respect to the enforceability of the term. But with respect to such other matters as the enforceability of the rest of the agreement (§§ 183, 184) and the possibility of restitution (Topic 5), a court will be guided by the same rules that apply to other terms unenforceable on grounds of public policy (see Illustration 1), absent contrary provision in the legislation itself (see Illustration 3). The term "legislation" is used here in the broadest sense to include any fixed text enacted by a body with authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them. It also encompasses foreign laws to the extent that they are applicable under conflict of laws rules. See Restatement, Second, Conflict of Laws §§ 202, 203.

**Illustrations:**

    1. A promises to pay B $1,000 if the Buckets win their basketball game with the Hoops, and B promises to pay A $2,000 if the Hoops win. A state statute makes wagering a crime and provides that a promise such as A's or B's is "void." A's and B's promises are unenforceable on grounds of public policy. Any claims of A or B to restitution for money paid under the agreement are governed by the rules stated in Topic 5. See § 199(b) and Illustrations 4 and 5 to that section.

2. A and B make an agreement by which A agrees to sell and B to buy, at a fixed price per bushel, one thousand bushels of wheat from A at any time that A shall choose during the following month. The state statute that makes wagering a crime does not apply to such an agreement and it does not offend any judicially declared public policy. Enforcement of A's and B's promises is not precluded on grounds of public policy.

3. A borrows $10,000 from the B Bank, promising to repay it with interest at the rate of twelve per cent. A state statute that fixes the maximum legal rate of interest on such loans at ten per cent provides that a promise to pay a greater sum is "void" as usurious as to all the promised interest but not as to the principal. A's promise to pay the interest is unenforceable on grounds of public policy. The rule stated in § 184(2) does not make A's promise to pay interest enforceable up to ten per cent because the legislation provides otherwise. Compare Illustration 5 to § 184.

*b. Balancing of interests.* Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability. See § 179. In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms. The most common factors in the balancing process are set out in Subsections (2) and (3). Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term.

*c. Strength of policy.* The strength of the public policy involved is a critical factor in the balancing process. Even when the policy is one manifested by legislation, it may be too insubstantial to outweigh the interest in the enforcement of the term in question. See Illustrations 4 and 5. A court should be particularly alert to this possibility in the case of minor administrative regulations or local ordinances that may not be indicative of the general welfare. A disparity between a

relatively modest criminal sanction provided by the legislature and a much larger forfeiture that will result if enforcement of the promise is refused may suggest that the policy is not substantial enough to justify the refusal. See Illustration 4.

**Illustrations:**

4. A and B make an agreement for the sale of goods for $10,000, in which A promises to deliver the goods in his own truck at a designated time and place. A municipal parking ordinance makes unloading of a truck at that time and place an offense punishable by a fine of up to $50. A delivers the goods to B as provided. Because the public policy manifested by the ordinance is not sufficiently substantial to outweigh the interest in the enforcement of B's promise, enforcement of his promise is not precluded on grounds of public policy.

5. A promises to employ B and B promises to work for A, all work to be done on weekdays. The agreement is made on Sunday in violation of a statute that makes the doing of business on Sunday a misdemeanor. If the court decides that the public policy manifested by the statute is not sufficiently substantial to outweigh the interests in enforcement of A's and B's promises, it will hold that enforcement of their promises is not precluded on grounds of public policy.

*d. Connection with term.* The extent to which a refusal to enforce a promise or other term on grounds of public policy will further that policy depends not only on the strength of the policy but also on the relation of the term to that policy and to any misconduct involved. In most cases there is a promise that involves conduct offensive to the policy. The promise may be one to engage in such conduct. See Illustration 6. Or it may be one that tends to induce the other party to engage in such conduct. This tendency may result from the fact that the promise is made in return for the promisee's engaging in the conduct (see Illustration 7) or in return for the promisee's return promise to engage in the conduct (see Illustration 8). Or it may result from the fact that the duty to perform the promise is conditional on the promisee's engaging in the conduct (see Illustration 9). In such cases, it is the tendency itself that makes the promise unenforceable, even though the promise does not actually induce the conduct. There are other situations in which the conduct is not itself against public policy, but it is against public policy to promise to engage in such conduct or to attempt to induce it. It is sometimes objectionable to make a commitment to engage in conduct that is not in itself objectionable. This is

**§ 178**      CONTRACTS, SECOND      Ch. 8

the case, for example, for a promise to vote in a particular way. See Illustration 10. It is sometimes objectionable to attempt to induce conduct that is not in itself objectionable. This is the case, for example, for a promise made in consideration of the promisee's voting in a particular way. See Illustration 11. This list does not exhaust all of the possible relations between the conduct and the promise that may justify a decision that the promise is unenforceable. But as the relation between the conduct and the promise becomes tenuous, it becomes difficult to justify unenforceability unless serious misconduct is involved. A party will not be barred from enforcing a promise because of misconduct that is so remote or collateral that refusal to enforce the promise will not deter such conduct and enforcement will not amount to an inappropriate use of the judicial process. See Illustrations 15 and 16. However, a new promise to perform an earlier promise that was unenforceable on grounds of public policy is also unenforceable on those grounds unless the circumstances that made the first promise unenforceable no longer exist. The rules stated in §§ 183 and 184 involve special applications of these general principles concerning the relation between the conduct and the promise.

**Illustrations:**

6. A, the owner of a newspaper, promises B that he will publish a statement about C known by A and B to be false and defamatory if B pays him $10,000. B pays A $10,000. A's promise is one to commit a tort (§ 192) and is unenforceable on grounds of public policy.

7. B promises to pay A, the owner of a newspaper, $10,000 if he will publish a statement about C known by A and B to be false and defamatory. A publishes the libel. B's promise is one tending to induce A to commit a tort (§ 192) and is unenforceable on grounds of public policy.

8. A, the owner of a newspaper, promises B that he will publish a statement about C known by A and B to be false and defamatory if B will promise to pay him $10,000. B makes the promise. A's promise is one tending to induce A to commit a tort (§ 192). Both promises are unenforceable on grounds of public policy.

9. B promises to convey a tract of land worth $11,000 to A, the owner of a newspaper, if A pays B $1,000, B's duty to be conditional on A's publishing a statement about C known by A and B to be false and defamatory. A pays B $1,000 and publishes the libel. B's promise is one tending to induce A to commit a tort (§

192) and is unenforceable on grounds of public policy.   Compare § 185.

10.   A pays B, a competitor, $10,000 for B's promise not to compete with A for a year.   Although B's refraining from competition with A would not in itself be improper, B's promise not to compete with A unreasonably restrains B from competition (§ 186) and is unenforceable on grounds of public policy.

11.   A promises to pay B, a competitor, $10,000 if he will refrain from competing with A for a year.   Although B's refraining from competing with A would not in itself be improper, A's promise unreasonably tends to induce B to refrain from competition (§ 186) and is unenforceable on grounds of public policy.

12.   A induces B to make an agreement to buy goods on credit from A by bribing B's purchasing agent.   A delivers the goods to B.   A's bribe tends to induce the agent to violate his fiduciary duty.   B's promise to pay the price is unenforceable on grounds of public policy.   See § 193.

13.   A, who wants to induce B to buy goods from him, promises to pay C $1,000 if he will bribe B's purchasing agent to arrange the sale.   C does so.   C's bribe tends to induce the agent to violate his fiduciary duty.   A's promise is unenforceable on grounds of public policy.   See § 193.

14.   A, who wants to induce B to buy goods from him, promises to pay C $1,000 if he arranges the sale.   C arranges the sale by bribing B's purchasing agent.   C's bribe tends to induce the agent to violate his fiduciary duty.   A's promise is unenforceable on grounds of public policy.   See § 193.

15.   A and B make an agreement for exclusive dealing that is unenforceable because unreasonably in restraint of trade (§ 186).   A sells and delivers goods pursuant to the unenforceable agreement to C, who promises to pay the price.   Because the relation between C's promise to pay the price and the unreasonable restraint is too remote, enforcement of C's promise is not precluded on grounds of public policy.

16.   A and B make a wagering agreement in violation of a statute that makes such agreements "void."   When A loses, C pays B at A's request, and A promises C to pay him that amount.   Because the relation between A's promise to pay C and the improper wager is too remote, enforcement of A's promise is not precluded on grounds of public policy.

Add. 73

*e. Other factors.* A court will be reluctant to frustrate a party's legitimate expectations unless there is a corresponding benefit to be gained in deterring misconduct or avoiding an inappropriate use of the judicial process. See Illustration 17. The promisee's ignorance or inadvertence, even if it does not bring him within the rule stated in § 180, is one factor in determining the weight to be attached to his expectations. See Illustration 4 to § 181. To the extent, however, that he engaged in misconduct that was serious or deliberate, his claim to protection of his expectations fails. The interest in favor of enforcement becomes much stronger after the promisee has relied substantially on those expectations as by preparation or performance. The court will then take into account any enrichment of the promisor and any forfeiture by the promisee if he should lose his right to the agreed exchange after he has relied substantially on those expectations. See Comment *b* to § 227. The possibility of restitution may be significant in this connection. See Topic 5. In addition to the interest of the promisee, the court will also weigh any interest that the public or third parties may have in the enforcement of the term in question. Such an interest may be particularly evident where the policy involved is designed to protect third parties. See Illustrations 18 and 19.

**Illustrations:**

17. A agrees to reimburse B for any legal expenses incurred if B will go on C's land in order to test a right of way that is disputed by A and C. B goes on C's land. Enforcement of A's promise is not precluded on grounds of public policy, even if it is later determined that B has committed a trespass. Compare § 192.

18. A, a trustee under a will, makes an agreement with B in violation of A's fiduciary duty. If enforcement of A's and B's promises is desirable for the protection of the beneficiaries, it is not precluded on grounds of public policy. Compare § 193.

19. A, B, and C, directors of a bank, make notes payable to the bank in order to deceive the bank examiner. They agree that the notes shall be returned and cancelled after they have served their purpose. Enforcement of the promises of A, B and C embodied in the notes is not precluded on grounds of public policy.

*f. Effect on rest of agreement.* The rules stated in this Section determine only whether a particular promise or other term is unenforceable. The question of the effect of such a determination on the rest of the agreement is sometimes a complex one. If there is only one promise in the transaction and it is unenforceable, then the question

will not arise. (As to the divisibility of such a promise, however, see §§ 184, 185). This is the case for offers that have been accepted by a performance rather than by a promise (§ 53), for promises enforceable because of reliance by the promisee (§ 90), and for promises under seal (§ 95). Furthermore, even when there is another promise, it too is often unenforceable under the rules stated in this Section. This is the case, for example, where one party's promise is unenforceable because the promised conduct offends public policy and the other party's return promise is unenforceable because it tends to induce that conduct. See Illustration 8. There are, however, situations in which only one party's promise is unenforceable while the other party's return promise is enforceable, as is the case where the promisee of the return promise belongs to the class sought to be protected by the policy in question. See Illustrations 3, 4 and 5 to § 179 and Illustration 5 to § 181. (That an unenforceable promise may be consideration for a return promise, see § 78.) Finally, there are circumstances in which the unenforceability of one part of an agreement does not entail the unenforceability of the rest of the agreement, and these are dealt with in §§ 183 and 184. As to the effect of public policy on conditions, see § 185.

## REPORTER'S NOTE

This Section is based primarily on former §§ 580 and 598, but also incorporates aspects of former §§ 597, 600, 601 and 603. Those aspects of the rules stated in former §§ 597 and 600 that turned on terms of matters of pleading and proof have been discarded as unnecessarily formal and insufficiently supported by precedent. See the Introductory Note to this Topic. See generally, 6A Corbin, Contracts §§ 1373–78, 1510–19, 1525–35 (1962 & Supp. 1980); 14 Williston, Contracts §§ 1628–30 (3d ed. 1972); 15 id. §§ 1748–50A, 1752–74, 1779–83, 1786A–88, 1792; Gellhorn, Contracts and Public Policy, 35 Colum. L. Rev. 679 (1935); Strong, The Enforceability of Illegal Contracts, 12 Hastings L. Rev. 347 (1961); Note, 42 N.D. Law. 46 (1966); Note, 5 UCLA-Alaska L. Rev. 381 (1976).

*Comment a.* The broad sense in which the term "legislation" is used is comparable to that employed for the term "statute" in Model Penal Code § 1.13(1). For a discussion of the constitutionality of legislation affecting existing contracts, see Mazda Motors of America v. Southwestern Motors, 36 N.C. App. 1, 243 S.E.2d 793 (1978). Legislation directly affecting contract rights and powers has become widespread in franchising and dealership arrangements. See, e.g., Automobile Dealers Day in Court Act, 15 U.S.C. § 1221 (1976); North Carolina Motor Vehicle Dealers and Manufacturers Licensing Law, N.C. Gen. Stat. 20–285 (1975); Wisconsin Fair Dealership Law, Wis. Stat. § 135.01 (1961). Examples of cases applying such statutes to strike down contract terms are Boatland, Inc. v. Brunswick Corp., 558 F.2d 818 (6th Cir.

Add. 75

**§ 179. Bases of Public Policies Against Enforcement**

A public policy against the enforcement of promises or other terms may be derived by the court from

(a) legislation relevant to such a policy, or

(b) the need to protect some aspect of the public welfare, as is the case for the judicial policies against, for example,

(i) restraint of trade (§§ 186–188),

(ii) impairment of family relations (§§ 189–191), and

(iii) interference with other protected interests (§§ 192–196, 356).

**Comment:**

*a. Development of the judicial role.* Historically, the public policies against enforcement of terms were developed by judges themselves on the basis of their own perception of the need to protect some aspect of the public welfare. Some of these policies are now rooted in precedents accumulated over centuries. Important examples are the policies against restraint of trade, impairment of domestic relations, and interference with duties owed to individuals. These are singled out for mention in Paragraph (b) because they are dealt with in detail in Topics 2–4 of this Chapter. Society has, however, many other interests that are worthy of protection, and as society changes so do these interests. Courts remain alert to other and sometimes novel situations in which enforcement of a term may contravene those interests. See Illustration 1. At the same time, courts should not implement obsolete policies that have lost their vigor over the course of years. The rule of this Section is therefore an open-ended one that does not purport to exhaust the categories of recognized public policies.

**Illustration:**

1. A and B make a written agreement that contains a term providing that "no prior negotiations shall be used to interpret this agreement." Prior negotiations would otherwise be admissible to establish the meaning of the writing (§ 214(c)). If the court decides that the term would unreasonably deprive it of relevant evidence that would enable it to resolve an ambiguity in the agreement and thereby hamper it in the fair administration of justice, it

will hold that the term is unenforceable on grounds of public policy.

*b. Modern role of legislation.* The declaration of public policy has now become largely the province of legislators rather than judges. This is in part because legislators are supported by facilities for factual investigations and can be more responsive to the general public. When proscribing conduct, however, legislators seldom address themselves explicitly to the problems of contract law that may arise in connection with such conduct. See § 178(a). Usually they do not even have these problems in mind and say nothing as to the enforceability of terms. In such situations it is pointless to search for the "intention of the legislature," and the court's task is to determine on its own whether it should, by refusing to enforce the promise, add a sanction to those already provided by the legislature. This is a question of "law," in the conventional sense, rather than one of "fact." The legislation is significant, not as controlling the disposition of the case, but as enlightening the court concerning some specific policy to which it is relevant. A court will examine the particular statute in the light of the whole legislative scheme in the jurisdiction to see, for example, if similar statutes in the same area contain explicit provisions making comparable promises unenforceable. It will look to the purpose and history of the statute. The fact that the statute explicitly prohibits the making of a promise or the engaging in the promised conduct may be persuasive in showing a policy against enforcement of a promise but it is not necessarily conclusive. On the other hand, the fact that the statute provides a civil sanction, whether in addition to a criminal penalty or not, may suggest that no other civil sanction such as unenforceability is intended, but this is not necessarily conclusive either. See Illustration 2. Furthermore, even though a field is the subject of legislation, a court may decide that the legislature has not entirely occupied the field and may refuse to enforce a term on grounds of a judicially developed public policy even though there is no contravention of the legislation. The term "legislation" is used here in the same broad sense as in the preceding section. See Comment *a* to § 178. Although no attempt is made in this Restatement to state rules to deal with any of the myriad of specific pieces of legislation that may be involved in such controversies, § 181 deals with the important cases involving licensing requirements.

**Illustration:**

  2. A induces B to make an agreement to buy goods on credit from A by bribing B's purchasing agent. A delivers the goods to

B. A state statu[te]
action to recover
the statute alrea[dy]
cide that B's pro[…]
of public policy.

*c. When refus[al…]* stances, refusal to e[…] public policy. This [is] acted to protect a c[lass] transactions of the k[ind] against the enforce[ment] class.

**Illustrations:**

  3. A, a co[…] city. C, an offi[…] statute prohibi[…] those who make[…] ment is defect[…] class of person[…] belongs, enforc[…] of public policy[…] contract.

  4. A, an [...] to B on his hou[se] statute prescri[…] by fire. Since [...] sons to which [...] forcement of [...] policy and B [...]

  5. A em[ployer…] him double for [...] the usual eight[-hour] workers in su[ch...] ment of eight[...] employer and [...] to pay him ex[…] statute was e[…] longs against [...] forcement of [...] policy.

B. A state statute makes such bribery a crime and gives B a civil action to recover the amount of the bribe against A. Although the statute already provides for a civil sanction, a court may decide that B's promise to pay the price is unenforceable on grounds of public policy. Cf. Illustration 12 to § 178.

*c. When refusal to enforce may frustrate policy.* In some instances, refusal to enforce a term may frustrate rather than further public policy. This is likely to be the case where legislation was enacted to protect a class of persons to which the promisee belongs in transactions of the kind involved. In such instances, there is no policy against the enforcement of the promise by one who belongs to that class.

**Illustrations:**

3. A, a corporation, makes an agreement to do work for B, a city. C, an official of B, is also a principal shareholder of A, and a statute prohibits the making of such agreements and subjects those who make them to penalties. A's performance of the agreement is defective. Since the statute was enacted to protect a class of persons to which B belongs against a class to which A belongs, enforcement of A's promise is not precluded on grounds of public policy and B can recover damages from A for breach of contract.

4. A, an insurance company, issues a policy of fire insurance to B on his house. The policy differs from that required by a state statute prescribing a standard fire policy. B's house is destroyed by fire. Since the statute was enacted to protect a class of persons to which B belongs against a class to which A belongs, enforcement of A's promise is not precluded on grounds of public policy and B can recover the insurance proceeds from A.

5. A employs B to work in his factory and promises to pay him double for the overtime if B works ten hours a day instead of the usual eight. A state statute, designed to protect the health of workers in such factories, provides a maximum period of employment of eight hours a day and makes violation a crime for both employer and employee. B works ten hours a day but A refuses to pay him extra for the overtime. A court may decide that the statute was enacted to protect a class of persons to which B belongs against a class to which A belongs and that therefore enforcement of A's promise is not precluded on grounds of public policy.

Add. 78

6. A, a bank, invests in a real estate mortgage. A statute prohibits it from making such investments and subjects it to penalties for doing so. Since otherwise the creditors and shareholders of the bank, for whose protection the statute was enacted, would be injured, enforcement of the mortgage debt is not precluded on grounds of public policy and the bank may recover on the debt and foreclose the mortgage.

*d. Change of circumstances.* Whether a promise is unenforceable on grounds of public policy is determined as of the time that the promise is made and is not ordinarily affected by a subsequent change of circumstances, whether of fact or law. If, however, both parties were excusably ignorant of facts or of legislation of a minor character that made it unenforceable, a change as to these may make the promise enforceable. Compare § 180.

## REPORTER'S NOTE

This Section is based on former §§ 512 and 580. See 6A Corbin, Contracts §§ 1373–78 (1962 & Supp. 1980); 14 Williston, Contracts §§ 1628–30 (3d ed. 1972).

*Comment a.* For cases in which courts discarded public policies as obsolete, see Marvin v. Marvin, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106 (1976); Davis v. Boston Mut. Life Ins. Co., 370 Mass. 602, 351 N.E.2d 207 (1976). Illustration 1 is based on Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485, 189 A.2d 448 (1963).

*Comment b.* For an elaborate analysis of legislative purpose, see Homestead Supplies v. Executive Life Ins. Co., 81 Cal. App.3d 978, 147 Cal. Rptr. 22 (1978). That the fact that similar statutes say "void" or "unenforceable" may be relevant, see Murphy v. Mallos, 59 A.2d 514 (D.C. Ct. App. 1948); Shepard v. Finance Assoc., 366 Mass. 182, 316 N.E.2d 597 (1974). Illustration 2 is based on United States v. Acme Process Equip. Co., 385 U.S. 138 (1966). In Marriage of Dawley, 17 Cal.3d 342,

131 Cal. Rptr. 3, 551 P.2d 323 (1976), the court considered statutes, case law and changing social patterns in determining the public policy relating to antenuptial agreements.

*Comment c.* Illustration 3 is based on Illustration 2 to former § 601. Illustration 4 is based on Illustration 5 to former § 601. Illustration 5 is based on Gates v. Rivers Constr. Co., 515 P.2d 1020 (Alaska 1973), and on criticism of Short v. Bullion-Beck and Champion Mining Co., 20 Utah 20, 57 P. 720 (1899), in Gellhorn, Contracts and Public Policy, 35 Colum. L. Rev. 679, 688 (1935), and Furmston, The Analysis of Illegal Contracts, 16 U. Toronto L.J. 267, 280 (1966). See also Nizamuddowlah v. Bengal Cabaret, 92 Misc.2d 220, 399 N.Y.S.2d 854 (1977) (illegal alien). But cf. Illustration 3 to former § 580. Illustration 6 is based on Illustration 1 to former § 601.

*Comment d.* This Comment is based on former § 609. In Mazda Motors of America v. Southwestern Motors, 36 N.C. App. 1, 243 S.E.2d 793 (1978), the court applied a regula-

## TOPIC 4. INTERFERENCE WITH OTHER PROTECTED INTERESTS

**Introductory Note:** Just as parties are generally free by agreement to impose new duties on each other, they are generally free by agreement to modify existing duties that they owe each other as a matter of law. One party can ordinarily, for example, contract out of his duty to exercise reasonable care with respect to the other party and thereby exonerate himself of liability to him for negligence (§ 195(2)). There are, however, important limitations imposed on grounds of public policy on the parties' power to interfere with such duties. He cannot, for example, exonerate himself of tort liability for harm caused intentionally or recklessly (§ 195(1)). Other significant limitations relate to a party's duty to refrain from conduct that is tortious (§ 192), including violation of a fiduciary duty (§ 193) or interference with a contract (§ 194). These and related rules are collected in this Topic. They are not intended to be exhaustive. In many instances legislation, such as the Uniform Commercial Code and consumer protection statutes, prohibits derogation from the rights it creates. See also § 356 on liquidated damages and penalties.

### REPORTER'S NOTE

This Topic is based largely on former Topic 8, Bargains Tending to Defraud or Injure Third Persons. It also includes material on violation of a fiduciary duty, based on §§ 569 and 570 of former Topic 7, Bargains in Violation of Public or Fiduciary Duty. The part of former Topic 7 that dealt with violation of a public duty has been omitted because that subject is largely covered by legislation. See 6A Corbin, Contracts §§ 1454–73 (1962 & Supp. 1980); 15 Williston, Contracts §§ 1737–39 (3d ed. 1972).

## § 192. Promise Involving Commission of a Tort

**A promise to commit a tort or to induce the commission of a tort is unenforceable on grounds of public policy.**

**Comment:**

*a. Scope.* A promise to commit a tort is plainly unenforceable on grounds of public policy. See Illustration 6 and 8 to § 178. So is a promise made in return for the commission of a tort or a promise to commit a tort. See Illustrations 7, 8 and 9 to § 178. The same is true if the act is a tortious interference with a third person's interest in

**ER**

ree by agree-
rally free by
h other as a
ntract out of
other party
egligence (§
imposed on
re with such
t liability for
r significant
duct that is
93) or inter-
are collected
In many in-
de and con-
he rights it
lties.

n of a public
because that
ed by legisla-
Contracts §§
980); 15 Wil-
7–39 (3d ed.

**mmis-**
**public**

enforceable
78. So is a
promise to
ame is true
interest in

property. The rule does not, however, apply to an agreement made in good faith merely to test another's claim to property. See Illustration 17 to § 178. It is also subject to the rule on excusable ignorance stated in § 180. See Illustration 2 to § 180. This Section does not purport to be exhaustive and there are other types of conduct, involving neither the commission of a tort nor the interference with property, that so jeopardize an individual's life or freedom as to render promises involving them unenforceable on grounds of public policy. See Restatement, Second, Torts §§ 892–92D.

**Illustrations:**

1. A and B make an agreement under which A promises to bring an action against a corporation, and have its assets seized, although there is no reasonable ground to believe that there is a cause of action, for the sole purpose of lowering the price of its stock so that B can buy it at an advantageous price. A's promise is to commit a tort and is unenforceable on grounds of public policy.

2. A makes an agreement with B under which A promises that he will excavate a city street without permission from the city. A's promise is to interfere tortiously with an interest in property of the city and is unenforceable on grounds of public policy.

*b. Promise to indemnify.* A promise to indemnify another against the consequences of his committing a tort is unobjectionable if the tortious act is only an undesired possibility and the promise does not tend to induce its commission. See Illustrations 3 and 4. In some circumstances, however, the promise may tend to induce the commission of the act. Where this is so, it is unenforceable for the same reason as is a promise to commit a tort or a promise in return for the commission of a tort. See Illustration 5.

**Illustrations:**

3. A, an insurance company, in consideration of a premium paid by B, promises to indemnify B against liability for injury to the persons or property of others whether caused by B's negligence or not. Enforcement of A's promise is not precluded on grounds of public policy.

4. A, a publisher, and B, an author, make an agreement for the publication of a book that B is about to write. Although it is neither expected nor desired that the book will contain false and defamatory matter, A is concerned about that possibility and re-

Add. 81

quires a bond on which C, a surety company, promises to indemnify A for any liability that A may incur for such matter in the book.  Enforcement of C's promise is not precluded on grounds of public policy.

5.  A, the owner of a newspaper, promises B that he will publish a statement about C known to be false and defamatory if B pays him $10,000 and furnishes a bond with B as principal and D as surety to indemnify A against liability for publishing the statement.  B's and D's promises on the bond tend to induce the commission of a tort and are unenforceable on grounds of public policy.  That A's promise is one to commit a tort and is unenforceable on grounds of public policy, see Illustration 6 to § 178.

### REPORTER'S NOTE

This Section is based on former §§ 571 and 572.  See also former §§ 555, 556, 577, 591.  See 6A Corbin, Contracts §§ 1455, 1458–60, 1471, 1473 (1962 & Supp. 1980); 15 Williston, Contracts §§ 1738–39, 1749–50 (3d ed. 1972).

*Comment a.*   Illustration 1 is based on Illustration 2 to former § 556; Jewett Publishing Co. v. Butler,

159 Mass. 517, 34 N.E. 1087 (1893).  Illustration 2 is based on Illustration 3 to former § 571.  See also Frederick v. Frederick, 44 Ill. App.3d 578, 3 Ill. Dec. 231, 358 N.E.2d 398 (1976).

*Comment b.*   This Comment is based on former § 572.  Illustrations 3, 4 and 5 are based on Illustrations 3, 2 and 4 to former § 572.

## § 193.   Promise Inducing Violation of Fiduciary Duty

**A promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy.**

### Comment:

*a.  Scope.*   A fiduciary is expected to refrain from acting for his private advantage or otherwise contrary to the interests of his beneficiary or principal in matters affecting the fiduciary relation, and he is liable in tort for breach of his duty.  Restatement, Second, Torts § 874, cf. Restatement, Second, Agency § 312.  A promise by a fiduciary to violate his duty as a fiduciary is unenforceable on grounds of public policy, as is a promise that tends to induce such a violation.  In an exceptional case, however, a court may conclude that the interests of third parties require enforcement.  See Illustration 18 to § 178.  Directors and other officials of a corporation act in a fiduciary capacity and are subject to the rule stated in this Section.  The rule applies by

940 CMR:   OFFICE OF THE ATTORNEY GENERAL

940 CMR 6.00:        RETAIL ADVERTISING

Section

6.01:  Definitions
6.02:  Scope
6.03:  Basic Principles
6.04:  General Requirements
6.05:  Price Comparison and Savings Claims
6.06:  Availability of Advertised Products
6.07:  Disclosure of Expiration Dates
6.08:  Prizes
6.09:  Availability of Financing
6.10:  Compliance with Truth-in-lending Requirements
6.11:  Lease and Rent-to-own Transactions
6.12:  Limitations on Implied Warranties Prohibited
6.13:  Corrections
6.14:  Record Keeping Requirements
6.15:  Severability

6.01:   Definitions

Advertisement (including the terms advertise and advertising) means any oral, written, graphic, or pictorial representation made by a seller in the course of the solicitation of retail business or which encourages a person to purchase a retail product. Advertisement includes a: representation made in a newspaper, magazine, on or *via* the Internet or other publication or on radio or television or contained in any notice, handbill, sign, billboard, banner, poster, display, circular, pamphlet, catalog, or letter, or printed on or contained in any tag or label which is attached to or accompanies any product offered for sale.   Advertisement includes any representation disseminated within Massachusetts if the advertisement is directed to consumers in Massachusetts, or accessible to Massachusetts consumers on or *via* the Internet.

Clear and Conspicuous (including the terms clearly and conspicuously) means that the material representation being disclosed is of such size, color, contrast or audibility and is so presented as to be readily noticed and understood by a reasonable person to whom it is being disclosed. Without limiting the requirements of the preceding sentence:
(a)  A material representation in a printed, written, typed or graphic advertisement, except a representation in a catalog or in a finance, lease or rent-to-own advertisement covered by the requirements of 940 CMR 6.01:  Clear and Conspicuous(e), is not clear and conspicuous unless such material representation either:
    1.  appears in type which is a minimum of eight point type; or
    2.  in the case of a material representation modifying eight point type copy, appears in type which is bold and a minimum of six point type; or
    3.  in the case of a material representation modifying eight point bold type, appears in type which is contrasting and a minimum of six point type.
(b)  In addition to the mandatory minimum type size requirements for clear and conspicuous disclosures in printed advertisements set forth in 940 CMR 6.01:  Clear and Conspicuous(a) and (e), the following non-mandatory guidelines will be considered in determining if such disclosures are clear and conspicuous:
    1.  whether the disclosure is in close proximity to the information which it modifies and is not obscured by any information which it does not modify;
    2.  whether the leading and spacing of the typeface or font used in the disclosure is of such size and appearance as to be readily noticed and legible;
    3.   whether the disclosure is printed in letters which noticeably contrast with the background against which it appears;
    4.   when an asterisk or similar symbol is used to denote that a disclosure appears elsewhere in the advertisement, whether every asterisk in the advertisement appears as prominent as the disclos ure it accompanies, whether the asterisk adjacent to the disclosure is of the same size and appearance as the original asterisk;

Add.83

940 CMR: OFFICE OF THE ATTORNEY GENERAL

6.01: continued

5. where a disclosure applies to an entire advertisement which consists of more than one page or to a significant number of identified products in the advertisement, that the disclosure appears on each page of the advertisement or in an area, or by reference to another page, in the advertisement, if the disclosure or reference, respectively, is readily noticeable by a reasonable person;

6. where the disclosures are made with respect to a particular product or service in an advertisement on the Internet, that all of the material terms of the disclosures must be prominently referenced by the seller and be accessible by the consumer before a purchase transaction can be completed.

(c) A disclosure is not clear and conspicuous if any material terms of the offer that affect the price of an item, impose conditions on acceptance of the offer, or affect the scope of eligibility for the promotion, prize or program, are not disclosed in the advertisement itself, but require reference to an outside source, including but not limited to those offers that specify: see store for details, see web site for details, call this number for additional details.

(d) A material representation in a radio advertisement, in the audio portion of a television advertisement, or broadcast in any other audio medium is not clear and conspicuous unless:

1. It is at an audible decibel level;

2. It is at a speed equal to or less than any other representation contained in the advertisement; and

3. No other words are used and no sounds are used which have the effect of obscuring or distracting attention from the material representation, or disparaging its meaning or importance.

(e) A material representation, other than a material representation covered by the requirements of 940 CMR 6.09, 6.10 or 6.11, in the video portion of a television advertisement or appearing in any video medium, including videos accessible on or *via* the Internet, is not clear and conspicuous unless:

1. It contains letters of a color or shade that noticeably contrast with the background, and the background does not consist of colors and/or images which obscure or detract attention from the material representation or are disparaging to its meaning or importance; and

2. It appears on the screen for a time period reasonably sufficient for a viewer to read, given the length of the disclosure, but in any event, for at least three seconds.

(f) An advertisement containing a representation subject to the requirements of 940 CMR 6.09, 6.10 or 6.11 is not clear and conspicuous unless:

1. for a printed, written, typed or graphic advertisement, such material representation appears in type which is at least one-third the size of the largest type of information which it modifies;

2. for the video portion of a television advertisement, such material representation:

a. contains letters of a color or shade that noticeably contrast with the background, and the background does not consist of colors and/or images which obscure or detract attention from the material representation or are disparaging to its meaning or importance; and

b. appears on the screen for a duration equal to at least one second for every three words of the material representation but in any event, not less than a total of five seconds.

3. for a radio advertisement or the audio portion of a television advertisement, such material representation complies with the requirements of 940 CMR 6.01: Clear and Conspicuous(c).

(g) It shall be an unfair or deceptive act or practice for a seller to use a disclosure set apart from the primary claim to which it refers, such as by use of an asterisked footnote, if such disclosure imparts a meaning that contradicts or materially alters the meaning of the term, statement or claim to which it refers.

Comparative Price means the price or value of a product to which a seller is comparing his or her current price in any advertisement.

Disseminate means to publish, broadcast, deliver, circulate, mail, display, post, make available for access on or *via* the Internet, or otherwise distribute to a consumer.

Add.84

940 CMR: OFFICE OF THE ATTORNEY GENERAL

6.01: continued

Dissemination Date means the earlier of:
(a) the first date an advertisement is disseminated; or
(b) the first date an advertisement takes effect.

Hard Goods mean any electrical, mechanical or thermal item produced or distributed for sale to a consumer for use in or around a permanent or temporary household or residence or as a part for or an accessory to a motor vehicle and shall include, but not be limited to, air conditioners, audio-video equipment, computers, dehumidifiers, dishwashers, dryers, electric blankets, electronic or mechanical games or toys, fans, freezers, humidifiers, motorized kitchen aids, ovens, radios, ranges, refrigerators, sports, recreational, hobby and exercise equipment, stereophonic equipment, televisions, and washers.

Material Representation means any oral, written, graphic or pictorial claim or statement, the disclosure of which has the tendency or capacity to influence the decision of reasonable buyers or reasonable prospective buyers whether to purchase the product.

Measurement Date means the Dissemination Date or the Submission Date, as determined by 940 CMR 6.04(3).

Person means an association, a corporation, an individual, an institution, an organization, a partnership, a trust or any other legal entity.

Price Comparison means the comparison in any advertisement (whether or not expressed wholly or in part in dollars, cents, fractions, or percentages) of a seller's current price for a product with any other price or representation of value, whether or not such other price is actually stated in the advertisement. Price comparison includes any price reduction claim or savings claim which a seller makes with respect to the seller's current price for any product.

Product means any and all goods, whether tangible or intangible, real, personal or mixed and any and all services or franchise or distribution systems of any nature which are used for personal, family or household purposes.

Representation means any oral, written, graphic or pictorial claim or statement.

Seller means any person who offers any product for sale, rental or lease. Seller includes any authorized representative of a seller; however seller shall exclude an individual not engaged in trade or commerce under M.G.L. c. 93A, who places a classified advertisement in a newspaper, magazine, on or *via* the Internet, or other publication.

Submission Date means the most recent of:
(a) the date an advertisement is submitted for publication or dissemination; or
(b) the last date upon which changes can be made to the advertisement prior to publication or dissemination.

Trade Area means the geographic area where the seller's outlets are located and where the seller's advertisements are disseminated. A trade area may include a sales location in a state other than Massachusetts only if it is reasonably foreseeable that Massachusetts buyers would regularly purchase at such out-of-state locations; however, a seller may compare its price for a product or a class of products to the price(s) offered by a competitor outside of Massachusetts for the same or similar products as long as the competitor is identified by location and name or by reputation in the advertisement, and the comparison complies with the provisions of 940 CMR 6.05(8) or (9).

6.02: Scope

940 CMR 6.00 shall apply to any advertisement, except those advertisements governed by 940 CMR 5.00: *Motor Vehicle Regulations*, 940 CMR 6.00 shall be in addition to 940 CMR 3.00: *General Regulations*.

Add. 85

940 CMR: OFFICE OF THE ATTORNEY GENERAL

<u>6.03: Basic Principles</u>

(1)   The responsibility for truthful and nondeceptive advertising rests with the seller. Sellers must be able to substantiate material representations made before such representations are disseminated. Sellers must maintain sufficient records pursuant to 940 CMR 6.14 to substantiate the representations made in their advertisements in order that such substantiation can be made available to the Attorney General upon request. The fact that the representations were made in information furnished to the seller by the manufacturer or distributor of a product shall be deemed sufficient substantiation for purposes of 940 CMR 6.03(1) if the seller repeated the representation in good faith reliance on that information.

(2)   Sellers shall not use advertisements which are untrue, misleading, deceptive, fraudulent, falsely disparaging of competitors, or insincere offers to sell.

(3)   An advertisement as a whole may be unfair or deceptive although each representation separately construed is literally true.

(4)   An unfair or deceptive representation may result not only from direct representations and the reasonable inferences they create, but from the seller's omitting or obscuring a material fact.

<u>6.04: General Requirements</u>

(1)   <u>Misleading Representations</u>. It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based.

(2)   <u>Disclosure of Material Representations</u>. It is an unfair or deceptive act for a seller to fail to clearly and conspicuously disclose in any advertisement any material representation, the omission of which would have the tendency or capacity to mislead reasonable buyers or prospective buyers. For purposes of 940 CMR 6.00, material representations which must be clearly and conspicuously disclosed shall include but are not limited to the following:

(a)   The fact that a mandatory fee in addition to the advertised price will be charged for any service such as delivery, handling, installation, or an initiation fee;

(b)   The amount of any handling, service or other additional fee for an admission ticket to an entertainment event charged to any purchaser who purchases such ticket through a ticket service or similar entity other than the box office for the facility holding such event when the advertisement refers to the price of such ticket;

(c)   The fact that the product advertised is available for the advertised price only after the purchaser receives a rebate from the manufacturer of the product. If the advertised price includes a rebate, and either the rebate is in a form other than cash or check, then the seller must disclose the form of the rebate clearly and conspicuously in immediate proximity to the reference to the rebate and the advertised price; and if the rebate is available only after certain conditions or limitations are satisfied, then the seller must disclose all terms, conditions and limitations of the rebate, either at the point it is promoted, or otherwise by asterisked disclosure as described in 940 CMR 6.01: Clear and Conspicuous(b)4.;

(d)   The fact that the product advertised is used, rebuilt, remanufactured, reconditioned, imperfect, irregular or a second, unless the context of the advertisement readily so indicates, such as an advertisement for sales of used or consigned goods;

(e)   In the case of hard goods, the fact that a hard good advertised has been discontinued by the manufacturer, if the seller knows:

1.   that there is a significant risk that the product will not have replacement parts and supplies essential to the operation of the product available during its average useful life or for three years after purchase, whichever is less; or

2.   that the product has been discontinued and either:

a.   is the subject of a notice from the manufacturer that the manufacturer will voluntarily add a safety improvement to the product; or

Add. 86

940 CMR: OFFICE OF THE ATTORNEY GENERAL

6.04: continued

b. lacks safety improvements that the manufacturer either has agreed to make or has been required to make by a regulatory agency; provided, however, that no product subject to a recall pursuant to the Consumer Product Safety Improvement Act of 2008 or the Federal Hazardous Substances Act may be sold or distributed within the Commonwealth after a recall notice has issued and the seller has had a reasonable opportunity to comply, not to exceed three calendar days.

(f) In the case of hard goods individually identified for sale in any advertisement, the manufacturer's name or trade name, the seller's proprietary trademark, or if a seller is prohibited by law or by contract from using the manufacturer's name or trade name in an advertisement, the phrase famous brand names or any similar phrase, and the model number of any hard goods, unless it is the only model of the hard good currently being sold in the trade area or the item is not customarily identified and distinguished by its model number, or it is being offered for sale at a price under $50.

(g) The fact that the product advertised at a stated price does not include parts, accessories or equipment customarily included and necessary or usual to the proper functioning, appearance, or use of such product.

(h) With respect to tags, labels and in-store signs:
1. a tag need only contain material representations regarding the price of an item;
2. a label need only contain material representations regarding the quality of an item;
3. an in-store sign need only contain material representations regarding the price or quality of an item.

(3) Time Periods. The validity of any material representation covered by 940 CMR 6.00 shall be determined, and all time periods set forth in 940 CMR 6.00 shall be measured, as of the dissemination date of the advertisement. However, a seller may base a material representation on the submission date of the advertisement provided that the seller has a good faith basis, founded on its own past and present selling practice or that of other sellers in its trade area, for believing that the material representation made in the advertisement will be true as of the dissemination date of the advertisement and during the effective period of the advertisement.

6.05: Price Comparison and Savings Claims

(1) Declaration of Policy. Price comparison advertising is a form of advertising used in the sale of products whereby current prices are compared with the seller's former or future prices, the prices of other sellers, or other stated values to demonstrate price reductions or cost savings. While price comparisons which accurately reflect market values in the trade area provide consumers with useful information in making buying decisions, price comparisons based on false, arbitrary or inflated prices or values deceive or mislead the public. Abuse also occurs when sellers fail to disclose material information which is important to enable consumers to understand the price comparison.

It is the intent of 940 CMR 6.00 to ensure that the comparative price used in any price comparison advertisement provides accurate information and meaningful guidance to the consumer, and to this end 940 CMR 6.05(1) through (17) are to be liberally construed.

(2) Unidentified Price Comparisons.
(a) It is an unfair or deceptive act for a seller to state or imply that it is offering any savings as to any product by making a direct or indirect price comparison, unless the seller clearly and conspicuously describes the basis for the price comparison. Notwithstanding the foregoing, a seller may claim a savings or compare a higher and a lower price without disclosing the basis for the comparison if the seller is comparing to its own former price. In such a case, the provisions of 940 CMR 6.05(3) will be applied for the purpose of determining the seller's former price.
(b) Terms such as formerly, regularly, originally, or terms of similar meaning shall mean the seller's own former price, as determined in accordance with 940 CMR 6.05(3). Advertisements containing such language shall be construed under such 940 CMR 6.05(3).